A Six Month Evaluation of the Huntington Drug Market Initiative (DMI) Strategy in the Fairfield West
Neighborhood in Huntington, West Virginia

November 1, 2010 – April 30, 2011

Prepared by

Scott Lemley

Criminal Intelligence Analyst

June 10, 2011

This project was supported by WV State Grant No. 10-JAG-25.

CONFIDENTIAL

HUNT_00029060

DEF-WV-00916.00001


DEF-WV-00916

**Executive Summary**

As a drug and violent crime prevention strategy, DMI has been extremely successful in the City of Huntington. Drug offenses have been cut in half, and violent offenses have been decreased by at least 80% in the DMI target area. Drug crimes in the DMI target area now represent less than 10% of all drug crimes in the City of Huntington, which is considered a key success in other cities that have implemented the DMI strategy. The fear that criminal activity would be displaced to surrounding areas instead of eliminated has generally been unfounded, as there has been no increase in offenses in the areas surrounding the target area when looking at the last six months as a whole. In April and May, 2011 there has been some hints of possible displacement to Fairfield East, and those are being addressed by Chief Holbrook before it becomes a problem. The drug activity left in the DMI area appears to be centered on the Sunoco gas station, thus this should be considered the new focal point to reduce drug activity further. As expected, property crimes were not affected by the DMI strategy, and have remained below average over the past six months. Crime overall has decreased in the target area by around 40% which generally shows a quality of life improvement for the residents living in Fairfield West. All four Call-In candidates that accepted the deal are still involved with the program, and have had varying degrees of success. None have reoffended over the past six months.

**Overview of the Strategy**

DMI is a strategic problem-solving initiative aimed at permanently closing down open-air drug markets. The strategy targets individual geographic drug markets using focused deterrence with transformational elements. The most violent offenders are targeted and prosecuted as examples. The strategy then targets low-level offenders and stages an intervention with families and community leaders. Law enforcement mobilizes community residents, leaders, and family

CONFIDENTIAL

HUNT_00029061

DEF-WV-00916.00002

members of low-level drug dealers to voice their intolerance for this criminal behavior and to create opportunity and support for the offenders.  Offenders are given the option to straighten up or face lengthy prison sentences and are provided assistance in locating employment, housing, transportation, health care, and access to other social services.

It was decided that the City of Huntington was going to implement this strategy in early 2010.  The target area in Huntington was going to be a four block by two block section of the Fairfield West neighborhood.   This area has been known to local law enforcement as a hot spot for drug activity and an open air drug market.  Verification that the Fairfield West neighborhood was an area with a high number of drug and violent offenses was substantiated in the *DMI Initial Findings* report.  After an extensive undercover drug investigation ten individuals were prosecuted on federal charges and fifteen people were prosecuted under state charges.  Six candidates were chosen by the Huntington Police department and the community to take part in the "Call-In" element of the strategy.  The Call-In element is when the community gets the opportunity to voice its opposition to the criminal behavior that the individuals are engaged in. Of the six that were invited, five chose to attend the Call-In which occurred on October 21, 2010. Shortly after the Call-In one of the individuals chose not to be involved with the program.  The other four individuals have worked with the Resource Coordinator, Maurice Kitchens, on stopping their drug activity, finding employment or educational opportunities, and learning life skills.

**The City of Huntington: A Contextual and Historic View**

The City of Huntington is home to around 49,000 residents according to U.S. Census records.  In geographic size the city is about 18 square miles with a population density of around 3,000 residents per square miles.  The City of Huntington is located in Cabell County in the state

CONFIDENTIAL

DEF-WV-00916.00003

HUNT_00029062

of West Virginia.  Demographically, Huntington is 89.61% White, 7.49% Black, 0.20% Native American, 0.82% Asian, 0.05% Pacific Islander, and 1.83% Other.  The newest numbers available list the Median household income in Huntington at $23,234, with 24.7% of residence living below the poverty line.  Huntington lies near the intersection of where Ohio, Kentucky and West Virginia meet.

Huntington is the second most populous city in the state behind Charleston, the capitol of West Virginia. Huntington is the home to Marshall University, a Division I school, with an enrolment of around 15,000 students.  Due to this, Huntington has become a relatively cosmopolitan city with a wide range of activities and events for different kinds of individuals. Huntington has also developed into a regional medical center over the last decade with two state-of-the-art hospitals, St. Mary's Medical Center and Cabell-Huntington Hospital.  Marshall University Medical School (Joan C Edwards School of Medicine) is also located in Huntington.

The City of Huntington's population peaked at 87,000 during the 1950s, fueled by high paying manufacturing jobs.  During the 1980s many of the manufacturing plants that once supported the areas' economy began to downsize and close.  By 2000 most of the high paying manufacturing plants that once provided a strong tax base for the city were gone.  The loss of these high paying jobs pushed the median income to $18,760, below the national medium household income level.  The population of the city which also supports the tax base has steadily declined to under 50,000.

The loss in revenue resulted in a cutback of essential services until 2002 when the police department was reduced by one quarter and the drug unit and Housing Inspection division were eliminated.  The loss of police protection and elimination of the drug unit left the city in a

CONFIDENTIAL

HUNT_00029063

DEF-WV-00916.00004

vulnerable condition.  This was soon discovered by drug dealers from large Midwestern cities such as Detroit and Columbus. The tipping point for the city occurred on May 22, 2005 when four teenagers were gunned down near 1410 Charleston Ave.  From this point forward the City of Huntington could no longer ignore that there was a drug and violent crime problem in the city.

The first step taken was acquiring a Weed and Seed designation for Huntington in 2008.  Year one of the program showed great success.  Drug offenses decreased 29% and violent offenses decreased 25% in the Weed and Seed designated area.  Vacant building were boarded up or demolished, while new houses were being built.  Year two saw further improvements as drug and violent offenses continued to decrease and perceptions of the community began to change as residents began to feel safer.  Despite this there was a small section at the center of the Weed and Seed area which still had a large number of drug and violent crimes.  It was also an open air drug market, where people from the surrounding tri-state areas came to if they wanted to buy drugs.



The Weed and Seed area is outlined in black

Page | [ PAGE  \* MERGEFORMAT ]

HUNT_00029064

DEF-WV-00916.00005

After reading a published study detailing the DMI strategy in High Point, North Carolina, Chief Holbrook recognized many similarities with the problems the City of Huntington was facing. After visiting High Point with police, prosecutors, and community members it was decided that they wanted to try the strategy in Huntington.

**The High Point Model**

The High Point model is a nine step process used to decrease drug and violent crimes in a target area. Some cities that had previously tried the strategy have condensed it down to a four step process, but those four steps have the same elements as the nine step process. It must also be mentioned that implementing the step is a fluid process where you might still be doing a previous step while starting the next.

Step one and two are Crime Mapping and the Survey. These two steps are used to identify where the drug and violent crime problem is and who is responsible for the activity. Mapping things such as crime offenses and 911 calls for assistance can narrow the area to where you have the most problems. A survey of community members, police officers, and other individuals can give you a beginning list of whom the drug dealers are and where they live.

In Huntington much of the groundwork had already been done with the Weed and Seed Initiative, thus those involved with investigating this already had a good idea of where the problem was located. The look of the Fairfield West neighborhood also differed as the open air drug market dominated this section of the city. This was another indicator of where the problem was centered. The *DMI Initial Findings* report, published later in the process, put the situation in quantifiable terms and gave verification to all involved of which areas we should be focusing on. Our DMI target area was determined to be a two block by four block area in the Fairfield West

CONFIDENTIAL

DEF-WV-00916.00006

neighborhood of Huntington.  It runs from 16th Street to 20th Street and 8th Avenue to 10th

Avenue.



The Huntington DMI Target Area is outlined in red.

Step three is the Incident Review where drug dealers are identified as street level or mid

level.  The histories of each individual is looked at to determine if they have previous records, if

they are violent, are they repeat offenders, and if they are still active in selling drugs.  This

allows some incorrect perceptions to be debunked.  When asked how many people are selling

drugs in these high crime areas, inflated numbers are tossed around usually involving hundreds

of individuals.  Through the Incident Review the numbers are shown to be more manageable.

Other cities having tried the DMI strategy show the numbers to be just twenty to thirty people.

Just like other cities, it was determined that there were 31 key people in the target area

that were dealing drugs.  The Huntington Police Department along with input from certain

community leaders developed an A List and a B List.  The A List individuals were the violent

CONFIDENTIAL

HUNT_00029066

DEF-WV-00916.00007

mid level offenders that were targeted for prosecution.  The B List individuals were non-violent, street level offenders, which did not have a history of felony offenses.

Undercover Operations is step four of the High Point model.  This is where targeted undercover drug buys are made against the individuals identified in step three.  The Huntington Drug and Violent Crime Task Force began their undercover operations with the purpose of buying drugs from the A and B list individuals.  Ironclad cases are developed against all 31 of these individuals over the next few months.  After all undercover operations were finished there was 10 individuals with federal indictments, 15 with state warrants, and 6 Call-In candidates.

Step five is Mobilize the Community.  During this step efforts are made to gain the support and involvement of the community, as well as mobilize resources for the B List individuals.  Huntington used this phase as an educational tool and a community outreach opportunity to different groups in the community.  Presentations were made to community groups explaining the strategy without compromising ongoing undercover operations.  Part of this was controlling media exposure to ensure that people on the A or B List were not tipped off to the strategy.  Getting support and feedback from these groups was essential in regaining the community trust.  One example of the groups visited was the NAACP West Virginia State Conference of Branches, which happened to be meeting in Huntington during this time.

Outside individuals not associated with the Huntington Police Department, including Major Marty Sumner and Pastor Sherman Mason, also attended these meetings to give an outsiders view of how DMI has worked in other cities.  Along with the outside individuals, local religious leaders that attended the trip to High Point began to speak about the program to their congregations.

Page | [ PAGE  \* MERGEFORMAT ]

DEF-WV-00916.00008

Contact with the Offender's Family is the next step in the strategy. Here, influential people such as family, friends and other people important in the offender's life are contacted and the goals of the DMI strategy are explained to them. Family and friends are invited to a Call-In meeting with the B List individuals. These influential people are crucial in building a support structure for the offenders. Of the six B List individuals at least one influential person was found, and invited to the Call-In.

| Initials of B List Offender | Family, Friend, etc. contacted |
|---|---|
| KW | Father, Mother |
| RS | Father, Sister, Brother-in-law |
| TW | Mother, Grandmother |
| DP (Female) | Sister |
| LB | Uncle |
| DP (Male) | Father, Mother, Sister |

Step seven of the strategy is the Call-In / Notification meeting. The targeted B List offenders receive a letter from the Chief of Police requesting that they stop their illegal behavior and invite them to a Call-In meeting. A Call-In meeting is a community meeting between offenders, community, and law enforcement. The intervention type format gives offenders the opportunity to see the evidence of their behavior and to stop their illegal activity or face long prison terms. In return the community will help the offender in straightening out their life and ensure they have all social services available to them.

The Huntington Call-In occurred on October 21, 2010 at the Marie Redd Center which is in the center of the DMI target area. Images of the A List offenders and the prison terms they were facing were posted around the room to show the individuals who were not getting this "second chance". Folders containing the cases against them with unsigned warrants were available to each of the six individuals, and videos of each of them selling drugs to undercover

CONFIDENTIAL

HUNT_00029068

DEF-WV-00916.00009

officers was played on a loop to reinforce the point that ironclad cases were developed against each of them.  There were two phases to the Call-In; the law enforcement side and community side.  Delivering the law enforcement message was:

1. Chief W.H.Skip Holbrook – HPD
2. Booth Goodwin – USDOJ
3. RAC Joe Ciccarelli – FBI
4. CPT Tim Bradley – WVSP
5. RAC Rick McMahan – ATF
6. Chris Chiles – Cabell Co. Prosecutor
7. SA Tom Bevins – DEA
8. Chief Brent Webster – Charleston PD
9. Sheriff Thomas McComas – Cabell Co. Sheriff Office

Their message was clear; we are all working together and if you continue this behavior we will prosecute you to the fullest extent of the law.  The community message was presented by:

1.   Reverend Reginald Hill
2.   Leon White – President FWIC
3.   Sandra Clements – City Councilwoman – District 5
4.   Thomas Kincaid – President Fairfield C&S
5.   Reverend Samuel Moore
6.   Maurice Kitchens – DMI Coordinator
7.   Chris Dean – Day Report Center
8.   Mike Jones – KISRA
9.   Tina Kimbro – Prestera

Their message focused on the resources available to them and that the community did not want them gone, but they did want them to stop their behavior.  This was an opportunity to turn their life around but the choice was theirs.

Step eight is continued enforcement in the DMI target Area.  Police offices and the community watch for any signs of continued drug dealing in the target area.  Residents are encouraged to call the police and report drug activity.  Complaints involving a B List offender will result in his or her arrest.  In Huntington the Criminal Intelligence Analyst continued to

CONFIDENTIAL

HUNT_00029069

DEF-WV-00916.00010

follow crime patterns and trends in the DMI target area, the surrounding area, and the rest of the city to ensure drug and violent crimes was decreasing and that those crimes were not being displaced to other parts of the city.  We also had various residents of Fairfield West report possible drug activity.  These cases were given priority and investigated quickly.

The final step is the Follow Up where the B List offenders are assigned mentors to ensure that they are getting the social services that they need to succeed.  The Huntington Police Department assigned Maurice Kitchens as the DMI Resource Coordinator who was charged with monitoring and verifying the activities of each individual on a regular basis to ensure their compliance with the program.  Each of the individuals that decided to take part in the program was required to undergo random weekly drug screenings at the Day Report Center.  They were also required to attend various classes that pertain to each of their individual needs.  These classes include drug and alcoholics anonymous, anger management, and educational classes. Finally as part to becoming independent, they each had to find employment.

**Results of DMI Strategy**

In the six months since the DMI strategy was implemented there has been a substantial decrease in the actual number of violent and drug offenses in the DMI target area, when compared to either of the comparison groups.  There has also been a large decrease in the number of all types of offenses in the DMI target area over the last six months in comparison to our baseline periods.  The surrounding area has also seen a considerable decrease in violent crime.  Drug crimes in the surrounding areas have remained relatively flat over the last six months.

CONFIDENTIAL

HUNT_00029070

DEF-WV-00916.00011

For this report two baseline or comparison time periods were analyzed.  The first ran from November 1, 2008 until April 30, 2009.  The second baseline ran from November 1, 2009 until April 30, 2010.  Our DMI time period runs from November 1, 2010 until April 30, 2011.  We did not do a comparison in the six months right before the DMI time period for two reasons.  The first was to ensure that season variations in crime activities did not affect our results.  The second is because DMI activities began at the end of April of 2010.  Undercover operations and the arrest of A List offenders could have skewed crime statics in unusual directions during the summer months of 2010.  We chose November 1, 2010 as our start date due to multiple reasons.  The first was at this point all of the A List offenders had been arrested.  The second was that the public and media had become fully aware of the DMI strategy and the public buy-in was at full force.  Finally the Call-In had occurred on October 21, 2010.  By November 1st word had spread on the street that law enforcement was shutting down drug activity in Fairfield West and that the community was taking back this section of Huntington.

It must also be mentioned that new GIS software recently made available to the Huntington Police Department has made gathering data and statistical information much more reliable, thus some of the numbers may not be in exactly matching information in the three month report.  The conclusions of that report should not have affected any data entry errors or Geofile location errors within the AS 400 system.

*Violent Crime*

In the DMI target area during the last six months there has been two violent offenses[1].  Both of these offenses were aggravated assaults, and neither of them was drug related.  The first

---

[1] Violent Crime is defined by Federal UCR guidelines as Murder & Non-Negligent Manslaughter, Forcible Rape, Aggravated Assault, and Robbery.

CONFIDENTIAL

HUNT_00029071

DEF-WV-00916.00012

occurred on February 4, 2011 at 1666 Artisan Avenue, and was domestic related. The second occurred on March 23, 2011 at the intersection of 17th Street and 10th Avenue, and can best be described as a fight between multiple individuals.

The comparison baseline of November 2008 to April 2009 had ten offenses. This would be an 80% decrease in violence compared to our DMI timeframe. The comparison baseline of November 2009 to April 2010 had 13 offenses. Comparing this baseline to our DMI timeframe would yield an 85% reduction in violent crime. Either way of looking at it, it is a drastic reduction in violent crime for our DMI timeframe.

| Violent Crimes DMI Area | | |
|---|---|---|
| Time Period | Violent Crimes | % Change |
| 11/08 – 4/09 | 10 | -80% |
| 11/09 – 4/10 | 13 | -85% |
| 11/10 – 4/11 | 2 | 0% |

Violent crime in our DMI target area, as a percentage of all violent crime in the city, is also an important factor we looked at. Previous time periods made up about 7% of all violent crimes in the city. Considering the size of the DMI target area and if crime was to be spread out equally across the entire city, we would expect about 3% of all violent crimes to occur in our DMI target area. During the last six months the two offenses made up 1.61% of all violent crimes in the City of Huntington. This is a large percentage drop that puts us well below what we would expect to see for an area of its size. Compared to other cities that have used the DMI strategy, Huntington has seen a better than average decrease in violent crime, as most cities average between a 50 to 60 percent decrease.

CONFIDENTIAL

HUNT_00029072

DEF-WV-00916.00013

| Violent Crimes (Percent of City of Huntington) | | | |
|---|---|---|---|
| | DMI Area | Entire City | % |
| 11/08 – 4/09 | 10 | 146 | 6.85% |
| 11/09 – 4/10 | 13 | 186 | 6.99% |
| 11/10 – 4/11 | 2 | 124 | 1.61% |

The surrounding area also saw a decrease in violent crimes over the last six months, as it also only saw two violent offenses. Compared to the November 2008 to April 2009 baseline which saw six violent offenses, it would be a 33% decrease in violent crime. The November 2009 to April 2010 time period had 10 offenses thus an 80% reduction in violent crime. As the numbers indicate there has been no displacement of violent crime to the surrounding area or anywhere else inside the City of Huntington as violent crimes have decreased in both areas.

| Violent Crimes Surrounding Area | | |
|---|---|---|
| | Violent Crimes | % Change |
| 11/08 – 4/09 | 6 | -33% |
| 11/09 – 4/10 | 10 | -80% |
| 11/10 – 4/11 | 2 | 0% |

*Drug Crimes*

Drug crimes in the DMI target area have decreased over the last six months compared to either comparison timeframe. There have been a total of eight drug offenses in the DMI target area during this time. This comes to about 1.33 drug offenses per month. The comparison baseline of November 2008 to April 2009 had seventeen drug offenses, while the November 2009 to April 2010 baseline had fifteen drug offenses. The first timeframe would give us a 53% decrease in drug crime, while the second would be a 47% decrease. Again, Huntington has done

CONFIDENTIAL

better than average in reducing drug crime using the DMI strategy as most cities see between a 30 to 40 percent decrease.

| Drug Crimes DMI Area | | |
|---|---|---|
| | Drug Crimes | % Change |
| 11/08 – 4/09 | 17 | -53% |
| 11/09 – 4/10 | 15 | -47% |
| 11/10 – 4/11 | 8 | 0% |

Drug crime in the DMI target area as a percentage of drug crime in the City of Huntington shows us some interesting numbers.  Both baseline timeframes show that drug offenses in the DMI area represented over 10% of all drug crimes in the city.  This is important because the 10% threshold is what other cities have used to determine if an area is a good candidate for the DMI strategy.  The *DMI Initial Findings* report specifically mentioned the 10% threshold and that Huntington's DMI target area met the criteria for implementation of the strategy.

The six month DMI time period shows that the DMI now only represents 5.97% of all drug crimes in the city.  This decrease has been driven by two things; a large decrease in the number of offenses, and a small increase in the number of offenses city wide.  It has been difficult to determine if this is a legitimate increase in drug crime or a result of better enforcement city wide.  To determine if this decrease actually puts us below the 10% level we took the lowest level of drug crimes city wide, which was the 11/08 to 4/09 base line, and compared it to the actual numbers from the DMI timeframe to see if we were below the 10% level.  In layman's terms, if drug crimes city wide had remained flat and we still had eight drug offenses in the DMI target area, would we be below the 10% threshold?  The answer is yes, as those eight offenses still would have only accounted for 6.84% of all drug offenses in the City of

CONFIDENTIAL

HUNT_00029074

DEF-WV-00916.00015

Huntington.  Although we have not reached the 3% level of what we would expect to see for an area of this size, if current trends continue we would expect to see us reach that level by November of 2011.

| Drug Crimes (Percent of City of Huntington) | | | |
|---|---|---|---|
| | DMI Area | Entire City | % |
| 11/08 – 4/09 | 17 | 117 | 14.53% |
| 11/09 – 4/10 | 15 | 120 | 12.50% |
| 11/10 – 4/11 | 8 | 134 | 5.97% |
| Test for 10% Level | 8 | 117 | 6.84% |

One thing of note is that most of the drug crimes that have occurred in the DMI target area over the past six months have occurred around the Sunoco gas station, as the map below shows.  This should be considered the new area of focus in the future months.



The red marks indicate the location of drug crimes over the past six months; they are generally surrounding the Sunoco gas station at the corner of 20th Street and 9th Avenue.

Drug crimes have remained relatively flat in the surrounding area when looking at the last six months as a whole.  There were a total of four drug crimes over the past six months in the surrounding area which is about 3% of all drug crimes in the city.  Compared to the 11/08 – 4/09 time period, which had two drug offenses, and 11/09 – 4/10, which had six, the increase and

CONFIDENTIAL

HUNT_00029075

DEF-WV-00916.00016

decrease it not very robust and relatively uninteresting.  The only thing of importance from the number is that it appears there is no displacement of drug crime to these areas.

Displacement is something that the Huntington Police Department has been focusing on since the beginning.  Reports from other cities who have implemented the DMI strategy state that if displacement is going to happen is usually occurs immediately after the program begins and within a few blocks of the DMI target area.  We saw no possible displacement for the first five months of the program, but in April and May[2] of 2011 some possible signs of it occurring took place.  Huntington Police saw an increase in drug activity from 20th Street to 22nd Street and 8th Avenue to 10th Avenue.  This area has seen an increase in drug offenses but not violent offenses during this time.  Again this area is in close proximity to the Sunoco gas station located at the corner of 9th Avenue and 20th Street.  Chief Holbrook has already been informed of this situation and will be diverting resources to this area to ensure that no displacement takes place.

*Other Crimes*

Although not a focus of the DMI strategy property crimes and all other crimes were also tracked to determine if any abnormalities occurred during implementation of the strategy. Property crimes[3] had gone up four offenses compared to the 11/09 – 4/10 baseline, and gone down four offenses compared to the 11/08 – 4/09 baseline.  All three time periods make up less than 1.5% of all property crimes in the City of Huntington.  This further verifies previous findings that the DMI target area does not have a property crime problem, and that the DMI strategy had little to no effect on property crimes.

---

[2] The month of May is not included in this report, but it must be mentioned to describe the full extent of the situation.  More information on this will be provided with the next report.
[3] Property crimes are a Federal UCR definition that includes Burglary, Larceny, Motor Vehicle Theft, and Arson.

CONFIDENTIAL

HUNT_00029076

DEF-WV-00916.00017

| Property Crimes (Percent of City of Huntington) | | | |
|---|---|---|---|
| | DMI Area | Entire City | % |
| 11/08 – 4/09 | 21 | 1421 | 1.48% |
| 11/09 – 4/10 | 13 | 1379 | 0.94% |
| 11/10 – 4/11 | 17 | 1322 | 1.29% |

When looking at all crimes the DMI target area experienced over the last six months, we see a dramatic drop compared to either comparison time period.  Over those six months there were only 98 total crimes committed.  This includes all violent, drug, property, and other crimes. The 11/08 – 4/09 timeframe had 173 crimes, and the 11/09 – 4/10 timeframe had 165 crimes. This means there was a decrease in crime between 40.61% and 43.35%, depending on what you compare it to.  This is a dramatic decrease in the target area, as crime city wide decrease 1% to 2% during these times periods.  This decrease in crime is a big quality of life indicator as it puts the DMI target area below the expected numbers of crime one would expect for an area of its size.  Crime in the DMI area now represents 2.65% of all crime in the City of Huntington. During the previous baselines it made up between 4.42% and 4.55% of all crime in the city.

| All Crime (Percent of City of Huntington) | | | |
|---|---|---|---|
| | DMI Area | Entire City | % |
| 11/08 – 4/09 | 173 | 3804 | 4.55% |
| 11/09 – 4/10 | 165 | 3736 | 4.42% |
| 11/10 – 4/11 | 98 | 3697 | 2.65% |

One of the best examples of this decrease in crime is the area around 9th Avenue between 18th Street to 19th Street.  The maps below show the decrease in the number of offenses. Each marker is a crime offense.  The red makers are violent crime, yellow are property crime, green are drug crime, and blue are all other crime.

CONFIDENTIAL

HUNT_00029077

DEF-WV-00916.00018



11/01/09 – 4/30/10



11/01/10 – 4/30/11

**DMI Call-In Candidates**

Besides the data element of the program there is also a human component that should be reported on. The four individuals that accepted the opportunity to straighten up have had varying levels of success with Resource Coordinator Maurice Kitchens. We think it is important to remember that this is a long term process in developing and supporting these individuals' lives. There will be progress and setbacks, as each individual finds his or her own path to success.

*Kevin Wells*

Over the past six months Kevin has had many ups and downs. In the first three months Kevin tested positive for cocaine once and his creatinine level had been abnormal three times which means that he attempted to dilute his urine. After another incident Kevin was checked

CONFIDENTIAL

HUNT_00029078

DEF-WV-00916.00019

into Healing Place[4] which is a 24 hours drug treatment facility.  After a few months there he moved to the Oxford House 2210 at 9th Ave and underwent the 30/30 program where he has to complete 30 AA/NA meetings in 30 days.  Currently he still resides at the Oxford House and is working fulltime.  He is required to check in daily and still attends various meetings to help him with his addiction.  Kevin's ongoing addiction should be his main focus in the future.

*Ronald Smith*

Ronnie has taken full advantage of the opportunity that has been presented to him.  All of Ronnie's drug tests have come back negative for illegal drugs.  Currently he has various life skills classes he is still attending, but some have been cut back due to the progress that he has made over the past six months.  Health problems have still plagued Ronnie but they have gotten better over the past six months.  Currently, Ronnie is living with his father, but he has expressed a desire to move to Columbus, OH to live with his sister after his time with the DMI strategy has ended.  The only thing we wish Ronnie would do is strive to get his GED in the future.  He is still required to call in at least once a day, and has never missed calling in.  Talking to Ronnie over the past week, he stated that he was at a low point in his life a year ago, but the plan developed for him has truly helped him, and that he was grateful for the opportunity that the DMI strategy gave him.

*Taylor Wheeler*

Taylor is currently working two jobs, one at Outback Steakhouse and the second at GC Services.  She also enrolled at Marshall University during the spring semester, but her grades were subpar.  Due to this she has enrolled in summer school to retake two of the classes.  Those

---

[4] http://thehealingplaceofhuntington.org/

CONFIDENTIAL

classes begin on July 12th. After getting the marijuana out of her system during the first few weeks of the testing, she has never failed a drug screening. Taylor's problem has never been drugs, but instead following directions. During the last two months, Taylor has improved on this but there still is room for improvement. Like the other three people still involved with the program she is required to call in everyday and has only missed one, but that was due to her work schedule.

*Margaret "Lois" Burnside*

Lois is enrolled at a local community college to gain basic computer skills, and will continue these classes when they continue in the fall. Along with this, she is currently working at the Big Sandy Superstore Arena doing janitorial work. She has found living arrangements in the last few months. Lois has had one positive test, which occurred in late January 2011. Since then she has passed all her drug test. We knew that when Mr. Kitchens left it would be a difficult adjustment for Lois, but after a few days she has come to accept the situation. Lois still has issues with asking for help, but has become more willing to embrace the program placed in front of her.

CONFIDENTIAL

HUNT_00029080

DEF-WV-00916.00021