# Attachment 3

WV_BOM00000037

DEF-WV-01935.00001





# State of West Virginia
# *Board of Medicine*

101 Dee Drive, Suite 103
Charleston, WV 25311
Telephone 304.558.2921
Fax 304.558.2084
www.wvbom.wv.gov

## POLICY ON THE USE OF OPIOID ANALGESICS IN THE TREATMENT OF CHRONIC PAIN

Adopted by the West Virginia Board of Medicine from the Model Policy Guidelines of the Federation of State Medical Boards of the United States, Inc., adopted as policy by the Executive Committee of the Federation of State Medical Boards of the United States, Inc., in July 2013.

_____
Reverend O. Richard Bowyer
President

_____
Teresa Frazer, M.D.
Acting Secretary

September 9, 2013
_____
Date Adopted

WV_BOM00000038

DEF-WV-01935.00002

# Policy for the Use of
# Opioid Analgesics in the Treatment of Chronic Pain

## Section I: Preamble

The West Virginia Board of Medicine ("Board") is obligated under the laws of the State of West Virginia to protect the public health and safety. The Board recognizes that principles of high-quality medical practice dictate that the people of the State of West Virginia have access to appropriate, safe and effective pain management. The application of up-to-date knowledge and treatment modalities can help to restore function and thus improve the quality of life of patients who suffer from pain, particularly chronic pain [4,8,26].

This policy has been developed to articulate the Board's position on the use of controlled substances for pain, particularly the use of opioid analgesics and with special attention to the management of chronic pain. The policy thus is intended to encourage physicians to be knowledgeable about best clinical practices as regards the prescribing of opioids and be aware of associated risks. For the purposes of this policy, inappropriate treatment of pain includes non-treatment, inadequate treatment, overtreatment, and continued use of ineffective treatments.

The Board recognizes that opioid analgesics are useful and can be essential in the treatment of acute pain that results from trauma or surgery, as well as in the management of certain types of chronic pain, whether due to cancer or non-cancer causes [20,26,28]. The Board will refer to current clinical practice guidelines and expert reviews in approaching allegations of possible mismanagement of pain [8,10,12,14,26-41, 80].

***Responsibility for Appropriate Pain Management:*** All physicians and other providers should be knowledgeable about assessing patients' pain and function, and familiar with methods of managing pain [4,16]. Physicians also need to understand and comply with federal and state requirements for prescribing opioid analgesics [3,12,19]. Whenever federal laws and regulations differ from those of a particular state, the more stringent rule is the one that should be followed [42].

Physicians should not fear disciplinary action from the Board for ordering, prescribing, dispensing or administering controlled substances, including opioid analgesics, for a legitimate medical purpose and in the course of professional practice, when current best clinical practices are met.

The Board will consider the use of opioids for pain management to be for a legitimate medical purpose if it is based on sound clinical judgment and current best clinical practices, is appropriately documented, and is of demonstrable benefit to the patient. To be within the usual course of professional practice, a legitimate physician-patient relationship must exist and the prescribing or administration of medications should be appropriate to the identified diagnosis, should be accompanied by careful follow-up monitoring of the patient's response to treatment as well as his or her safe use of the prescribed medication, and should demonstrate that the therapy has been adjusted as needed [7,38,43]. There should be documentation of appropriate referrals as necessary [36-37].

The medical management of pain should reflect current knowledge of evidence-based or best clinical practices for the use of pharmacologic and nonpharmacologic modalities, including the use of opioid analgesics and non-opioid therapies [14,16,27]. Such prescribing must be based on careful assessment of the patient and his or her pain (see the discussion on risk stratification, below) [33].

2

Pain should be assessed and treated promptly, and the selection of therapeutic modalities (including the quantity and frequency of medication doses) should be adjusted according to the nature of the pain, the patient's response to treatment, and the patient's risk level relative to the use of medications with abuse potential [8,10,12,14,26-38].

***Preventing Opioid Diversion and Abuse:*** The Board also recognizes that individuals' use of opioid analgesics for other than legitimate medical purposes poses a significant threat to the health and safety of the individual as well as to the public health [3]. The Board further recognizes that inappropriate prescribing of controlled substances by physicians may contribute to drug misuse and diversion by individuals who seek opioids for other than legitimate medical purposes [5,19,44]. Accordingly, the Board expects physicians to incorporate safeguards into their practices to minimize the risk of misuse and diversion of opioid analgesics and other controlled substances [19-23,38,45-46].

Allegations of inappropriate pain management will be evaluated on an individual basis. The Board may use a variety of sources to determine the appropriateness of treatment including prescribing information obtained from the State Prescription Drug Monitoring Program. The Board will not take disciplinary action against a physician for deviating from this Model Policy when contemporaneous medical records show reasonable cause for such a deviation.

The Board will judge the validity of the physician's treatment of a patient on the basis of available documentation, rather than solely on the quantity and duration of medication administered. The goal is the management of the patient's pain while effectively addressing other aspects of the patient's functioning, including physical, psychological, social and work-related factors, and mitigating risk of misuse, abuse, diversion and overdose [4,29].

The Board will consider the unsafe or otherwise inappropriate treatment of pain to be a departure from best clinical practice, taking into account whether the treatment is appropriate to the diagnosis and the patient's level of risk.

## Section II: Guidelines

The Board has adopted the following criteria for use in evaluating a physician's management of a patient with pain, including the physician's prescribing of opioid analgesics:

***Understanding Pain:*** The diagnosis and treatment of pain is integral to the practice of medicine [4,34-37]. In order to cautiously prescribe opioids, physicians must understand the relevant pharmacologic and clinical issues in the use of such analgesics, and carefully structure a treatment plan that reflects the particular benefits and risks of opioid use for each individual patient. Such an approach should be employed in the care of every patient who receives chronic opioid therapy [4,8].

***Patient Evaluation and Risk Stratification:*** The medical record should document the presence of one or more recognized medical indications for prescribing an opioid analgesic [7] and reflect an appropriately detailed patient evaluation [38]. Such an evaluation should be completed before a decision is made as to whether to prescribe an opioid analgesic.

The nature and extent of the evaluation depends on the type of pain and the context in which it occurs. For example, meaningful assessment of chronic pain, including pain related to cancer or non-cancer origins, usually demands a more detailed evaluation than an assessment of acute pain. Assessment of

3

the patient's pain typically would include the nature and intensity of the pain, past and current treatments for the pain, any underlying or co-occurring disorders and conditions, and the effect of the pain on the patient's physical and psychological functioning [31].

For every patient, the initial work-up should include a systems review and relevant physical examination, as well as laboratory investigations as indicated [33,36,48-53]. Such investigations help the physician address not only the nature and intensity of the pain, but also its secondary manifestations, such as its effects on the patient's sleep, mood, work, relationships, valued recreational activities, and alcohol and drug use.

Social and vocational assessment is useful in identifying supports and obstacles to treatment and rehabilitation; for example: Does the patient have good social supports, housing, and meaningful work? Is the home environment stressful or nurturing? [14].

Assessment of the patient's personal and family history of alcohol or drug abuse and relative risk for medication misuse or abuse also should be part of the initial evaluation [11,14,21-23,45], and ideally should be completed prior to a decision as to whether to prescribe opioid analgesics [56-58]. This can be done through a careful clinical interview, which also should inquire into any history of physical, emotional or sexual abuse, because those are risk factors for substance misuse [31]. Use of a validated screening tool (such as the Screener and Opioid Assessment for Patients with Pain [SOAPP-R; 48] or the Opioid Risk Tool [ORT; 49]), or other validated screening tools, can save time in collecting and evaluating the information and determining the patient's level of risk.

All patients should be screened for depression and other mental health disorders, as part of risk evaluation. Patients with untreated depression and other mental health problems are at increased risk for misuse or abuse of controlled medications, including addiction, as well as overdose.

Patients who have a history of substance use disorder (including alcohol) are at elevated risk for failure of opioid analgesic therapy to achieve the goals of improved comfort and function, and also are at high risk for experiencing harm from this therapy, since exposure to addictive substances often is a powerful trigger of relapse [11,31,45]. Therefore, treatment of a patient who has a history of substance use disorder should, if possible, involve consultation with an addiction specialist before opioid therapy is initiated (and follow-up as needed). Patients who have an active substance use disorder should not receive opioid therapy until they are established in a treatment/recovery program [31] or alternatives are established such as co-management with an addiction professional. Physicians who treat patients with chronic pain should be encouraged to also be knowledgeable about the treatment of addiction, including the role of replacement agonists such as methadone and buprenorphine. For some physicians, there may be advantages to becoming eligible to treat addiction using office-based buprenorphine treatment.

Information provided by the patient is a necessary but insufficient part of the evaluation process. Reports of previous evaluations and treatments should be confirmed by obtaining records from other providers, if possible. Patients have occasionally provided fraudulent records, so if there is any reason to question the truthfulness of a patient's report, it is best to request records directly from the other providers [54-55].

If possible, the patient evaluation should include information from family members and/or significant others [22-23,49-50]. Where available, the state prescription drug monitoring program (PDMP) should be consulted to determine whether the patient is receiving prescriptions from any

WV_BOM00000041

DEF-WV-01935.00005

other physicians, and the results obtained from the PDMP should be documented in the patient record [34].

In dealing with a patient who is taking opioids prescribed by another physician—particularly a patient on high doses—the evaluation and risk stratification assume even greater importance [21-23]. With all patients, the physician's decision as to whether to prescribe opioid analgesics should reflect the totality of the information collected, as well as the physician's own knowledge and comfort level in prescribing such medications and the resources for patient support that are available in the community [21-23].

***Development of a Treatment Plan and Goals:*** The goals of pain treatment include reasonably attainable improvement in pain and function; improvement in pain-associated symptoms such as sleep disturbance, depression, and anxiety; and avoidance of unnecessary or excessive use of medications [4,8]. Effective means of achieving these goals vary widely, depending on the type and causes of the patient's pain, other concurrent issues, and the preferences of the physician and the patient.

The treatment plan and goals should be established as early as possible in the treatment process and revisited regularly, so as to provide clear-cut, individualized objectives to guide the choice of therapies [38]. The treatment plan should contain information supporting the selection of therapies, both pharmacologic (including medications other than opioids) and nonpharmacologic. It also should specify the objectives that will be used to evaluate treatment progress, such as relief of pain and improved physical and psychosocial function [14,36,47].

The plan should document any further diagnostic evaluations, consultations or referrals, or additional therapies that have been considered [21-23,45].

***Informed Consent and Treatment Agreement:*** The decision to initiate opioid therapy should be a shared decision between the physician and the patient. The physician should discuss the risks and benefits of the treatment plan (including any proposed use of opioid analgesics) with the patient, with persons designated by the patient, or with the patient's surrogate or guardian if the patient is without medical decision-making capacity [32,35]. If opioids are prescribed, the patient (and possibly family members) should be counseled on safe ways to store and dispose of medications [3,37].

Use of a written informed consent and treatment agreement (sometimes referred to as a "treatment contract") is recommended [21-23,35,38].

*Informed consent* documents typically address:

- The potential risks and anticipated benefits of chronic opioid therapy.
- Potential side effects (both short- and long-term) of the medication, such as constipation and cognitive impairment.
- The likelihood that tolerance to and physical dependence on the medication will develop.
- The risk of drug interactions and over-sedation.
- The risk of impaired motor skills (affecting driving and other tasks).
- The risk of opioid misuse, dependence, addiction, and overdose.
- The limited evidence as to the benefit of long-term opioid therapy.

WV_BOM00000042

DEF-WV-01935.00006

- The physician's prescribing policies and expectations, including the number and frequency of prescription refills, as well as the physician's policy on early refills and replacement of lost or stolen medications.
- Specific reasons for which drug therapy may be changed or discontinued (including violation of the policies and agreements spelled out in the treatment agreement).

*Treatment agreements* outline the joint responsibilities of physician and patient [35-37] and are indicated for opioid or other abusable medications. They typically discuss:

- The goals of treatment, in terms of pain management, restoration of function, and safety.
- The patient's responsibility for safe medication use (e.g., by not using more medication than prescribed or using the opioid in combination with alcohol or other substances; storing medications in a secure location; and safe disposal of any unused medication).
- The patient's responsibility to obtain his or her prescribed opioids from only one physician or practice.
- The patient's agreement to periodic drug testing (as of blood, urine, hair, or saliva).
- The physician's responsibility to be available or to have a covering physician available to care for unforeseen problems and to prescribe scheduled refills.

Informed consent documents and treatment agreements can be part of one document for the sake of convenience.

***Initiating an Opioid Trial:*** Generally, safer alternative treatments should be considered before initiating opioid therapy for chronic, non-malignant pain. Opioid therapy should be presented to the patient as a therapeutic trial or test for a defined period of time (usually no more than 90 days) and with specified evaluation points. The physician should explain that progress will be carefully monitored for both benefit and harm in terms of the effects of opioids on the patient's level of pain, function, and quality of life, as well as to identify any adverse events or risks to safety [51]. When initiating opioid therapy, the lowest dose possible should be given to an opioid naïve patient and titrate to affect. It is generally suggested to begin opioid therapy with a short acting opioid and rotate to a long acting/extended release if indicated.

A decision to continue opioid therapy beyond the trial period should reflect a careful evaluation of benefits versus adverse events [29]and/or potential risks..

***Ongoing Monitoring and Adapting the Treatment Plan:*** The physician should regularly review the patient's progress, including any new information about the etiology of the pain or the patient's overall health and level of function [35,49-50]. When possible, collateral information about the patient's response to opioid therapy should be obtained from family members or other close contacts, and the state PDMP. The patient should be seen more frequently while the treatment plan is being initiated and the opioid dose adjusted [44-51]. As the patient is stabilized in the treatment regimen, follow-up visits may be scheduled less frequently. (However, if the patient is seen less than monthly and an opioid is prescribed, arrangements must be made for the patient to obtain a refill or new prescription when needed.)

At each visit, the results of chronic opioid therapy should be monitored by assessing what have been called the "5As" of chronic pain management; these involve a determination of whether the patient is experiencing a reduction in pain (Analgesia), has demonstrated an improvement in level of function (Activity), whether there are significant Adverse effects, whether there is evidence of

6

Aberrant substance-related behaviors, and mood of the individual (Affect) [38,52]. Validated brief assessment tools that measure pain and function, such as the three-question "Pain, Enjoyment and General Activity" (PEG) scale [47] or other validated assessment tools, may be helpful and time effective.

Continuation, modification or termination of opioid therapy for pain should be contingent on the physician's evaluation of (1) evidence of the patient's progress toward treatment objectives and (2) the absence of substantial risks or adverse events, such as overdose or diversion [21-23,45]. A satisfactory response to treatment would be indicated by a reduced level of pain, increased level of function, and/or improved quality of life [29]. Information from family members or other caregivers should be considered in evaluating the patient's response to treatment [14,35-36]. Use of measurement tools to assess the patient's level of pain, function, and quality of life (such as a visual analog or numerical scale) can be helpful in documenting therapeutic outcomes [14,49].

***Periodic Drug Testing:*** Periodic drug testing may be useful in monitoring adherence to the treatment plan, as well as in detecting the use of non-prescribed drugs [53-54]. Drug testing is an important monitoring tool because self-reports of medication use is not always reliable and behavioral observations may detect some problems but not others [55-59]. Patients being treated for addiction should be tested as frequently as necessary to ensure therapeutic adherence, but for patients being treated for pain, clinical judgment trumps recommendations for frequency of testing.

Urine may be the preferred biologic specimen for testing because of its ease of collection and storage and the cost-effectiveness of such testing [53]. When such testing is conducted as part of pain treatment, forensic standards are generally not necessary and not in place, so collection is not observed and chain-of-custody protocols are not followed. Initial testing may be done using class-specific immunoassay drug panels (point-of-care or laboratory-based), which typically do not identify particular drugs within a class unless the immunoassay is specific for that drug. If necessary, this can be followed up with a more specific technique, such as gas chromatography/mass spectrometry (GC/MS) or other chromatographic tests to confirm the presence or absence of a specific drug or its metabolites [53]. In drug testing in a pain practice, it is important to identify the specific drug not just the class of the drug.

Physicians need to be aware of the limitations of available tests (such as their limited sensitivity for many opioids) and take care to order tests appropriately [54]. For example, when a drug test is ordered, it is important to specify that it include the opioid being prescribed [53]. Because of the complexities involved in interpreting drug test results, it is advisable to confirm significant or unexpected results with the laboratory toxicologist or a clinical pathologist [59-60].

While immunoassay, point of care (POC) testing has its utility in the making of temporary and "on the spot" changes in clinical management, its limitations with regard to accuracy have recently been the subject of study. These limitations are such that the use of point of care testing for the making of more long term and permanent changes in management of people with the disease of addiction and other clinical situations may not be justified until the results of confirmatory testing with more accurate methods such as LC-MS/MS are obtained. A recent study on LC-MS/MS results following immunoassay POC testing in addiction treatment settings and found very high rates of "false negatives and positives" [53,81].

Test results that suggest opioid misuse should be discussed with the patient. It is helpful to approach such a discussion in a positive, supportive fashion, so as to strengthen the physician-patient relationship and encourage healthy behaviors (as well as behavioral change where that is

7

needed). Both the test results and subsequent discussion with the patient should be documented in the medical record [53].

Periodic pill counting is also a useful strategy to confirm medication adherence and to minimize diversion (e.g., selling, sharing or giving away medications). As noted earlier and where available, consulting the state's PDMP before prescribing opioids for pain and during ongoing use is highly recommended. A PDMP can be useful in monitoring compliance with the treatment agreement as well as identifying individuals obtaining controlled substances from multiple prescribers [21-23,55,62].

If the patient's progress is unsatisfactory, the physician must decide whether to revise or augment the treatment plan, whether other treatment modalities should be added to or substituted for the opioid therapy, or whether a different approach—possibly involving referral to a pain specialist or other health professional—should be employed [35-37,62-63].

Evidence of misuse of prescribed opioids demands prompt intervention by the physician [19,21-23,32,35]. Patient behaviors that require such intervention typically involve recurrent early requests for refills, multiple reports of lost or stolen prescriptions, obtaining controlled medications from multiple sources without the physician's knowledge, intoxication or impairment (either observed or reported), and pressuring or threatening behaviors [23]. The presence of illicit or unprescribed drugs, (drugs not prescribed by a physician) in drug tests similarly requires action on the part of the prescriber. Some aberrant behaviors are more closely associated with medication misuse than others [62-63]. Most worrisome is a pattern of behavior that suggests recurring misuse, such as unsanctioned dose escalations, deteriorating function, and failure to comply with the treatment plan [64].

Documented drug diversion or prescription forgery, obvious impairment, and abusive or assaultive behaviors require a firm, immediate response [22-23,38,46]. Indeed, failure to respond can place the patient and others at significant risk of adverse consequences, including accidental overdose, suicide attempts, arrests and incarceration, or even death [23,65-67]. For this reason, physicians who prescribe chronic opioid therapy should be knowledgeable in the diagnosis of substance use disorders and able to distinguish such disorders from physical dependence—which is expected in chronic therapy with opioids and many sedatives.

**Consultation and Referral:** The treating physician should seek a consultation with, or refer the patient to, a pain, psychiatry, addiction or mental health specialist as needed [37-38]. For example, a patient who has a history of substance use disorder or a co-occurring mental health disorder may require specialized assessment and treatment, if available [31,66].

Physicians who prescribe chronic opioid therapy should be familiar with treatment options for opioid addiction (including those available in licensed opioid treatment programs [OTPs]) and those offered by an appropriately credentialed and experienced physician through office-based opioid treatment [OBOT]), so as to make appropriate referrals when needed [23,31,37,39].

**Discontinuing Opioid Therapy:** Throughout the course of opioid therapy, the physician and patient should regularly weigh the potential benefits and risks of continued treatment and determine whether such treatment remains appropriate [46].

8

If opioid therapy is continued, the treatment plan may need to be adjusted to reflect the patient's changing physical status and needs, as well as to support safe and appropriate medication use [22-23].

Reasons for discontinuing opioid therapy include resolution of the underlying painful condition, emergence of intolerable side effects, inadequate analgesic effect, failure to improve the patient's quality of life despite reasonable titration, deteriorating function, or significant aberrant medication use [38, 45].

If opioid therapy is discontinued, the patient who has become physically dependent should be provided with a safely structured tapering regimen. Withdrawal can be managed either by the prescribing physician or by referring the patient to an addiction specialist [63]. The termination of opioid therapy should not mark the end of treatment, which should continue with other modalities, either through direct care or referral to other health care specialists, as appropriate [21-23].

Additionally, providers should not continue opioid treatment unless the patient has received a benefit, including demonstrated functional improvement.

***Medical Records:*** Every physician who treats patients for chronic pain must maintain accurate and complete medical records. Information that should appear in the medical record includes the following [22-23,38,43-44]:

- Copies of the signed informed consent and treatment agreement.
- The patient's medical history.
- Results of the physical examination and all laboratory tests.
- Results of the risk assessment, including results of any screening instruments used.
- A description of the treatments provided, including all medications prescribed or administered (including the date, type, dose and quantity).
- Instructions to the patient, including discussions of risks and benefits with the patient and any significant others.
- Results of ongoing monitoring of patient progress (or lack of progress) in terms of pain management and functional improvement.
- Notes on evaluations by and consultations with specialists.
- Any other information used to support the initiation, continuation, revision, or termination of treatment and the steps taken in response to any aberrant medication use behaviors [21-23,30,38,45,68]. These may include actual copies of, or references to, medical records of past hospitalizations or treatments by other providers.
- Authorization for release of information to other treatment providers.

The medical record must include all prescription orders for opioid analgesics and other controlled substances, whether written or telephoned. In addition, written instructions for the use of all medications should be given to the patient and documented in the record [25]. The name, telephone number, and address of the patient's pharmacy also should be recorded to facilitate contact as needed [23]. Records should be up-to-date and maintained in an accessible manner so as to be readily available for review [25].

Good records demonstrate that a service was provided to the patient and establish that the service provided was medically necessary. Even if the outcome is less than optimal, thorough records protect the physician as well as the patient [23,38,45,68].

9

***Compliance with Controlled Substance Laws and Regulations:*** To prescribe, dispense or administer controlled substances, the physician must be registered with the DEA, licensed by the state in which he or she practices, and comply with applicable federal and state regulations [25].

Physicians are referred to the *Physicians' Manual of the U.S. Drug Enforcement Administration* for specific rules and regulations governing the use of controlled substances. Additional resources are available on the DEA's website (at www.deadiversion.usdoj.gov), as well as from West Virginia Legislative Rule 11 CSR 10.

## Section III: Definitions

For the purposes of this Model Policy, the following terms are defined as shown.

***Aberrant Substance Use Behaviors:*** Behaviors that are outside the boundaries of the agreed-upon treatment plan may constitute aberrant substance use behaviors [22-23]. For example, obtaining prescriptions for the same or similar drugs from more than one physician or other health care provider without the treating physician's knowledge is aberrant behavior, as is use of illicit drugs.

***Abuse:*** Abuse has been described as a maladaptive pattern of drug use that results in harm or places the individual at risk of harm [29]. Abuse of a prescription medication involves its use in a manner that deviates from approved medical, legal, and social standards, generally to achieve a euphoric state ("high") or to sustain opioid dependence that is opioid addiction or that is other than the purpose for which the medication was prescribed [28].

***Addiction:*** A longstanding definition of addiction is that it is "a primary, chronic, neurobiologic disease, whose development and manifestations are influenced by genetic, psychosocial, and environmental factors" [28]. Addiction often is said to be characterized by behaviors that include impaired control over drug use, craving, compulsive use, and continued use despite harm [28].

A newer definition, adopted by the American Society of Addiction Medicine in 2011, describes addiction as "a primary, chronic disease of brain reward, motivation, memory and related circuitry. Dysfunction in these circuits leads to characteristic biological, psychological, social and spiritual manifestations. This is reflected in an individual pathologically pursuing reward and/or relief by substance use and other behaviors. Addiction is characterized by inability to consistently abstain, impairment in behavioral control, craving, diminished recognition of significant problems with one's behaviors and interpersonal relationships, and a dysfunctional emotional response. Like other chronic diseases, addiction often involves cycles of relapse and remission. Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death" [40].

(As discussed below, physical dependence and tolerance are expected physiological consequences of extended opioid therapy for pain and in this context do not indicate the presence of addiction.)

***Controlled Substance:*** A controlled substance is a drug that is subject to special requirements under the federal Controlled Substances Act of 1970 (CSA) [25], which is designed to ensure both the availability and control of regulated substances. Under the CSA, availability of regulated drugs for medical purposes is accomplished through a system that establishes quotas for drug production and a distribution system that closely monitors the importation, manufacture, distribution, prescribing, dispensing, administering, and possession of controlled drugs. Civil and criminal

10

sanctions for serious violations of the statute are part of the government's control apparatus. The Code of Federal Regulations (Title 21, Chapter 2) implements the CSA.

The CSA provides that responsibility for scheduling controlled substances is shared between the Food and Drug Administration (FDA) and the DEA. In granting regulatory authority to these agencies, the Congress noted that both public health and public safety needs are important and that neither takes primacy over the other. To accomplish this, the Congress provided guidance in the form of factors that must be considered by the FDA and DEA when assessing public health and safety issues related to a new drug or one that is being considered for rescheduling or removal from control.

The CSA does *not* limit the amount of drug prescribed, the duration for which it is prescribed, or the period for which a prescription is valid (although some states do impose such limits).

Most potent opioid analgesics are classified in *Schedules II or III* under the CSA, indicating that they have a significant potential for abuse and a currently accepted medical use in treatment in the U.S. (with certain restrictions), and that abuse of the drug may lead to severe psychological or physical dependence. Although the scheduling system provides a rough guide to abuse potential, it should be recognized that all controlled medications have some potential for abuse.

***Dependence:*** Physical dependence is a state of biologic adaptation that is evidenced by a class-specific withdrawal syndrome when the drug is abruptly discontinued or the dose rapidly reduced, and/or by the administration of an antagonist [28]. It is important to distinguish addiction from the type of physical dependence that can and does occur within the context of good medical care, as when a patient on long-term opioid analgesics for pain becomes physically dependent on the analgesic. This distinction is reflected in the two primary diagnostic classification systems used by health care professionals: the *International Classification of Mental and Behavioural Disorders, 10th Edition (ICD-10)* of the World Health Organization [70], and the *Diagnostic and Statistical Manual (DSM)* of the American Psychiatric Association [71]. In the DSM-IV-TR, a diagnosis of "substance dependence" meant addiction. In the upcoming DSM V, the term *dependence* is reestablished in its original meaning of physiological dependence. When symptoms are sufficient to meet criteria for substance misuse or addiction, the term "substance use disorder" is used, accompanied by severity ratings [69].

It may be important to clarify this distinction during the informed consent process, so that the patient (and family) understands that physical dependence and tolerance are likely to occur if opioids are taken regularly over a period of time, but that the risk of addiction is relatively low, although estimates do vary. Discontinuing chronic opioid therapy may be difficult, even in the absence of addiction. According to the World Health Organization, "The development of tolerance and physical dependence denote normal physiologic adaptations of the body to the presence of an opioid" [70]. Consequently, physical dependence alone is neither necessary nor sufficient to diagnose addiction [71,72].

***Diversion:*** Drug diversion is defined as the intentional transfer of a controlled substance from authorized to unauthorized possession or channels of distribution [73-74]. The federal Controlled Substances Act (21 U.S.C. §§ 801 et seq.) establishes a closed system of distribution for drugs that are classified as controlled substances. Records must be kept from the time a drug is manufactured to the time it is dispensed. Health care professionals who are authorized to prescribe, dispense, and otherwise control access to such drugs are required to register with the DEA [25,75].

11

Pharmaceuticals that make their way outside this closed distribution system are said to have been "diverted" [75], and the individuals responsible for the diversion (including patients) are in violation of federal law.

Experience shows that the degree to which a prescribed medication is misused depends in large part on how easily it is redirected (diverted) from the legitimate distribution system [17,19,74].

*Misuse:* The term *misuse* (also called *nonmedical use*) encompasses all uses of a prescription medication other than those that are directed by a physician and used by a patient within the law and the requirements of good medical practice [28].

*Opioid:* An opioid is any compound that binds to an opioid receptor in the central nervous system (CNS) [4]. The class includes both naturally occurring and synthetic or semi-synthetic opioid drugs or medications, as well as endogenous opioid peptides [35].

Most physicians use the terms "opiate" and "opioid" interchangeably, but toxicologists (who perform and interpret drug tests) make a clear distinction between them. "Opioid" is the broader term because it includes the entire class of agents that act at opioid receptors in the CNS, whereas "opiates" refers to natural compounds derived from the opium plant but not semisynthetic opioid derivatives of opiates or completely synthetic agents. Thus, drug tests that are "positive for opiates" have detected one of these compounds or a metabolite of heroin, 6-monoacetyl morphine (MAM). Drug tests that are "negative for opiates" have found no detectable levels of opiates in the sample, even though other opioids that were not tested for—including the most common currently used and misused prescription opioids—may be present in the sample that was analyzed [53,59-260].

*Pain:* An unpleasant and potentially disabling sensory and emotional experience associated with actual or potential tissue damage or described in terms of such damage.

*Acute pain* is the normal, predictable physiological response to a noxious chemical, thermal or mechanical stimulus and typically is associated with invasive procedures, trauma and disease. Acute pain generally is time-limited, lasting six weeks or less [4].

*Chronic pain* is a state in which pain persists beyond the usual course of an acute disease or healing of an injury (e.g., more than three months). It may or may not be associated with an acute or chronic pathologic process that causes continuous or intermittent pain over a period of months or years.

*Chronic non-cancer related pain* is chronic pain that is not associated with active cancer and does not occur at the end of life [4,76].

*Opioid-induced hyperalgesia* may develop as a result of long-term opioid use in the treatment of chronic pain. *Primary hyperalgesia* is pain sensitivity that occurs directly in the damaged tissues, while *secondary hyperalgesia* occurs in surrounding undamaged tissues. Human and animal studies have demonstrated that primary or secondary hyperalgesia can develop in response to both chronic and acute exposure to opioids. Hyperalgesia can be severe enough to warrant discontinuation of opioid treatment [77].

*Prescription Drug Monitoring Program:* Almost all states have enacted laws that establish prescription drug monitoring programs (PDMPs) to facilitate the collection, analysis, and reporting of information on the prescribing and dispensing of controlled substances. Most such programs employ electronic data transfer systems, under which prescription information is transmitted from

WV_BOM00000049

DEF-WV-01935.00013

the dispensing pharmacy to a state agency, which collates and analyzes the information [3,24].

After analyzing the efficacy of PDMPs, the GAO concluded that such programs have the potential to help law enforcement and regulatory agencies rapidly identify and investigate activities that may involve illegal prescribing, dispensing or consumption of controlled substances. Where real-time data are available, PDMPs also can help to prevent prescription drug misuse and diversion by allowing physicians to determine whether a patient is receiving prescriptions for controlled substances from other physicians, as well as whether the patient has filled or refilled an order for an opioid the physician has prescribed [24,78-79].

***Tolerance:*** Tolerance is a state of physiologic adaptation in which exposure to a drug induces changes that result in diminution of one or more of the drug's effects over time. Tolerance is common in opioid treatment, has been demonstrated following a single dose of opioids, and is not the same as addiction [28].

***Trial Period:*** A period of time during which the efficacy of an opioid for treatment of an individual's pain is tested to determine whether the treatment goals can be met in terms of reduction of pain and restoration of function. If the goals are not met, the opioid dose may be adjusted, a different opioid substituted, an adjunctive therapy added, or use of opioids discontinued and an alternative approach to pain management selected [36].

***Universal Precautions:*** The concept of *universal precautions* is borrowed from an infectious disease model of the same name to underscore its comparability to practices in other areas of medicine. The concept recognizes that all patients have a level of risk that can only be estimated initially, with the estimate modified over time as more information is obtained. The 10 essential steps of universal precautions can be summarized as follows [38]:

1. Make a diagnosis with an appropriate differential.
2. Conduct a patient assessment, including risk for substance use disorders.
3. Discuss the proposed treatment plan with the patient and obtain informed consent.
4. Have a written treatment agreement that sets forth the expectations and obligations of both the patient and the treating physician.
5. Initiate an appropriate trial of opioid therapy, with or without adjunctive medications.
6. Perform regular assessments of pain and function.
7. Reassess the patient's pain score and level of function.
8. Regularly evaluate the patient in terms of the "5 A's": Analgesia, Activity, Adverse effects, Aberrant behaviors, and Affect.
9. Periodically review the pain diagnosis and any comorbid conditions, including substance use disorders, and adjust the treatment regimen accordingly.
10. Keep careful and complete records of the initial evaluation and each follow-up visit.

By acknowledging the fact that there are no signs that invariably point to substance use disorder [41], the universal precautions encourage a consistent and respectful approach to the assessment and management of pain patients, thereby minimizing stigma, improving patient care, and reducing overall risk [38].

# References

1. Federation of State Medical Boards (FSMB). *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain.* Washington, DC: The Federation, 1998.

2. Federation of State Medical Boards (FSMB). *Model Policy for the Use of Controlled Substances for the Treatment of Pain.* Washington, DC: The Federation, 2004.

3. Office of National Drug Control Policy (ONDCP). *Epidemic: Responding to America's Prescription Drug Abuse Crisis.* Washington, DC: Executive Office of the President, The White House, 2011.

4. Institute of Medicine (IOM) of the National Academy of Sciences (NAS). *Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education and Research.* Washington, DC: National Academies Press, 2011.

5. Bohnert ASB, Valenstein M, Bair MJ et al. Association between opioid prescribing patterns and opioid overdose-related deaths. *Journal of the American Medical Association.* 2011 Apr 6;305(13):1315-1321.

6. Fishbain D, Johnson S, Webster L et al. Review of regulatory programs and new opioid technologies in chronic pain management: Balancing the risk of medication abuse with medical need. *Journal of Managed Care Pharmacy.* 2010;16(4):276-278.

7. Bloodworth D. Opioids in the treatment of chronic pain: Legal framework and therapeutic indications and limitations. *Physical Medicine and Rehabilitation Clinics of North America.* 2006;17:355-379.

8. Noble M, Treadwell JR, Tregear SJ et al. *Cochrane Database of Systematic Reviews, Issue 1. Long-term Opioid Management for Chronic Noncancer Pain.* New York, NY: The Cochrane Collaborative, John Wiley & Sons, Ltd., 2010. Review.

9. Rosenblum A, Marsch LA, Joseph H et al. Opioids and the treatment of chronic pain: Controversies, current status, and future directions. *Experimental and Clinical Psychopharmacology.* 2008 Oct;16(5):405-416.

10. Passik SD & Weinreb HJ. Managing chronic nonmalignant pain: Overcoming obstacles to the use of opioids. *Advances in Therapy.* 2000;17(2):70-83.

11. Passik SD & Kirsch KL. The interface between pain and drug abuse and the evolution of strategies to optimize pain management while minimizing drug abuse. *European Clinical Psychopharmacology.* 2008 Oct; 16(5):400-404.

12. American Academy of Pain Medicine (AAPM), American Pain Society (APS), and American Society of Addiction Medicine (ASAM). *Public Policy Statement on the Rights and Responsibilities of Healthcare Professionals in the Use of Opioids for the Treatment of Pain.* Chevy Chase, MD: American Society of Addiction Medicine, 2004.

13. Gomes T, Mamdani MM, Dhalla IA et al. Opioid dose and drug-related mortality in patients with nonmalignant pain. *Archives of Internal Medicine.* 2011 Apr 11;171(7):686-691.

14. Chou R, Fanciullo GJ, Fine PG et al., for the American Pain Society and American Academy of Pain Medicine Opioid Guidelines Panel. Clinical guidelines for the use of chronic opioid therapy in chronic noncancer pain. *Journal of Pain.* 2009 Feb;10(2):113-130.

15. Cicero TJ, Surratt HL, Kurtz S et al. Patterns of prescription opioid abuse and comorbidity in an aging treatment population. *Journal of Substance Abuse Treatment.* 2012 Jan;42(1):87-94.

WV_BOM00000051

DEF-WV-01935.00015

16. American College of Physicians (ACP). *Evidence-Based Interventions to Improve the Palliative Care of Pain, Dyspnea, and Depression at the End of Life: A Clinical Practice Guideline from the American College of Physicians.* Philadelphia, PA: The College, 2008.

17. Parran TV Jr. Prescription drug abuse: A question of balance. *Alcohol and Substance Abuse.* 1997;81(4):253-278.

18. Wilford BB, Finch J, Czechowicz D et al. An overview of prescription drug misuse and abuse: Defining the problem and seeking solutions. *Journal of Law, Medicine and Ethics.* 1994 Fall;22(3):197-203.

19. American Medical Association (AMA), Council on Scientific Affairs. Drug abuse related to prescribing practices (CSA Rep. C, A-81; Reaffirmed 1991, 2001, 2011). *Proceedings of the House of Delegates of the American Medical Association.* Chicago, IL: The Association, 1981.

20. American Medical Association (AMA), Council on Scientific Affairs. Education regarding prescribing controlled substances (Sub. Res. 76; Reaffirmed: 1998, 2008). *Proceedings of the House of Delegates of the American Medical Association.* Chicago, IL: The Association, 1988.

21. Ling W, Wesson DR & Smith DE. Abuse of prescription opioids. In AW Graham, TK Schultz, M Mayo-Smith, RK Ries & BB Wilford (eds.) *Principles of Addiction Medicine, Third Edition.* Chevy Chase, MD: American Society of Addiction Medicine, 2003.

22. Wesson DR & Smith DE. Prescription drug abuse: Patient, physician, and cultural responsibilities. *Western Journal of Medicine.* 1990;152(5):613-616.

23. Parran TV Jr., Wilford BB & DuPont RL. Prescription drug abuse and addiction, Part II: Patient management. *Up-to-Date online medical education website* [www.uptodate.com]. Philadelphia, PA: Lippincott, Williams & Wilkins, 2012.

24. Blumenschein K, Fink JL, Freeman PR et al., for the Kentucky All Schedule Prescription Electronic Reporting Program (KASPER) Evaluation Team. *Review of Prescription Drug Monitoring Programs in the United States.* Lexington, KY: University of Kentucky College of Pharmacy, June 2010.

25. Controlled Substances Act of 1970 (CSA). *Federal Register* (CFR). Public Law No. 91-513, 84 Stat. 1242.

26. Dasgupta N, Kramer ED, Zalman MA et al. Association between nonmedical and prescriptive usage of opioids. *Drug and Alcohol Dependence.* 2006 Apr 28;82(2):135-142.

27. American Academy of Addiction Psychiatry (AAAP). *Policy Statement: Use of Opioids in the Treatment of Chronic, Non-malignant Pain.* East Providence, RI: The Academy, 2007 (revised 2009).

28. American Academy of Pain Medicine (AAPM), American Pain Society (APS), and American Society of Addiction Medicine (ASAM). *Definitions Related to the Use of Opioids in the Treatment of Chronic Pain.* Glenview, IL: American Pain Society, 2001.

29. American Pain Society (APS) and American Academy of Pain Medicine (AAPM). Clinical guideline for the use of chronic opioid therapy in chronic noncancer pain. *Journal of Pain* 2009 Feb; 10(2):113-130.

30. American Society of Anesthesiologists (ASA) and American Society of Regional Anesthesia and Pain Medicine (ASRAPM). *Practice Guidelines for Chronic Pain Management: An Updated Report by the ASA Task Force on Chronic Pain Management and ASRAPM.* Washington, DC: ASA & ASRAPM, 2010.

31. Center for Substance Abuse Treatment (CSAT), Substance Abuse and Mental Health Services Administration (SAMHSA). *Treatment Improvement Protocol (TIP) 54: Managing Chronic Pain in Adults With*

WV_BOM00000052

DEF-WV-01935.00016

*or in Recovery From Substance Use Disorders.* DHHS Pub. No. (SMA) 12-4671. Rockville, MD: CSAT, SAMHSA, 2012.

32. Department of Veterans Affairs (VA) and Department of Defense (DoD). *Clinical Practice Guideline: Management of Opioid Therapy for Chronic Pain* (Version 2.0). Washington, DC: VA/DoD, 2010.

33. Institute for Clinical Systems Improvement (ICSI). *Health Care Guideline: Assessment and Management of Chronic Pain, Fifth Edition.* Bloomington, MN: The Institute, 2011.

34. Maine Primary Care Association (MPCA). *Health Care Safety Net Series: Opiate Use for Chronic, Non-Cancer Pain (CNCP), First Edition.* Augusta, ME: The Association, October 2011.

35. National Opioid Use Guideline Group (NOUGG). *Canadian Guideline for Safe and Effective Use of Opioids for Chronic Non-Cancer Pain, Version 5.6.* Ottawa, Canada: National Pain Centre, April 30, 2010.

36. Utah Department of Health (UDOH). *Utah Clinical Guidelines on Prescribing Opioids for Treatment of Pain.* Salt Lake City, UT: The Department, February 2009.

37. Washington State Agency Medical Directors' Group (WSAMDG). *Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain: An Educational Aid to Improve Care and Safety With Opioid Treatment.* Corvallis, WA: Washington Department of Health, 2010.

38. Gourlay DL & Heit HA. Universal precautions in pain medicine: A rational approach to the treatment of chronic pain. *Pain Medicine.* 2005;6:107-112.

39. Zacny J, Bigelow G, Compton P et al. College on Problems of Drug Dependence task force on prescription opioid nonmedical use and abuse: Position statement. *Drug and Alcohol Dependence.* 2003;69:215-232.

40. American Society of Addiction Medicine (ASAM). *The Definition of Addiction.* Chevy Chase, MD: The Society, 2011.

41. Heit HA & Gourlay DL. The treatment of chronic pain in patients with a history of substance abuse. In JC Ballantyne & JP Rathmell (eds.) *Bonica's Management of Pain, Fourth Edition.* Philadelphia, PA: Lippincott, Wiliams & Wilkins, 2010.

42. Angarola R. The effect of national and international drug control laws on patient care. In BB Wilford (ed.) *Balancing the Response to Prescription Drug Abuse: Report of a National Symposium on Medicine and Public Policy.* Chicago, IL: American Medical Association, 1990.

43. Drug Enforcement Administration (DEA), Office of Diversion Control. *Physician's Manual: An Informational Outline of the Controlled Substances Act of 1970.* Washington, DC: DEA, U.S. Department of Justice, 1990.

44. Wilford BB & DuPont RL. Prescription drug abuse. In A Wertheimer & T Fulda (eds.). *A Textbook on Pharmaceutical Policy.* Binghamton, NY: The Haworth Press, 2007.

45. Isaacson JH, Hopper JA, Alford DP et al. Prescription drug use and abuse: Risk factors, red flags, and prevention strategies. *Postgraduate Medicine.* 2005;118:19.

46. Smith MY & Woody G. Nonmedical use and abuse of scheduled medications prescribed for pain, pain-related symptoms, and psychiatric disorders: Patterns, user characteristics, and management options. *Current Psychiatry Reports.* 2005 Oct;7(5):337-343.

47. Krebs EE, Lorenz KA, Bair MJ et al. Development and initial validation of the PEG, a three-item scale assessing pain intensity and interference. *Journal of General Internal Medicine.* 2009 Jun;24(6):733-738.

WV_BOM00000053

DEF-WV-01935.00017

48. Butler SF, Budman SH, Fernandez K et al. Validation of a screener and opioid assessment measure for patients with chronic pain. *Pain.* 2004 Nov;112(1-2):65-75.

49. Webster LR & Webster RM. Predicting aberrant behaviors in opioid-treated patients: Preliminary validation of the Opioid Risk Tool. *Pain Medicine.* 2005 Nov-Dec;6(6):432-442.

50. White AG, Birnbaum HG, Schiller M et al. Analytic models to identify patients at risk for prescription opioid abuse. *American Journal of Managed Care.* 2009 Dec;15(12):897-906.

51. Nicolaidis C, Chianello T & Gerrity M. Development and preliminary psychometric testing of the Centrality of Pain Scale. *Pain Medicine.* 2011 Apr;12(4):612-617.

52. Becker WC, Tobin DG & Fiellin DA. Nonmedical use of opioid analgesics obtained directly from physicians: Prevalence and correlates. *Archives of Internal Medicine.* 2011;171(11):1034-1036.

53. Gourlay D, Heit HA & Caplan YH. *Urine Drug Testing in Clinical Practice; The Art & Science of Patient Care.* John Hopkins University School of Medicine; 5th Edition, June 2012. Available: (http://www.udtmonograph.com/).

54. Starrels JL, Fox AD, Kunins HV et al. They don't know what they don't know: Internal medicine residents' knowledge and confidence in urine drug test interpretation for patients with chronic pain. *Journal of General Internal Medicine.* 2012 Nov;27(11):1521-1527.

55. Edlund M, Martin BC, Fan M-Y et al. Risks for opioid abuse and dependence among recipients of chronic opioid therapy: Results from the TROUP Study. *Drug and Alcohol Dependence.* 2010;112;90-98.

56. Fleming MF, Balousek SL, Klessig CL et al. Substance use disorders in a primary care sample receiving daily opioid therapy. *Journal of Pain.* 2007 Jul;8(7):573-582.

57. Fishbain DA, Cole B, Lewis J et al. What percentage of chronic nonmalignant pain patients exposed to chronic opioid analgesic therapy develop abuse/addiction and/or aberrant drug-related behaviors? A structured evidence-based review. *Pain Medicine.* 2008 May-Jun;9(4):444-459.

58. Berndt S, Maier C & Schütz HW. Polymedication and medication compliance in patients with chronic non-malignant pain. *Pain.* 1993 Mar;52(3):331-339.

59. Wasan AD, Michna E, Janfaza D et al. Interpreting urine drug tests: Prevalence of morphine metabolism to hydromorphone in chronic pain patients treated with morphine. *Pain Medicine.* 2008 Oct;9(7):918-923.

60. Starrels JL, Becker WC, Alford DP et al. Systematic review: Treatment agreements and urine drug testing to reduce opioid misuse in patients with chronic pain. *Annals of Internal Medicine.* 2010 Jun 1;152(11):712-720.

61. Meltzer EC, Rybin D, Saitz R et al. Identifying prescription opioid use disorder in primary care: Diagnostic characteristics of the Current Opioid Misuse Measure (COMM). *Pain.* 2011 Feb;152(2):397-402.

62. Passik SD & Kirsh KL. Assessing aberrant drug-taking behaviors in the patient with chronic pain. *Current Pain Headache Reports.* 2004;8(4):289-294.

63. Passik SD & Kirsch KL. Managing pain in patients with aberrant drug-taking behaviors. *Journal of Supportive Oncology.* 2005;3(1):83-86.

64. Schnoll SH & Finch J. Medical education for pain and addiction: Making progress toward answering a need. *Journal of Law, Medicine & Ethics.* 1994 Fall;22(3):252-256.

WV_BOM00000054

DEF-WV-01935.00018

65. Chou R, Fanciullo GJ, Fine PG et al. Opioids for chronic noncancer pain: Prediction and identification of aberrant drug-related behaviors: A review of the evidence for an American Pain Society and American Academy of Pain Medicine clinical practice guideline. *Journal of Pain* 2009 Feb;10(2):131-146.

66. Walwyn WM, Miotto KA & Evans CJ. Opioid pharmaceuticals and addiction: The issues, and research directions seeking solutions. *Drug and Alcohol Dependence.* 2010 May 1;108(3):156-165.

67. Turk DC, Swanson KS & Gatchel RJ. Predicting opioid misuse by chronic pain patients: A systematic review and literature synthesis. *Clinical Journal of Pain.* 2008 Jul-Aug;24(6):497-508.

68. Community Care Behavioral Health (CCBH) & Institutes for Research Education and Training in Addictions (IRETA). *Buprenorphine Treatment for Opioid Dependence.* Pittsburgh, PA: The Institute, May 2011.

69. American Psychiatric Association (APA). *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V).* Washington, DC: American Psychiatric Publishing, Inc., 2013.

70. World Health Organization (WHO). *International Classification of Diseases, 10th Edition (ICD-10).* Geneva, Switzerland: World Health Organization, 1996.

71. American Psychiatric Association (APA). *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR).* Washington, DC: American Psychiatric Publishing, Inc., 2000.

72. Heit HA. Addiction, physical dependence, and tolerance: Precise definitions to help clinicians evaluate and treat chronic pain patients. *Journal of Pain Palliative Care Pharmacotherapy* 2003;17(1):15-29.

73. Johnson CE, Arfken CL, DiMenza S et al. Diversion and abuse of buprenorphine: Findings from national surveys of treatment patients and physicians. *Drug and Alcohol Dependence.* 2012 Jan 1;120(1-3):190-195.

74. Cicero TJ, Kurtz SP, Surratt HL et al. Multiple determinants of specific modes of prescription opioid diversion. *Journal of Drug Issues.* 2011 Spring;41(2):283-304.

75. McNicholas LF, chair, for the CSAT Expert Panel. *Clinical Guidelines for the Use of Buprenorphine in the Treatment of Opioid Addiction.* Treatment Improvement Protocol [TIP] Series Number 40. DHHS Publication No. [SMA] 04-3939. Rockville, MD: Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, 2004.

76. Covington EC. Pain and addictive disorder: Challenge and opportunity. In P Prithvi Raj (ed.) *Practical Management of Pain, 4th Edition.* New York, NY: Elsevier/Mosby, 2007.

77. Chu LF, Angst MS & Clark D. Opioid-induced hyperalgesia in humans: Molecular mechanisms and clinical considerations. *Clinical Journal of Pain.* 2008;24(6):479-496.

78. World Health Organization (WHO). *Ensuring Balance in National Policies on Controlled Substances: Guidance for Availability and Accessibility of Controlled Medicines, Second Edition.* Geneva, Switzerland: World Health Organization, 2011.

79. General Accounting Office (GAO). *Prescription Drugs: State Monitoring Programs May Help to Reduce Illegal Diversion.* Washington, DC: Government Printing Office, 2004.

80. National Summit for Opioid Safety: Project ROAM and Physicians for Responsible Opioid Prescribing; October 31 and November 1, 2012; Seattle, WA.

WV_BOM00000055

DEF-WV-01935.00019

81. Passik S, Heit H, Rzetelny A, Pesce A, Mikel C, and Kirsh K (2013). Trends in Drug and Illicit Use from Urine Drug Testing from Addiction Treatment Clients. Proceedings of the International Conference on Opioids. Boston, MA.

19

WV_BOM00000056

DEF-WV-01935.00020