

**U.S. Department of Health and Human Services**

**Office of Inspector General**

# States' Use of Grant Funding for a Targeted Response to the Opioid Crisis

**OEI-BL-18-00460**

March 2020

oig.hhs.gov

**Suzanne Murrin**

Deputy Inspector General
for Evaluation and Inspections



DEF_WV_Trial_00030257

DEF-WV-03237.00001


DEF-WV-03237

Report in Brief
March 2020
OEI-BL-18-00460

**U.S. Department of Health and Human Services**
# Office of Inspector General



# States' Use of Grant Funding for a Targeted Response to the Opioid Crisis

## What OIG Found

More than $300 million—almost a third of the total nationwide grant funding for the State Targeted Response to the Opioid Crisis grant program (STR grant program)—remained unspent after 2 years. Among individual States, 14 spent less than half of their respective grant allocations. In total, all but six States requested no-cost extensions that will allow them up to an additional 12 months to spend their original STR funding. States attributed spending delays primarily to challenges related to State procurement processes. Additionally, several States are in danger of exceeding the legislatively mandated 5-percent cap on administrative costs.

Across all States, 65 percent of spending was devoted to improving access to treatment in general for opioid use disorder (OUD), and as a result, States reported that the number of patients receiving any type of OUD treatment increased substantially during the grant period. However, although the Substance Abuse and Mental Health Services Administration (SAMHSA) required States to use STR grant funds to implement or expand access specifically to *evidence-based* OUD treatment—particularly, medication-assisted treatment (MAT)—the agency did not collect data on how many patients specifically received MAT versus other types of treatment (i.e., detoxification or abstinence-based treatment).

Given the lack of data, it is unclear how successful the STR grant program was at achieving its goal of expanded access to MAT. Without such data, SAMHSA has limited means to monitor whether the money spent through the STR grant program, or other future grant programs, is helping patients obtain effective, evidence-based treatment for OUD.

## What OIG Recommends

We recommend that SAMHSA work closely with States and territories during the no-cost extension period to address barriers to timely spending and to ensure that administrative cost caps are not exceeded. Additionally, we recommend that SAMHSA require States that receive grants for OUD treatment to specifically report how many patients are receiving MAT. SAMHSA concurred with our recommendations.

Full report: oig.hhs.gov/oei/reports/oei-BL-18-00460.asp

---

**Key Takeaway**

States have been slow to spend their awards under the State Targeted Response to the Opioid Crisis grant program (STR grant program). With an average of 130 opioid-overdose deaths per day, it is paramount that SAMHSA and its State partners quickly and effectively use Federal grant dollars to expand access to treatment for opioid use disorder (OUD). States reported that the STR expenditures they did make allowed them to expand access to treatment; however, SAMHSA did not collect data to determine how many patients received medication-assisted treatment, an evidence-based treatment for OUD.

---

## Why OIG Did This Review

To address the increased need for treatment services, the 21st Century Cures Act established the STR grant program. Through this program, SAMHSA awarded almost $1 billion in grants to States over a 2-year grant period (May 2017 through April 2019). States were required to use these funds to:

- expand access to evidence-based treatment for OUD, especially MAT;
- reduce unmet treatment needs; and
- reduce opioid overdose-related deaths through the provision of prevention, treatment, and recovery support services.

## How OIG Did This Review

For 56 States and territories that received STR grants, we examined how much of each State's award remained unspent at the end of the first and second years of the grant period. We also reviewed progress reports to determine how States used STR grant funds to expand access to OUD prevention, evidence-based treatment, and recovery support services. We also reviewed the number of patients who received OUD treatment and recovery services through STR-funded activities.

DEF_WV_Trial_00030258

# TABLE OF CONTENTS

BACKGROUND                                                                                                  1

    Methodology                                                                                        5

FINDINGS

    Almost a third of total nationwide STR grant funding ($304 million) remained unspent after          7
    2 years

    States reported using STR funding to expand access to treatment, but the number of patients        8
    who specifically received MAT is unknown

CONCLUSION AND RECOMMENDATIONS

    Work closely with States and territories during the no-cost extension period to address            12
    barriers to timely spending and to ensure that administrative cost caps are met

    Require States receiving OUD treatment grants to specifically report how many patients are         13
    receiving evidence-based treatment, including MAT

AGENCY COMMENTS AND OIG RESPONSE                                                                            14

APPENDICES

    A:  Percentages of STR Awards That Remained Unspent by April 30, 2019                               15

    B:  Percentage of STR Award Expenditures by Category as of October 31, 2018                         17

    C:  Agency Comments                                                                                19

ACKNOWLEDGMENTS                                                                                             21

**DEF_WV_Trial_00030259**

**DEF-WV-03237.00003**

# BACKGROUND

> ### Objective
> To review grantees' use of funds under the State Targeted Response to the Opioid Crisis grant program.

The rise in opioid addiction and overdose rates among Americans combined with inadequate access to quality, specialized treatment for substance abuse continues to fuel the opioid crisis.  More than 2 million people in the United States have an opioid use disorder (OUD) related to prescription pain relievers and/or heroin.[1]  Moreover, roughly two-thirds of the 70,000 drug overdose deaths in 2017 involved an opioid, with an average of 130 opioid-overdose deaths each day.[2]  Access to appropriate treatment is vital in addressing the escalating rates of addiction and mortality.  However, the Substance Abuse and Mental Health Services Administration (SAMHSA) estimates that only 29 percent of people with OUD received specialty treatment for illicit drug use in 2017.[3]

To address the increased need for OUD treatment services, the 21st Century Cures Act established the State Targeted Response to the Opioid Crisis grant program, hereinafter referred to as the STR grant program.[4] The STR grant program, administered by SAMHSA, provided $1 billion over a 2-year period to 57 States and U.S. territories.  According to SAMHSA, the purpose of the program is to expand access to evidence-based OUD treatment, particularly medication-assisted treatment (MAT); reduce unmet treatment needs; and reduce opioid overdose-related deaths through the provision of prevention, treatment, and recovery support services.[5, 6]  (Recovery support typically occurs after treatment begins and is an ongoing process in which patients rebuild their lives, relationships, and health.[7])

In this report, OIG examined how States and territories used STR grant funds disbursed in 2017 and 2018 to meet the above goals.

**Medication-Assisted Treatment**

MAT is widely recognized as the primary evidence-based treatment for OUD.[8, 9]  It includes the use of medications approved by the Food and Drug Administration (FDA) in combination with behavioral interventions and recovery support services.[10]  Exhibit 1 provides an overview of the medications (i.e., methadone, buprenorphine, and naltrexone) used in MAT. Some in the treatment community adhere to an abstinence-only philosophy that—in contrast to MAT—avoids the use of medications, particularly those that activate opioid receptors.  However, abstinence-based treatment—the use of behavioral therapy or counseling combined with complete abstinence—is not scientifically supported.  MAT has been found to be

DEF_WV_Trial_00030260

DEF-WV-03237.00004

more effective than abstinence-based treatment at keeping patients in treatment and reducing their use of opioids because MAT drugs are designed to reduce opioid cravings and withdrawal.[11]  Research has also shown that abstinence-based treatment is associated with a very high relapse rate, and significantly increases an individual's risk for opioid overdose and death if opioid use is resumed.[12, 13]

**Exhibit 1: Three FDA-Approved Drugs Are Used in Medication-Assisted Treatment.**

MAT is the use of medications coupled with effective behavioral therapies and recovery support services to treat OUD and prevent opioid overdose.  There are three FDA-approved drugs used in MAT, and each is subject to different restrictions.

| Methadone | Buprenorphine | Naltrexone |
|---|---|---|
| • Schedule II controlled substance<br>• Dispensed only through SAMHSA-certified Opioid Treatment Programs (OTPs) | • Schedule III controlled substance<br>• Dispensed through a SAMHSA-certified OTP or a Buprenorphine-Waivered Office-Based Opioid Treatment practice | • Not a controlled substance<br>• Can be prescribed by any health care provider licensed to prescribe medications |

Source: SAMHSA, *Medication-Assisted Treatment*, April 26, 2019.  Accessed at https://www.samhsa.gov/medication-assisted-treatment on September 3, 2019.
Note:   Schedule II drugs have a high potential for abuse, with use potentially leading to severe psychological or physical dependence. Schedule III drugs have a moderate to low potential for physical and psychological dependence.

Despite the well-documented effectiveness of MAT, individuals often encounter barriers to accessing this type of treatment.[14, 15]  Because of the historic emphasis on abstinence in substance abuse treatment, MAT has sometimes been stigmatized and dismissed as "substituting one addiction for another."[16]  Many patients seeking OUD treatment experience difficulties in finding providers who prescribe MAT,[17] as approximately 90 percent of conventional drug treatment facilities do not offer it.[18]  Additionally, prior OIG work and other research have demonstrated that there are geographic disparities in the availability of MAT services.[19, 20]

To address these barriers, the U.S. Department of Health and Human Services (HHS) developed a Five-Point Strategy to Combat the Opioid Crisis, which prioritizes improving access to MAT and strengthening data collection and reporting on patients receiving MAT.[21]  The STR grant program represents one of HHS's primary efforts to meet these stated goals.[22]  However, in a 2017 review, the Government Accountability Office found that HHS had not established performance measures that would allow HHS to determine whether its various programs, including the STR grant program, were successful in expanding access to MAT.[23]

DEF_WV_Trial_00030261

DEF-WV-03237.00005

## State Targeted Response to the Opioid Crisis Grants

The STR grant program was SAMHSA's first opioid-specific grant program that provided nationwide funding to expand access to OUD prevention, treatment, and recovery support services. The agency awarded $970 million in STR funding across all 50 States, the District of Columbia, 4 U.S. territories, and the free-associated States of Palau and Micronesia (collectively referred to hereafter as "States").[24, 25] SAMHSA allocated this funding using a formula based on drug-related deaths and unmet treatment needs in each State.[26] Funds were split over a 2-year period, with $485 million awarded for the first grant year (May 1, 2017, to April 30, 2018) and the remaining $485 million awarded for the second grant year (May 1, 2018, to April 30, 2019).[27, 28] SAMHSA also divided an additional $1 million in supplemental STR funding among three States—Massachusetts, New Hampshire, and West Virginia—that have been particularly affected by the opioid crisis.[29]

### Required Activities

States were required to develop a strategic plan identifying and addressing gaps in OUD prevention, treatment, and recovery support services.[30] Within this broad mandate, States were given flexibility to determine how to best use funds to meet the needs of their respective communities. SAMHSA reviewed and approved each State's strategic plan.

Although States had flexibility to use STR funding for a variety of activities, SAMHSA required all strategic plans to address the following:

- designing and implementing primary and secondary prevention methods;

- implementing or expanding access to clinically appropriate evidence-based treatment—particularly, the use of MAT;

- assisting patients with treatment costs;

- providing treatment coverage for patients transitioning from criminal justice or other rehabilitative settings; and

- enhancing recovery support services.

States were also permitted to use funds to train practitioners; support telehealth in rural and underserved areas; purchase the overdose-reversal drug naloxone for distribution; enhance their respective State Prescription Drug Monitoring Programs; and conduct other nondirect allowable activities specified by SAMHSA.[31, 32]

### Funding Requirements

States were required to spend funds in accordance with SAMHSA's funding requirements, which included provisions that:[33]

- funds may supplement, but not supplant, existing OUD prevention, treatment, and recovery support services within the State;

DEF_WV_Trial_00030262

DEF-WV-03237.00006

- providers that receive funding must not deny a patient access to MAT or consider a patient "not in recovery" based solely on the patient's use of MAT; and

- no more than 5 percent of the total 2-year grant award can be used for administrative and infrastructure development costs.

States were permitted to carry over unobligated funds to the second year of the STR grant program if the amount did not exceed 10 percent of the State's approved annual budget.[34, 35]  To carry over unobligated funds exceeding this amount, prior approval from SAMHSA was required. Although the 2-year STR grant period ended on April 30, 2019, States could apply to SAMHSA for a one-time no-cost extension.  This extended the final budget period for up to 12 months to give States additional time to obligate and spend their STR grant funds beyond the original end date for the project.

### Reporting Requirements

States were required to submit both financial and progress reports twice a year (every November and May).  Progress reports included information on how States allocated their STR funding across the different areas (i.e., prevention, treatment, recovery, and administrative costs) as well as information on the number of people receiving treatment and recovery support services through STR grant funding.[36]

### STR Grant Program Reauthorization

The SUPPORT for Patients and Communities Act of 2018 reauthorized the STR grant program through FY 2021.[37]  However, Congress did not allocate new funds to STR in FY 2019.  Instead, Congress provided funding through a new effort—the State Opioid Response (SOR) grant program.[38]

**State Opioid Response Grants**

As described above, Congress established the SOR grant program to build upon the STR grant program.  The requirements for the SOR grant program are similar to those for STR grants but are more explicitly focused on "increasing access to MAT using the three FDA-approved medications for the treatment of opioid use disorder."[39]

SAMHSA awarded the first SOR grant 17 months after it awarded the first STR grant.[40]  Therefore, States received both STR and SOR funding during the second year of the STR grant period, as depicted in Exhibit 2 (see next page).  The SOR funding was distributed using a formula similar to the STR grant formula, but it included an additional 15-percent set-aside for the 10 States hardest hit by the crisis.[41]  SAMHSA first announced awarding $930 million in SOR grants on September 19, 2018, and announced an additional $487 million in supplementary funding on March 20, 2019.[42, 43]  Another $932 million was announced in September 2019 for second-year SOR grants.[44]

DEF_WV_Trial_00030263

DEF-WV-03237.00007

**Exhibit 2.  States Received Both STR and SOR Grant Funding During the Second Year of the STR Grant Program.**



Source: OIG review of SAMHSA grant award announcements

## Methodology

### Scope

This study included 56 of the 57 States and territories that received STR awards during the 2-year grant period (May 2017 through April 2019).  We excluded one territory—the U.S. Virgin Islands—from our analysis because a hurricane had destroyed its communications infrastructure, rendering it unable to implement its STR grant program.  This study examined only funds disbursed under the STR grant program.  We did not include any other SAMHSA grant programs, such as SOR grants, in this review.

### Data Sources

We obtained drawdown data from the HHS Payment Management System for both years of the STR grant program (May 2017 through April 2019).  Drawdown data reflects records of grantee withdrawals of STR funds.

From SAMHSA, we obtained a list of the States that requested to carry over first-year STR grant funds into the second year of the grant program; the amounts they requested to carry over; and the States' rationales for the unspent funds.  We also obtained a list of the States that requested a no-cost extension to allow for up to 12 additional months to spend their grant funds beyond the original end date for the project.

We also obtained from SAMHSA the three 6-month STR grant progress reports that each State submitted for the first 18 months of the program (May 2017 through October 2018).  The progress reports for the final 6 months of the 2-year STR grant program (November 2018 through April 2019) were not available at the time of our review.  The STR progress reports included data on (1) how States allocated funding among the various priorities, (2) the OUD service providers that received grant funding, and (3) the number of patients receiving treatment and recovery support services through STR grants.

DEF_WV_Trial_00030264

DEF-WV-03237.00008

### Data Analysis

We analyzed STR grant drawdown data to determine how much of each State's award remained unspent after each year of the 2-year grant period. We examined the States' carryover requests to determine how many States requested to carry over more than 10 percent of their funding and why their grant awards had remained unspent.  We also examined how many States requested no-cost extensions for additional time to spend their grant funds beyond the original end date for the project.

We reviewed the three progress reports that each State submitted at 6-month intervals to determine (1) the amount of funding devoted to prevention, treatment, recovery support, and administrative costs after 18 months of STR grant funding; (2) how States reported using STR funds to expand access to MAT; and (3) the number of patients who received treatment and recovery support services during each 6-month period.

### Limitations

This report relied on States' self-reported data on how the STR grant funding was spent—the priority areas on which they focused; the type of providers that received subrecipient funding; and the number of patients who received services.  OIG did not independently assess the validity of these data.

Although SAMHSA maintained its own financial records about the overall amount drawn down and carried over by each State, it relied on States' progress reports for more detailed information about how STR funding was spent (e.g., the proportions dedicated to prevention, treatment, recovery support, and administrative costs).  Although these data were self-reported by each State, they were the best available information about how States were using their STR awards.

**Standards**

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

DEF_WV_Trial_00030265

DEF-WV-03237.00009

# FINDINGS

**Almost a third of the total nationwide STR grant funding ($304 million) remained unspent after 2 years**

### States have been slow to spend their STR awards, with $304 million remaining unspent after 2 years

During the first grant year, most States experienced delays in implementing their respective STR grant programs.  In total, $295 million (61 percent) of the $485 million award allocated in the first year remained unspent after 12 months.  As a result, all but 2 States carried over first-year funding into the second year—including 17 that requested to carry over more than half of their annual funding.

Although expenditures increased during year two of the grant, $304 million—31 percent of the total 2-year $970 million award—still remained unspent after 24 months.  This included nine States and five territories that spent less than half of their respective grant allocations.  (See Exhibit 3.)  Six of the nine States had drug overdose death rates that were higher than the national rate, so their inability to expend STR funding is particularly concerning.[45]  (Data on overdose death rates in U.S. territories were not available.)  For example, West Virginia's drug overdose death rate was more than double the national rate, yet it still had nearly two-thirds of its STR award remaining at the end of the second year.  Appendix A shows the percentage of each STR grant award that was spent by April 30, 2019.  In total, all but six States requested a no-cost extension that will allow them to spend their STR funding for up to 12 months beyond the original end date for the project.[46]

**Exhibit 3: Fourteen States Spent Less Than Half of Their Respective STR Grant Awards by the End of the 2-Year STR Grant Period.**



Source: OIG analysis of the Payment Management System's Grant Drawdown Report, May 2, 2019.

DEF_WV_Trial_00030266

DEF-WV-03237.00010

## Challenges with State procurement processes were a primary driver for spending delays

SAMHSA staff reported that the most common explanation for States not drawing down significant portions of their respective STR awards was challenges related to State procurement processes.  Procurement challenges included State legislative timelines that did not align with Federal appropriation cycles; State staffing shortages, sometimes as a result of hiring freezes; reluctance from contract bidders because the grants had a short duration (i.e., 2 years);[47] and delays that resulted from contract negotiations.  In addition to States encountering procurement challenges, some States also expressed to SAMHSA that they had not drawn down their awards because of workforce challenges and stigma related to MAT.

Although SAMHSA cannot assist with State-specific procurement processes, it stated that it works with States to accelerate program implementation in other ways.  For example, SAMHSA awarded an STR technical assistance contract to the American Academy of Addiction Psychiatry, which partnered with 27 other national professional organizations to form the Opioid Response Network.  This network provides training and technical assistance focusing on applying evidence-based practices in prevention, treatment, and recovery support to meet locally identified needs.  SAMHSA also reported that it works with States via regular conference calls and prioritized site visits.  These technical assistance activities are intended to support States in effectively expending their STR awards by helping States overcome obstacles to expanding OUD prevention, treatment, and recovery support services in their respective local communities.

**States reported using STR funding to expand access to treatment, but the number of patients who specifically received MAT is unknown**

## Across all States, 65 percent of STR funding was devoted to expanding access to treatment

According to SAMHSA, funding under the STR grant program was intended to expand access to evidence-based OUD treatment, especially MAT; reduce unmet treatment needs; and reduce opioid overdose-related deaths through the provision of prevention, treatment, and recovery support services.  States had flexibility in determining how to prioritize these goals when spending their STR awards.

During the first 18 months of the 2-year grant program, 65 percent of the total STR funding spent nationwide was devoted to treatment, 17 percent to prevention, 13 percent to recovery support, and the remaining 4 percent to administrative costs.  (See Exhibit 4.)  However, there was wide variation among States in how they allocated funding in accordance with their assessment of local needs.  For example, 46 States reported that more than half of their expenditures went to treatment services.  Among these 46 States were 2 States—Delaware and Florida—that dedicated more than 90 percent of their expenditures to treatment.  In contrast, one State— Massachusetts—reported that it spent more than half of its expenditures on recovery support services.  Two States—South Dakota and Nebraska—

DEF_WV_Trial_00030267

DEF-WV-03237.00011

reported that they spent more than half on prevention.  Appendix B shows the percentage of each State's STR grant award expenditures by category.

**Exhibit 4: Nearly Two-Thirds of STR Grant Funding Spent During the First 18 Months Was Devoted to Treatment.**



Source: OIG analysis of SAMHSA STR Grant data, 2019.

Although 4 percent of funding was spent nationwide on administrative costs, more than a third of States (22 of 56) were exceeding the 5-percent administrative spending cap at the 18-month mark of the 2-year grant period.  (See Appendix B.)  This included eight States that had spent 10 percent or more in this area.  SAMHSA staff noted that administrative expenses are often higher during the initial implementation of a grant and that agency staff work closely with grantees to ensure that administrative caps are not exceeded by the time all funds have been disbursed.  However, at least according to the 18-month data reported to SAMHSA, two States (i.e., Georgia and Minnesota) will exceed the 5-percent threshold even if they do not spend another dollar on administrative costs during the remainder of the grant.

### STR grant funding increased the number of patients receiving some form of OUD treatment, but SAMHSA did not track whether these patients received MAT

SAMHSA required States to use STR grant funds to implement or expand access to evidence-based treatment for OUD, particularly MAT.  However, SAMHSA required States to provide data only on the number of patients who received *any* type of OUD treatment (i.e., detoxification, abstinence-based approaches, or MAT).  SAMHSA did not collect data on the precise numbers of patients who received MAT services through STR funding, but rather on the broad numerical ranges of such patients—

DEF_WV_Trial_00030268

DEF-WV-03237.00012

e.g., "25 to 49," "100 to 249," "1000 or more." As a result, an exact count of patients receiving STR-funded MAT cannot be calculated.

As shown in Exhibit 5, the number of patients receiving any OUD treatment (not exclusively MAT) under STR grants nationwide increased steadily from about 37,000 patients during the first half of the first grant year to approximately 118,000 during the first half of the second year. Similarly, the number of patients receiving recovery support services also increased over time, from 13,000 in the first 6 months of the grant to nearly 54,000 patients 1 year later.

**Exhibit 5: The Number of Patients Receiving Treatment and Recovery Support Services Increased Substantially After Initial Delays in Implementation of the STR Program.**



Source: OIG analysis of SAMHSA STR grant data, 2019.

The information above suggests that the STR grant program was likely successful in expanding access to general OUD treatment and recovery support services, given that Congress required States to use allocated funds to supplement, not supplant, existing treatment and recovery support services. However, it is unclear how successful the program was at achieving its goal of expanding access to MAT, because SAMHSA did not collect specific data on how many patients received this service.

Although we were unable to determine how many patients received MAT, SAMHSA did ask States to indicate whether they were using STR grant funding to expand access to MAT in different clinical and institutional settings. During the most recent reporting period (May through October 2018), 50 of the 56 States and territories responded that they were using STR grant funds to expand access to at least one of the three types of MAT. As shown in Exhibit 6, 71 percent of States reported using STR funding to expand access to MAT in Opioid Treatment Programs (commonly known as methadone clinics), 62 percent to MAT in doctors' offices, and 52 percent to MAT in other settings. Additionally, nearly

DEF_WV_Trial_00030269

DEF-WV-03237.00013

two-thirds of States reported offering MAT services to patients transitioning from criminal justice facilities or residential settings for substance-abuse treatment.  During the same period (May through October 2018), States indicated that they allocated funds to a total of 641 MAT-providing entities.

**Exhibit 6: Most States Reported Using STR Grant Funds To Expand Access to MAT.**

| Select STR Grant Priority Areas | States Using STR Grant Funds for This Service |
|---|---|
| Expanding the number of patients served with: | |
| Methadone, buprenorphine, or naltrexone in Opioid Treatment Programs | 40 (71%) |
| Buprenorphine-Waivered Office-Based Opioid Treatment practice settings | 35 (62%) |
| Naltrexone in other settings | 29 (52%) |
| Expanding the number of MAT patients admitted from: | |
| Hospital emergency departments or hospital inpatient treatment units | 32 (57%) |
| Detoxification services | 26 (46%) |
| Residential services for substance-abuse treatment | 37 (66%) |
| Correctional or detention facilities | 34 (61%) |

Source: OIG analysis of SAMHSA May to October 2018 STR Grant Report, 2019.  N = 56 States and territories.

DEF_WV_Trial_00030270

DEF-WV-03237.00014

# CONCLUSION AND RECOMMENDATIONS

With an average of 130 opioid-overdose deaths per day,[48] it is paramount that SAMHSA and its State partners quickly and effectively use Federal grant dollars to expand access to OUD treatment.  The STR grant program represented SAMHSA's first nationwide effort to assist States in addressing the opioid crisis through improved access to evidence-based OUD treatment services.  In this review, OIG found that most States were slow to spend their STR awards, with $304 million—almost a third of total funding—remaining unspent after 2 years.  These delays raise serious concerns given the urgency of the opioid crisis as well as the billions in additional opioid funding allocated through other grant programs, such as the SOR grant program.  The fact that many States found it difficult to spend STR awards in a timely fashion leads to questions about their capacity to meet the urgent treatment needs of Americans suffering from OUD.  If States are slow or stalled in spending Federal grants, local communities may not have the resources needed to fight the overdose epidemic and to continue their efforts to reverse the OUD crisis.

In addition, several States were also in danger of exceeding the legislatively mandated 5-percent cap on administrative costs.  According to data provided to SAMHSA, two of these States may have already exceeded this threshold.

Nonetheless, States reported using STR grant funding to expand access to treatment services.  Across all 56 States and territories included in our review, 65 percent of spending over the first 18 months was devoted to increasing access to some form of OUD treatment, with most States reporting that at least a portion of their respective STR awards went towards MAT-related services.  However, SAMHSA did not collect data on how many patients specifically received MAT—the primary evidence-based OUD treatment—versus other types of treatment (abstinence or detoxification).  Without such information, it is unclear how successful the program was at achieving its goal of expanding access to evidence-based OUD treatment.

We recommend that SAMHSA do the following:

## Work closely with States and territories during the no-cost extension period to address barriers to timely spending and to ensure that administrative cost caps are not exceeded

Fifty-one States and territories requested no-cost extensions that will allow them to spend their STR funding for up to 12 months beyond the original end date for the project.  During this additional time, SAMHSA should proactively monitor States—particularly, the 14 that have spent less than half of their respective grant allocations—to ensure they efficiently and effectively spend their awards to meet STR program goals.  If States are

DEF_WV_Trial_00030271

DEF-WV-03237.00015

experiencing barriers to expanding OUD treatment capacity through the STR program, these same barriers could likewise limit their ability to effectively administer similar grant programs, such as the SOR grants. SAMHSA could take any lessons learned from assisting States with barriers to OUD treatment expansion and apply them to future grant programs with similar goals.  Likewise, SAMHSA should apply any tools and lessons learned from its monitoring of the STR grant expenditures (including oversight of States' administrative spending) to be better prepared for oversight of other opioid treatment grant programs, like SOR.

Additionally, SAMHSA staff should carefully review the administrative costs reported by States since our review, with particular attention to the 22 States at risk of exceeding the 5-percent cap on such costs.  SAMHSA should impose additional award conditions, such as requiring additional project monitoring and more detailed financial reports, for those States that have exceeded the administrative cost cap.[49]

### Require States that receive grants for OUD treatment to specifically report how many patients are receiving MAT

A key strategy of HHS's Five-Point Strategy to Combat the Opioid Crisis is to "strengthen public health data reporting and collection to improve the timeliness and specificity of data."  A primary goal associated with this strategy is to collect better data on outcomes, including better data on the number of patients receiving MAT.  Also, in an October 2017 report, GAO found that HHS lacked specific performance measures to evaluate whether its efforts had expanded access to MAT, and recommended that HHS "establish performance measures with targets related to expanding access to MAT."[50]

SAMHSA is one of the primary Federal agencies charged with providing funding to States to address the opioid crisis and plays a significant role in HHS's efforts to collect more timely and specific data in this area.[51]  As SAMHSA continues to administer grant programs intended to increase access to OUD treatment, it should develop specific metrics to track and monitor whether the patients served through these programs are receiving MAT, the primary evidence-based treatment for OUD.  Without such data, SAMHSA has limited means to monitor whether the money spent through STR grants, SOR grants, and other future grant programs is helping patients obtain effective, evidence-based treatment for OUD.

DEF_WV_Trial_00030272

DEF-WV-03237.00016

# AGENCY COMMENTS AND OIG RESPONSE

SAMHSA concurred with both of our recommendations.

In response to our first recommendation, SAMHSA noted that it permitted no-cost extensions so that States had additional time to complete grant activities that might have been delayed because of procurement processes or other challenges.  SAMHSA also stated that its Government Project Officers communicate regularly with States to discuss barriers to implementation, provide guidance, and direct grantees to appropriate technical assistance.  OIG believes that as part of this process, SAMHSA should work proactively with the 14 States and territories identified in this report that had spent less than half of their grant allocations, as these States may be encountering significant challenges.  Additionally, OIG urges SAMHSA to monitor the 22 States and territories at risk of exceeding the 5-percent administrative cost cap and impose additional award conditions on those that exceed it.

In response to the second recommendation, SAMHSA indicated that its newer opioid-related grant program, the SOR grant program, requires the reporting of more detailed information, including the exact number of clients receiving MAT services.  OIG believes that SAMHSA's efforts to collect more precise data under the SOR grant program will improve HHS's ability to evaluate whether its efforts have expanded access to effective, evidence-based treatment for OUD.

Finally, SAMHSA took issue with how OIG's findings presented data related to MAT reporting.  SAMHSA stated that it tracked whether STR grant funding was used to provide MAT, but that it did not collect data on the exact number of patients receiving MAT.  OIG acknowledges this in the report and makes the point that collecting data on numerical ranges of patients who were provided MAT does not allow OIG or SAMHSA to calculate the total number of patients receiving MAT through STR funding.

For the full text of SAMHSA's comments, see Appendix C.

DEF_WV_Trial_00030273

DEF-WV-03237.00017

# APPENDIX A:  Percentages of STR Awards That Remained Unspent After 2 Years

| State | 2-Year Grant Award | Total Spent | Remaining Balance |
|-------|-------------------:|------------:|------------------:|
| Alabama | 15,935,746 | 91.9% | 8.1% |
| Alaska | 4,000,000 | 51.2% | 48.8% |
| American Samoa | 500,000 | 47.5% | 52.5% |
| Arizona | 24,343,036 | 49.4% | 50.6% |
| Arkansas | 7,802,590 | 39.1% | 60.9% |
| California | 89,499,542 | 50.2% | 49.8% |
| Colorado | 15,739,302 | 78.3% | 21.7% |
| Connecticut | 11,000,314 | 88.4% | 11.6% |
| Delaware | 4,000,000 | 36.8% | 63.2% |
| District of Columbia | 4,000,000 | 52.1% | 47.9% |
| Florida | 54,300,806 | 88.6% | 11.4% |
| Georgia | 23,565,420 | 72.2% | 27.8% |
| Hawaii | 4,000,000 | 59.6% | 40.4% |
| Idaho | 4,000,000 | 94.2% | 5.8% |
| Illinois | 32,657,166 | 71.6% | 28.4% |
| Indiana | 21,851,984 | 46.9% | 53.1% |
| Iowa | 5,456,154 | 75.4% | 24.6% |
| Kansas | 6,228,804 | 93.3% | 6.7% |
| Kentucky | 21,056,186 | 62.9% | 37.1% |
| Louisiana | 16,335,942 | 45.8% | 54.2% |
| Maine | 4,078,058 | 71.5% | 28.5% |
| Maryland | 20,073,627 | 58.9% | 41.1% |
| Massachusetts | 23,818,848 | 80.9% | 19.1% |
| Michigan | 32,745,360 | 56.0% | 44.0% |
| Micronesia | 500,000 | 22.6% | 77.4% |
| Minnesota | 10,758,698 | 73.3% | 26.7% |
| Mississippi | 7,169,354 | 71.6% | 28.4% |
| Missouri | 20,031,796 | 97.3% | 2.7% |
| Montana | 4,000,000 | 45.2% | 54.8% |
| Nebraska | 4,000,000 | 43.6% | 56.4% |
| Nevada | 11,326,656 | 67.1% | 32.9% |
| New Hampshire | 6,589,732 | 55.3% | 44.7% |
| New Jersey | 25,991,241 | 55.5% | 44.5% |
| New Mexico | 9,585,102 | 87.3% | 12.7% |
| New York | 50,521,352 | 74.4% | 25.6% |
| North Carolina | 31,173,448 | 90.9% | 9.1% |
| North Dakota | 4,000,000 | 89.6% | 10.4% |
| Northern Marianas | 500,000 | 23.2% | 76.8% |

DEF_WV_Trial_00030274

DEF-WV-03237.00018

| State | 2-Year Grant Award | Total Spent | Remaining Balance |
|---|---|---|---|
| Ohio | 52,121,004 | 77.0% | 23.0% |
| Oklahoma | 14,566,458 | 84.7% | 15.3% |
| Oregon | 13,128,850 | 55.2% | 44.8% |
| Palau | 500,000 | 44.0% | 56.0% |
| Pennsylvania | 53,015,118 | 73.4% | 26.6% |
| Puerto Rico | 9,623,924 | 31.2% | 68.8% |
| Rhode Island | 4,334,014 | 71.4% | 28.6% |
| South Carolina | 13,151,246 | 94.6% | 5.4% |
| South Dakota | 3,999,994 | 53.6% | 46.4% |
| Tennessee | 27,630,264 | 90.2% | 9.8% |
| Texas | 54,724,714 | 52.1% | 47.9% |
| Utah | 11,074,916 | 85.5% | 14.5% |
| Vermont | 4,000,000 | 36.4% | 63.6% |
| Virginia | 19,524,664 | 95.4% | 4.6% |
| Washington | 23,580,512 | 70.0% | 30.0% |
| West Virginia | 12,096,966 | 34.1% | 65.9% |
| Wisconsin | 15,273,876 | 60.0% | 40.0% |
| Wyoming | 4,000,000 | 82.3% | 17.7% |
| **Total** | **969,482,784** | **68.7%** | **31.3%** |

DEF_WV_Trial_00030275

DEF-WV-03237.00019

# APPENDIX B:  Percentage of STR Award Expenditures by Category After 18 Months

| State | Prevention | Treatment | Recovery Support | Administration |
|---|---|---|---|---|
| Alabama | 8.9% | 85.6% | 2.9% | 2.6% |
| Alaska | 31.4% | 33.3% | 35.2% | 0.0% |
| American Samoa | 12.5% | 84.5% | 0.0% | 3.0% |
| Arizona | 24.0% | 73.0% | 0.0% | 2.9% |
| Arkansas | 23.1% | 46.6% | 14.7% | 15.6% |
| California | 34.7% | 63.6% | 0.0% | 1.6% |
| Colorado | 20.3% | 76.3% | 3.2% | 0.3% |
| Connecticut | 29.7% | 44.9% | 23.8% | 1.6% |
| Delaware | 0.2% | 91.9% | 0.0% | 7.9% |
| District of Columbia | 9.9% | 87.2% | 0.5% | 2.3% |
| Florida | 1.5% | 91.7% | 3.5% | 3.3% |
| Georgia | 20.2% | 52.1% | 14.3% | 13.3% |
| Hawaii | 9.9% | 80.1% | 10.0% | 0.0% |
| Idaho | 6.1% | 65.8% | 26.1% | 2.0% |
| Illinois | 14.6% | 81.1% | 1.2% | 3.1% |
| Indiana | 29.2% | 60.5% | 0.0% | 10.3% |
| Iowa | 22.2% | 72.7% | 0.0% | 5.1% |
| Kansas | 12.9% | 81.4% | 4.6% | 1.2% |
| Kentucky | 24.2% | 55.5% | 14.4% | 5.9% |
| Louisiana | 16.7% | 62.7% | 8.7% | 11.9% |
| Maine | 22.9% | 74.9% | 2.0% | 0.2% |
| Maryland | 28.6% | 69.2% | 1.4% | 0.8% |
| Massachusetts | 12.7% | 8.5% | 74.1% | 4.7% |
| Michigan | 32.2% | 53.0% | 7.8% | 7.0% |
| Micronesia | 8.4% | 77.5% | 6.4% | 7.7% |
| Minnesota | 23.8% | 53.5% | 13.2% | 9.5% |
| Mississippi | 9.5% | 86.0% | 1.0% | 3.5% |
| Missouri | 4.9% | 83.3% | 7.8% | 3.9% |
| Montana | 21.5% | 54.7% | 12.3% | 11.5% |
| Nebraska | 54.5% | 37.0% | 0.0% | 8.5% |
| Nevada | 13.2% | 81.7% | 0.0% | 5.1% |
| New Hampshire | 39.1% | 54.5% | 6.4% | 0.0% |
| New Jersey | 3.5% | 43.1% | 48.8% | 4.6% |
| New Mexico | 22.2% | 63.1% | 10.5% | 4.2% |
| New York | 18.6% | 46.6% | 31.6% | 3.3% |
| North Carolina | 12.8% | 80.3% | 6.2% | 0.7% |
| North Dakota | 24.8% | 59.3% | 10.4% | 5.5% |
| Northern Marianas | 0.0% | 86.2% | 0.0% | 13.8% |
| Ohio | 21.1% | 76.2% | 0.0% | 2.7% |
| Oklahoma | 32.6% | 54.9% | 5.0% | 7.5% |

DEF_WV_Trial_00030276

DEF-WV-03237.00020

| State | Prevention | Treatment | Recovery Support | Administration |
|-------|-----------:|----------:|-----------------:|---------------:|
| Oregon | 26.1% | 63.5% | 8.0% | 2.4% |
| Palau | 7.0% | 81.7% | 8.3% | 3.0% |
| Pennsylvania | 15.7% | 65.4% | 14.6% | 4.3% |
| Puerto Rico | 27.1% | 63.1% | 0.7% | 9.1% |
| Rhode Island | 22.7% | 35.4% | 35.4% | 6.4% |
| South Carolina | 17.4% | 62.0% | 16.6% | 4.0% |
| South Dakota | 79.3% | 7.5% | 2.7% | 10.5% |
| Tennessee | 18.3% | 71.8% | 7.0% | 2.9% |
| Texas | 9.5% | 52.3% | 30.3% | 7.9% |
| Utah | 11.6% | 73.7% | 10.0% | 4.6% |
| Vermont | 25.8% | 24.1% | 37.2% | 12.8% |
| Virginia | 24.9% | 53.8% | 17.7% | 3.6% |
| Washington | 15.1% | 71.8% | 8.2% | 5.0% |
| West Virginia | 18.4% | 70.7% | 8.9% | 1.9% |
| Wisconsin | 11.8% | 63.6% | 18.4% | 6.1% |
| Wyoming | 8.9% | 84.1% | 6.7% | 0.4% |
| **Total Expenditures Nationwide** | **17.2%** | **65.4%** | **13.2%** | **4.2%** |

DEF_WV_Trial_00030277

DEF-WV-03237.00021

# APPENDIX C: Agency Comments



**Substance Abuse and Mental Health Services Administration**

5600 Fishers Lane • Rockville, MD 20857
www.samhsa.gov • 1-877-SAMHSA-7 (1-877-726-4727)



FEB 2 7 2020

TO:     Suzanne Murrin
        Deputy Inspector General for Evaluation and Inspections
        Office of Inspector General

FROM:   Elinore F. McCance-Katz, M.D., Ph.D.
        Assistant Secretary for Mental Health and Substance Use

SUBJECT:    OIG Draft Report: *States' Use of Grant Funding for a Targeted Response to the Opioid Crisis,* OEI-BL-18-00460

The Substance Abuse and Mental Health Services Administration has reviewed the subject document and concurs with the recommendations. SAMHSA offers the attached comments for consideration.

Elinore F. McCance-Katz, M.D., Ph.D.

Attachment

Behavioral Health is Essential To Health • Prevention Works • Treatment is Effective • People Recover

DEF_WV_Trial_00030278

DEF-WV-03237.00022

**GENERAL COMMENTS FROM THE SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION ON THE OFFICE OF INSPECTOR GENERAL'S DRAFT REPORT ENTITLED –STATES USE OF GRANT FUNDING FOR A TARGETED RESPONSE TO THE OPIOID CRISIS**

The Substance Abuse and Mental Health Services Administration (SAMHSA) appreciates the opportunity from the Office of Inspector General (OIG) to review and comment on this report and looks forward to continuing to work with the Department and Congress on efforts to address the opioid crisis.

SAMHSA would like to note that the report is not fully accurate in stating that SAMHSA did not track whether patients received medication-assisted treatment (MAT). SAMHSA tracked that STR grant funding was used to provide MAT. However, staff did not collect data on the exact number of patients receiving MAT. SAMHSA would also like to note that the report is not fully accurate in stating that SAMHSA only required states to provide data on the number of patients that received any type of OUD treatment. SAMHSA did collect data on the ranges of the provision of MAT, as noted in Exhibit 6.

SAMHSA would also like to mention that during the audit the agency noted data limitations and have corrected this issue to collect more specific data on MAT in the SOR grant program.

**Recommendation 1**
SAMHSA should work closely with States and territories during the no-cost extension period to address barriers to timely spending and to ensure that administrative cost caps are not exceeded.

> **SAMHSA Response**
> SAMHSA concurs with this recommendation. By granting no cost extensions, SAMHSA allows grantees to complete unfinished work from the original project period often due to barriers and challenges experienced during grant implementation. Additionally, Government Project Officers communicate regularly with states to discuss challenges and barriers to implementation, provide guidance, and direct grantees to appropriate technical assistance.
>
> **Recommendation 2**
> SAMHSA should require States that receive grants for OUD treatment to specifically report how many patients are receiving MAT.
>
> **SAMHSA Response**
> SAMHSA concurs with this recommendation. Metrics for this program were determined under previous SAMHSA leadership. As noted during the investigation, new State Opioid Response funding requires much more detailed information on the provision of MAT, including the exact number of clients receiving each form of MAT.

Page 1 of 1

**DEF_WV_Trial_00030279**

DEF-WV-03237.00023

# ACKNOWLEDGMENTS

Heather Barton served as the team leader for this study, and Louis Day served as the lead analyst.  Others in the Office of Evaluation and Inspections who conducted the study include Louise Schoggen and Jeremy Siegel.  Office of Evaluation and Inspections staff who provided support include Adam Freeman and Christine Moritz.

We would also like to acknowledge the contributions of other Office of Inspector General staff, including Jennifer Wagner.

This report was prepared under the direction of David Tawes, Regional Inspector General for Evaluation and Inspections in the Baltimore regional office, and Heather Barton, Deputy Regional Inspector General.

To obtain additional information concerning this report or to obtain copies, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.

DEF_WV_Trial_00030280

DEF-WV-03237.00024

# ABOUT THE OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

**Office of Audit Services**

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

**Office of Evaluation and Inspections**

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

**Office of Investigations**

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

**Office of Counsel to the Inspector General**

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

DEF_WV_Trial_00030281

DEF-WV-03237.00025

# ENDNOTES

[1] Substance Abuse and Mental Health Administration (SAMHSA), *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health*, August 2019.

[2] Centers for Disease Control and Prevention (CDC), *Understanding the Epidemic*, December 2018.  Accessed at https://www.cdc.gov/drugoverdose/epidemic/index.html  on July 23, 2019.

[3] SAMHSA, *Results from the 2017 National Survey on Drug Use and Health: Detailed Tables, September 2018.*

[4] 21st Century Cures Act, P.L. No. 114-255, §1003.

[5] SAMHSA, *State Targeted Response to the Opioid Crisis Grants: Funding Opportunity Announcement* (FOA) No. TI-17-014.

[6] SAMHSA defines recovery as a voluntary, self-directed, ongoing process where patients access formal and informal resources; manage their care and their addiction; and rebuild their lives, relationships, and health to lead full meaningful lives.  The delivery of recovery support services typically occurs after the acute stage of treatment.  SAMHSA, *Federal Opioid Treatment Standards*, January 2015.

[7] SAMHSA, *Federal Opioid Treatment Standards*, January 2015.

[8] U.S. Department of Health and Human Services (HHS), *Facing Addiction in America: The Surgeon General's Spotlight on Opioids*, September 2018.

[9] World Health Organization, *Guidelines for the Psychosocially Assisted Pharmacological Treatment of Opioid Dependence*, 2009. Accessed at http://www.who.int/substance_abuse/activities/treatment_opioid_dependence/en/.

[10] HHS, *Facing Addiction in America: The Surgeon General's Spotlight on Opioids*, September 2018.

[11] National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction*, November 2017.  Accessed at https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction on September 10, 2019.

[12] Bart, G., "Maintenance medication for opiate addiction: The foundation of recovery." *J Addict Dis.* 2012; 31(3): 207-225.

[13] HHS, *Facing Addiction in America: The Surgeon General's Spotlight on Opioids*, September 2018.

[14] United States Government Accountability Office (GAO), *Laws, Regulations, and Other Factors Can Affect Medication-Assisted Treatment Access*, September 2016.

[15] Jones, Christopher M., et al., "National and State Treatment Need and Capacity for Opioid Agonist Medication-Assisted Treatment." *American Journal of Public Health* 105.8 (August 2015): 55-64.

[16] White, W., *Long-term strategies to reduce the stigma attached to addiction, treatment, and recovery within the City of Philadelphia (with particular reference to medication-assisted treatment/recovery)*.  Philadelphia: Department of Behavioral Health and Mental Retardation Services, 2009.

[17] GAO, *Laws, Regulations, and Other Factors Can Affect Medication-Assisted Treatment Access*, September 2016.

[18] The White House, *The president's commission on combating drug addiction and the opioid crisis*. Washington, DC, U.S. Government Publishing Office, November 1, 2017.

[19] OIG, *Geographic Disparities Affect Access to Buprenorphine Services for Opioid Use Disorder*, OEI-12-17-00240, January 2020.

[20] Congressional Research Service, *Location of Medication-Assisted Treatment for Opioid Addiction: In Brief*, June 2019.  Accessed at https://www.everycrsreport.com/reports/R45782.html on September 19, 2019.

[21] HHS, *Strategy to Combat Opioid Abuse, Misuse, and Overdose.  A Framework Based on the Five Point Strategy*, April 2017.

[22] GAO, *Opioid Use Disorders: HHS Needs Measures to Assess the Effectiveness of Efforts to Expand Access to Medication-Assisted Treatment*, October 2017.

[23] Ibid.

[24] HHS Press Release, *Trump Administration awards grants to states to combat opioid crisis*, April 2017.  Accessed at https://www.hhs.gov/about/news/2017/04/19/trump-administration-awards-grants-states-combat-opioid-crisis.html on August 29, 2018. The four territories were American Samoa, the Northern Mariana Islands, Puerto Rico, and the Virgin Islands.

[25] HHS Press Release, *HHS provides states second installment of grant awards to combat opioid crisis*, April 2018.  Accessed at https://www.hhs.gov/about/news/2018/04/18/hhs-provides-states-second-installment-grant-awards-combat-opioid-crisis.html on July 25, 2019.

[26] SAMHSA, *State Targeted Response to the Opioid Crisis Grants: Funding Opportunity Announcement* (FOA) No. TI-17-014.

[27] HHS Press Release, *Trump Administration awards grants to states to combat opioid crisis*, April 2017.  Accessed at https://www.hhs.gov/about/news/2017/04/19/trump-administration-awards-grants-states-combat-opioid-crisis.html on July 23, 2019.

[28] HHS Press Release, *HHS provides states second installment of grant awards to combat opioid crisis*, April 2018.  Accessed at https://www.hhs.gov/about/news/2018/04/18/hhs-provides-states-second-installment-grant-awards-combat-opioid-crisis.html on July 25, 2019.

[29] SAMHSA, *SAMHSA directing supplemental funding to three states hit hard by opioid crisis*, March 2018.  Accessed at https://www.samhsa.gov/newsroom/press-announcements/201803200300 on July 23, 2019.

DEF_WV_Trial_00030282

DEF-WV-03237.00026

[30] SAMHSA, *State Targeted Response to the Opioid Crisis Grants:* FOA No. TI-17-014.

[31] Naloxone is an opioid antagonist that can quickly restore normal respiration to a person whose breathing has slowed or stopped because of an opioid overdose. It is a nonscheduled (i.e., nonaddictive) prescription medication and works only if individuals have opioids in their systems; the medication has no effect if opioids are absent. National Institute on Drug Abuse, *Medication-Assisted Treatment: Naloxone.* Accessed at https://www.drugabuse.gov/publications/drugfacts/naloxone on June 10, 2019.

[32] A prescription drug monitoring program is an electronic database that tracks controlled substance prescriptions in a State. CDC, *What States Need to Know about PDMPs,* October 2017. Accessed at https://www.cdc.gov/drugoverdose/pdmp/states.html on November 25, 2019.

[33] SAMHSA, *State Targeted Response to the Opioid Crisis Grants:* FOA No. TI-17-014.

[34] SAMHSA, *Fiscal Year 2017 - Award Standard Terms.* Accessed at https://www.samhsa.gov/sites/default/files/grants/fy-2017-standard-terms-conditions.pdf on November 25, 2019.

[35] "Obligated balances" are balances for which there has been legally binding action (for example, contracts signed) and for which payment has not yet been made but will be required to be made in the future. "Unobligated balances" are balances that have not yet been committed by contract or other legally binding action by the Government. U.S. Government Publishing Office (GPO), *Balances of the Budget Authority, Budget for Fiscal Year 2020.* Accessed at https://www.govinfo.gov/content/pkg/BUDGET-2020-BALANCES/pdf/BUDGET-2020-BALANCES.pdf on July 22, 2019.

[36] SAMHSA, *State Targeted Response to the Opioid Crisis Grants: Funding Opportunity Announcement* (FOA) No. TI-17-014.

[37] SUPPORT for Patients and Communities Act, P.L. No. 115-271, tit. VII, § 7181(h).

[38] Consolidated Appropriations Act, 2018, P.L. No. 115–141.

[39] SAMHSA, *State Opioid Response Grants:* FOA No. TI-18-015.

[40] HHS Press Release, *HHS Awards Over $1 Billion to Combat the Opioid Crisis,* September 2018. Accessed at https://www.hhs.gov/about/news/2018/09/19/hhs-awards-over-1-billion-combat-opioid-crisis.html on July 23, 2019.

[41] These 10 States were allocated a total of $142.5 million in additional SOR grant funding. The 10 States with the highest mortality rates related to drug poisoning deaths were West Virginia, Ohio, New Hampshire, the District of Columbia, Pennsylvania, Kentucky, Maryland, Massachusetts, Delaware, and Rhode Island. SAMHSA, *State Opioid Response Grants*: FOA No. TI-18-015.

[42] HHS Press Release, *HHS Awards Over $1 Billion to Combat the Opioid Crisis,* September 18, 2018. Accessed at https://www.hhs.gov/about/news/2018/09/19/hhs-awards-over-1-billion-combat-opioid-crisis.html on June 3, 2019.

[43] HHS Press Release, *HHS releases additional $487 million to states, territories to expand access to effective opioid treatment; 2019 SOR grants will total $1.4 billion,* March 20, 2019. Accessed at https://www.hhs.gov/about/news/2019/03/20/hhs-releases-additional-487-million-to-states-territories-to-expand-access-to-effective-opioid-treatment.html on June 3, 2019.

[44] HHS Press Release, *Trump Administration Announces $1.8 Billion in Funding to States to Continue Combating Opioid Crisis,* September 4, 2019. Accessed at https://www.hhs.gov/about/news/2019/09/04/trump-administration-announces-1-8-billion-funding-states-combating-opioid.html on September 4, 2019.

[45] CDC, *2017 Drug Overdose Death Rates*. Accessed at https://www.cdc.gov/drugoverdose/data/statedeaths/drug-overdose-death-2017.html on December 12, 2019.

[46] HHS, *HHS Grants Policy Statement,* January 1, 2007. A grant recipient may submit a one-time post-award amendment to request a no-cost extension of up to 12 months on its project to ensure completion of the originally approved project, or to permit an orderly phase-out of a project that will not receive continuation support. As of July 25, 2019, 48 State requests for no-cost extensions had been approved by SAMHSA and 3 State requests were pending review.

[47] Pradhan, R. and Ehley, B., "Hundreds of millions in state opioid cash left unspent," *Politico,* March 3, 2019. Accessed at https://www.politico.com/story/2018/03/19/opioid-crisis-funding-unspent-468658 on October 2, 2019.

[48] Centers for Disease Control and Prevention (CDC), *Understanding the Epidemic,* December 2018. Accessed at https://www.cdc.gov/drugoverdose/epidemic/index.html on July 23, 2019.

[49] 45 CFR § 75.207, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards—Specific award conditions.

[50] GAO, *Opioid Use Disorders: HHS Needs Measures to Assess the Effectiveness of Efforts to Expand Access to Medication-Assisted Treatment,* October 2017.

[51] Ibid.

DEF_WV_Trial_00030283

DEF-WV-03237.00027