**STATE OF WEST VIRGINIA**
# DEPARTMENT OF HEALTH AND HUMAN RESOURCES
**Bureau for Public Health**
**Commissioner's Office**

Bill J. Crouch
Cabinet Secretary

Rahul Gupta, MD, MPH, MBA, FACP
Commissioner
State Health Officer

January 30, 2018

The Honorable Jim Justice, Governor
State of West Virginia
Office of the Governor
1900 Kanawha Blvd, East
Charleston, West Virginia 25305

Dear Governor Justice:

In the effort to fight the public health crisis of the highest order, please find the enclosed *Opioid Response Plan for the State of West Virginia*. This plan was developed through public engagement and expert input with the primary focus of fighting the opioid epidemic on all fronts. This plan is a crucial step in meeting that goal. We stand ready to implement these recommendations per your directive.

You may find an electronic version of this plan and public comments online at www.dhhr.wv.gov/bph. If you have any questions or concerns, please feel free to contact the West Virginia Department of Health and Human Resources, Bureau for Public Health at 350 Capitol Street, Room 702, Charleston, West Virginia 25301-3714 or call (304) 558-2971. We look forward to saving lives in West Virginia with this strategic plan.

Sincerely,

Rahul Gupta, MD, MPH, MBA, FACP
Commissioner, Bureau for Public Health
West Virginia State Health Officer

RG/alf

Enclosure

cc:   Mitch Carmichael, Senate President
      Tim Armstead, Speaker of the House
      Bill Crouch, Cabinet Secretary

PLAINTIFFS TRIAL
EXHIBIT
P-44223_00001

# Opioid Response Plan for the State of West Virginia



Rahul Gupta, MD, MPH, MBA, FACP
Commissioner
State Health Officer

January 2018

**CT2_RGupta000005**

P-44223_00002

# Table of Contents

Executive Summary                                                    2

Background                                                          4

Process                                                            6

Prevention                                                         7

Early Intervention                                                 10

Treatment                                                          13

Overdose Reversal                                                  18

Supporting Families with Substance Use Disorder                    20

Recovery                                                           22

Conclusion                                                         25

CT2_RGupta000006

P-44223_00003

## Executive Summary

West Virginia suffers from the highest rate of drug overdose mortality in the United States, with more than 880 deaths in 2016. Driving this public health crisis is the opioid epidemic, a dual challenge involving both prescribed opioids, such as oxycodone and illicit opioids, including heroin and fentanyl.



On November 30, 2017, the West Virginia Department of Health and Human Resources announced an effort to develop an Opioid Response Plan for the State of West Virginia through public engagement and consultation with regional and national experts. More than 350 people responded to a call for public comments. More than 100 state residents attended a public meeting on December 21, 2017.

An expert group including experts from West Virginia University, Marshall University, and Johns Hopkins University met to review public input, data, information from senior state officials, and best practices from around the country and provide a focused set of high priority, short-term recommendations. More than 100 additional public comments were received on the draft report.

These high priority, short-term recommendations are as follows:

*Prevention*

1. West Virginia should expand the authority of medical professional boards and public health officials to address inappropriate prescribing of pain medications.

2. West Virginia should limit the duration of initial opioid prescriptions.

2

CT2_RGupta000007

P-44223_00004

*Early Intervention*

3. West Virginia should expand awareness of substance use disorder as a treatable disease by developing a public education campaign to address misinformation and associated stigma. This campaign should also support access to treatment through 1-844-HELP4WV.

4. West Virginia should expand promising law-enforcement diversion programs, such as the LEAD model, to help people experiencing a substance use disorder access treatment and achieve sustained recovery.

5. West Virginia should strengthen support for lifesaving comprehensive harm reduction policies, by removing legal barriers to programs that are based on scientific evidence and by adding resources.

*Treatment*

6. Reflecting the need for all patients to have access to multiple options for treatment, West Virginia should require a statewide quality strategy for opioid use disorder treatment and remove unnecessary regulatory barriers to the expansion of effective treatment.

7. West Virginia should expand access to effective substance use disorder treatment in hospital emergency departments, other healthcare settings, and the criminal justice system to reach people at key moments of opportunity to enter care.

*Overdose Reversal*

8. West Virginia should require all first responders to carry naloxone and be trained in its use, support community-based naloxone programs for initial responders, and authorize a standing order for naloxone prescriptions to improve insurance coverage.

9. West Virginia should require hospital emergency departments and Emergency Medical Services to notify the Bureau for Public Health of nonfatal overdoses for the purpose of arranging for outreach and services.

*Supporting Families with Substance Use Disorder*

10. West Virginia should expand effective programs that serve families, including Drug Free Moms and Babies, home visitation programs, and comprehensive services for the families of children born with Neonatal Abstinence Syndrome such as Lily's Place.

11. West Virginia should expand access to voluntary, long-acting, reversible contraception and other contraceptive services for men and women with substance use disorder in multiple settings.

CT2_RGupta000008

P-44223_00005

*Recovery*          12. West Virginia should continue pursuing a broad expansion of recovery supports, including peer-based support services, families, and allies.

In addition to these 12 high priority recommendations, West Virginia should pursue the additional recommended strategies described in each area.

There are no quick fixes to the opioid epidemic. Adopting these 12 recommendations, however, will put West Virginia on a path to reduce the tragic impact of this epidemic.

## Background

West Virginia continues to lead the nation in overdose deaths per capita. This tragic epidemic has taken a significant toll on individuals, families, communities, and government resources.

In 2001, when West Virginia began to capture complete data on the types of drugs involved in death, there were a total of 212 overdose deaths. Initially, the overdose death increases were driven by pharmaceuticals, first methadone (which was prescribed for pain), and then oxycodone, hydrocodone, and oxymorphone. At its peak oxycodone was involved in over 200 deaths in 2011, and both oxymorphone and hydrocodone were involved in over 150 deaths in the same year. In 2012, just as prescriptions for opioids were beginning to decline, a major shift from pharmaceuticals to illicit drugs began. This shift began with heroin in 2012 and then shifted to fentanyl/fentanyl analogues, alone or in combination, starting in 2014. The fentanyl driving the unprecedented increase in deaths is illicitly sourced and generally not of pharmaceutical origin. In 2016, heroin was involved in over 250 deaths and fentanyl was involved in over 350 deaths. Gabapentin was involved in more than 100 deaths. Mixtures of opioids and stimulants such as amphetamines, methamphetamines, and cocaine were surging in 2017, with benzodiazepines frequently involved in deaths with opioids.

By 2016, West Virginia continued to have the highest overdose rate in the nation at 52 overdose deaths per 100,000 population, surpassing the next closest state, Ohio, by over 20%. Three of the four states with the highest overdose rates are West Virginia, Ohio and Pennsylvania. It appears likely there may be over 1,000 overdose deaths in West Virginia in 2017, far surpassing the 884 overdose deaths recorded in 2016.

To better understand overdose deaths in West Virginia, the West Virginia Department of Health and Human Resources, Bureau for Public Health examined the health system data for 830 residents who died of overdose. Death records were matched to available data sources to determine whether the individuals utilized emergency medical services, behavioral health

4

treatment, were prescribed controlled substances, were incarcerated in state-run facilities, and/or were eligible for Medicaid.  Key findings include:

- The majority (81%) of overdose decedents interacted with at least one of the health systems in this report.

- Males were twice as likely as females to die from a drug overdose, but females were 80% more likely than males to use all the health systems in the 12 months prior to their death.

- 33% of decedents tested positive for a controlled substance, but had no record of a prescription at their time of death, indicating diversion of a controlled substance prescription.

- 91% of all decedents had a documented history within the Controlled Substance Monitoring Program.  In the 30 days prior to death, nearly half (49%) of female decedents filled a controlled substance prescription in the 30 days prior to death, as compared to 36% of males.

- Decedents were three times more likely to have three or more prescribers as compared to the overall population in the Controlled Substance Monitoring Program for 2016 (9% versus 3%).  Decedents were more than 70 times likely to have prescriptions at four or more pharmacies compared to the overall population in the Controlled Substance Monitoring Program for 2016 (7% vs. 0.1%).

- 71% of all decedents utilized emergency medical services within the 12 months prior to their death.  Regardless of the type of EMS run, only 31% of decedents had naloxone administration documented in their EMS record.

- Decedents were much more likely to have Medicaid (71%) in the 12 months prior to their death as compared to West Virginia's adult population ages 19-64 (23%).

- Over half (56%) of all decedents had been previously incarcerated.  Decedents were at an increased risk of death in the 30 days after their date of release, especially in decedents with only some high school education.

- Males working in blue collar industry, industries that come with higher risk of injury, may be at increased risk for overdose death.

- Overall, there were opportunities to prevent fatal overdoses among the 2016 overdose decedents.  Emergency services appear to have had the most opportunity for intervention, followed by the Controlled Substance Monitoring Program and Corrections.

CT2_RGupta000010

P-44223_00007

## Process

On November 30, 2017, the West Virginia Department of Health and Human Resources announced the development of an Opioid Response Plan for the State of West Virginia through public engagement and expert input. The process was to include a period of public comment, a public meeting, and consultation with a panel of five local and national experts. These included:

- **Jim Johnson**, former Director of the Department of Health and Human Resources' Office of Drug Control Policy, with 29 years of law enforcement experience including having served as both a police chief and director of the Mayor's Office of Drug Control Policy in Huntington.

- **Dr. Sean Allen**, Assistant Scientist in the Department of Health, Behavior, and Society at the Johns Hopkins University Bloomberg School of Public Health and former senior policy advisor in the White House Office of National Drug Control Policy.

- **Dr. Jeffrey Coben**, Dean of the West Virginia University School of Public Health and Associate Vice President of Health Affairs and expert in the field of injury prevention and control.

- **Dr. Shannon Frattaroli**, Associate Professor of Health Policy and Management at the Johns Hopkins University Bloomberg School of Public Health and one of the lead authors of *America's Opioid Epidemic: From Evidence to Impact*, a report released by Johns Hopkins University and the Clinton Foundation.

- **Dr. Sean Loudin**, Associate Professor at the Marshall University Joan C. Edwards School of Medicine, with a specialty in neonatal-perinatal medicine and research and clinical interests that have focused on neonatal abstinence syndrome.

The Department of Health and Human Resources opened a period for public comment on November 30, and more than 350 comments were received by December 30, 2017. The Department of Health and Human Resources also held a public meeting on December 21, with more than 100 people in attendance. Dr. Christina Mullins, Director of the Office of Maternal, Child, and Family Health of the Bureau for Public Health, presented recent data on opioid use and overdose in West Virginia. Daniel Raymond, Policy Director for the Harm Reduction Coalition, presented on the topic of "Undoing Stigma: Harm Reduction in Action." Approximately 15 state residents provided oral public comment and answered questions from the expert panel. The proposed plan was released for public comment, and additional comments were accepted until January 19, 2018.

6

CT2_RGupta000011

P-44223_00008

This report reflects recommendations from the expert group, based on their review of public comments; the public meeting; information received from senior state officials in the Bureau for Public Health, Bureau for Medical Services, and Bureau for Behavioral Health and Health Facilities; review of data; and knowledge of national best practices.

## Prevention

*"The Board of Medicine could become much more aggressive in disciplining physicians who overprescribe. Dentists as well as doctors should be required to complete education … and protocols could be tightened regarding amounts and frequency of opioid prescriptions. Clearly prescription drugs are at the heart of this problem. While only a very small percentage of providers are at fault the damage, they have done is incalculable. Ruined lives, lack of economic development (workers cannot pass drug screens), wildly escalating governmental costs, and desolated communities are the result of this failure to regulate and control a renegade few."*

-- Public Comment, Charleston, West Virginia

*"Drs should be persuaded to not start with the strongest drugs out there when dealing with a patient who is in pain, and certainly, before going to the strongest of pain medications, they should consider alternatives for pain management such as physical therapy, acupuncture, etc."*

-- Public Comment, Parkersburg, West Virginia

*"A few years ago I had sinus surgery, and the doctor prescribed pain medication, which I filled on the way home while still groggy from the surgery. When I opened the medication, which was oxycodone, I found that there were 40 tablets. At my follow-up appointment I asked the doctor why on earth he prescribed 40 tablets. I only used one the first night just in case, and didn't need any more. He said it was the 'protocol.' So who decides the protocol? How can it be changed?"*

-- Public Comment, Hillsboro, West Virginia

**Data and Evidence.** A critical factor fueling the national opioid epidemic is the rapid rise in opioid prescriptions for pain. From 1999 to 2012, opioid prescribing increased fourfold, with more than 250 million prescriptions written in the United States that year. West Virginia has experienced some of the highest rates of opioid prescribing in the nation.[1] Between 2007 and 2012, drug wholesalers shipped more than 780 million hydrocodone and oxycodone pills into the state.

---

[1] https://www.cdc.gov/drugoverdose/data/prescribing.html

7

P-44223_00009

Excessive prescribing can lead to substance use disorders directly, as the risk of developing such a disorder increases with higher doses for longer durations, or indirectly, as extra pills are provided to or stolen by others. The President's Commission on Combating Drug Addiction and the Opioid Crisis has found that "patients are often ill-informed about the risks of taking opioid analgesics and, therefore, are not able to balance the potential benefits with the associated risks."[2]

**Public Comment.** Multiple comments addressed the need for additional restrictions on opioid prescribing. Several comments expressed concern that restrictions on opioid prescribing would limit access to medications for people who rely on them to treat serious symptoms of pain. Other comments called for renewed attention to primary prevention through greater education of children in schools, economic recovery, and mentoring programs.

**Discussion and Recommendations.** The most promising approaches to opioid prescribing combine education and tools for all prescribers with enhanced enforcement for the relatively few prescribers who are violating standards of care. West Virginia instituted mandatory prescriber education in 2012, and there are additional steps to further enhance prescribing in the state.

The state's Prescription Drug Monitoring Program should have the authority to follow national best practices, as identified by the Training and Technical Assistance Center at Brandeis University. Important steps include requiring regular checking of the database, linking prescribing to overdoses, notifying prescribers about high-risk patients, and proactively using data for education (such as academic detailing and video consultation) and enforcement. To find the highest risk prescribers, the Bureau for Public Health should have the authority to search the Prescription Drug Monitoring Program database to identify high-risk practices such as co-prescribing of benzodiazepines and opioids or linkage to multiple nonfatal overdoses and then refer prescribers to the professional boards for review.

In addition, West Virginia's professional boards should have the authority to issue a certificate to prescribe controlled substances along with the license to practice, based on proof of national DEA licensure.[3] Then, the boards should be able to revoke this certificate based on an investigation finding prescribing of controlled substances outside of the standard of care, using evidence-based practices as guideposts.[4]

---

[2] https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf

[3] There may be other administrative mechanisms available to accomplish the goal of a distinct approval to prescribe controlled substances, that can be more readily revoked than the entire license.

[4] In 2016, the Centers for Disease Control and Prevention released guidelines for the use of opioids for non-cancer chronic pain; among other recommendations, the guideline called for limiting initial prescribing of opioids to between 3 and 7 days and urged physicians not to co-prescribe opioids and benzodiazepines because of the high risk of overdose when used together. See https://www.cdc.gov/drugoverdose/prescribing/guideline.html.

CT2_RGupta000013

P-44223_00010

It is important that efforts to address excessive prescribing not go too far. In developing a targeted investigation to assess prescribing, the professional boards should recognize the importance of individualized care and clinical judgment in supporting patients with severe pain and where inappropriate prescribing is found, should support the tapering of medications rather than rapid withdrawal. It is also important that a patient care plan be adopted when a provider's certification to prescribe is terminated, in order to support appropriate treatment for the provider's patients.

In addition to these short-term steps, West Virginia should also encourage insurers to adopt evidence-based guidelines on reimbursement for opioid prescribing, such as a step recently instituted by the Medicaid program of requiring additional information before filling co-prescriptions of benzodiazepines and opioids. West Virginia should also support coverage of non-pharmaceutical approaches to managing pain and improve medical education on prescribing for pain and treatment of substance use disorders.

The state should consider developing a cross-agency strategy for primary prevention. The Surgeon General has found, "Preventing or reducing early substance use initiation, substance misuse, and the harms related to misuse requires the implementation of effective programs and policies that address substance misuse across the lifespan."[5] This strategy could include targeted economic development, expanded use of mentoring, identification and resources for youth at highest risk based on adverse childhood experiences, and expansion of primary prevention through education in schools using evidence-based curricula.

---

**High Priority, Short-Term Recommendations**

1. West Virginia should expand the authority of medical professional boards and public health officials to address inappropriate prescribing of pain medications.

   a. Key Measure: New co-prescribing of opioids and benzodiazepines.

   b. Key Measure: Prescribing for chronic, non-cancer pain outside of the CDC guidelines.[6]

2. West Virginia should limit the duration of initial opioid prescriptions.

   a. Key Measure: Initial opioid prescriptions greater than designated length.

---

[5] https://addiction.surgeongeneral.gov/

[6] For an approach to this measure, see:
https://www.healthaffairs.org/do/10.1377/hblog20171215.681297/full/?linkId=46130726

9

CT2_RGupta000014

P-44223_00011

# Early Intervention

*"I ask, beg, plead...that whatever is chosen to be done, be done in a way that carefully thinks about those who suffer from the addiction and those who love someone who suffer from the addiction. I've been there, I've seen the hurt and pain. I've seen families grieve of a loved one lost too young. I've seen children lose their parents at three, four, five, and so on...I've seen and know the pain because I lived with it, I walked in its shoes. I've carried it, held it, cried with it but I mostly loved someone with it."*

     -- Public Comment, Pritchard, West Virginia

*"I find that the current model of law and order and continuing the "war on drugs" to be a harmful and failing model. Overall, it has caused far more harm than good and at the cost of everyone's taxes. Rather than arresting and jailing, the focus should be shifted towards treating drug abuse as a disease, not a criminal offense. The repeat offense rate for drug crimes is extremely high, showing that simply arresting and jailing an individual will not "fix" them... I would rather fund treatment and prevention centers with my taxes, rather than paying to keep our prisons over capacity."*

     -- Public Comment, Bridgeport, West Virginia.

**Data and Evidence.** Nearly 21 million Americans have a substance use disorder, yet only approximately 10% seek treatment, a disparity many believe is due to stigma. Early intervention for individuals with substance use disorders requires (1) reducing the stigma that keeps the opioid epidemic in the shadows; (2) encouraging innovative practices in law enforcement that support access to treatment; and (3) supporting evidence-based harm reduction strategies.

     *Stigma.* Stigma is "an attitude, behavior, or condition that is socially discrediting."[7] As explained by Daniel Raymond at the December 21 public meeting, the intense stigma on substance use disorder makes it more difficult for people to turn for help and undermines the

---

[7] Goffman I (1963). Stigma: Notes on the Management of Spoiled Identity. Prentice Hall, Englewood Cliffs, NJ.

10

CT2_RGupta000015

P-44223_00012

internal motivation for change.[8] The stigma on substance use disorder is reflected in much of the moralizing language that surround this problem, starting with the word "addict" to describe an individual with a chronic illness.[9] There is also considerable stigma placed on the use of medications as part of treatment for opioid use disorder.[10] Recently, the Commissioner of the U.S. Food and Drug Administration, Dr. Scott Gottlieb, stated:

> The stigma reflects a view some have: that a patient is still suffering from addiction even when they're in full recovery, just because they require medication to treat their illness. This attitude reveals a flawed interpretation of science … Addiction requires the continued use of opioids despite harmful consequences. Addiction involves a psychological craving above and beyond a physical dependence...We should not consider people who hold jobs, re-engage with their families, and regain control over their lives through treatment that uses medications to be addicted. Rather, we should consider them to be role models in the fight against the opioid epidemic.[11]

*Innovation in Law Enforcement.* Evidence also supports the value of early intervention by law enforcement at multiple opportunities. In the LEAD program, for example, Police Departments divert non-violent individuals into treatment instead of jail and prosecution, sparing them a criminal record and giving them a chance at recovery.[12] The program has been associated with large declines in re-arrests.[13] Kanawha County has instituted the first LEAD program in West Virginia and several other counties are preparing to launch programs.

*Harm reduction.* There is considerable evidence supporting the use of harm reduction strategies, such as syringe exchange,[14] to save lives now and help people connect with critical

---

[8] The Surgeon General's Report stated: "For far too long, too many in our country have viewed addiction as a moral failing. This unfortunate stigma has created an added burden of shame that has made people with substance use disorders less likely to come forward and seek help. It has also made it more challenging to marshal the necessary investments in prevention and treatment. We must help everyone see that addiction is not a character flaw – it is a chronic illness that we must approach with the same skill and compassion with which we approach heart disease, diabetes, and cancer." https://addiction.surgeongeneral.gov/

[9] Botticelli MP, Koh HK. Changing the Language of Addiction. JAMA. 2016 Oct 4;316(13):1361-1362. The Associated Press recently updated the 2017 AP Stylebook to recommend that the term "addict" should be replaced by "phrasing like he was addicted, people with heroin addiction or he used drugs."

[10] Olsen Y, Sharfstein JM. Confronting the stigma of opioid use disorder--and its treatment. JAMA. 2014 Apr 9;311(14):1393-4.

[11] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm582031.htm

[12] http://leadkingcounty.org/

[13] https://www.crimesolutions.gov/ProgramDetails.aspx?ID=477

[14] https://www.nytimes.com/2016/09/05/upshot/politics-are-tricky-but-science-is-clear-needle-exchanges-work.html

11

CT2_RGupta000016

P-44223_00013

treatment services. For example, as Dr. Rahul Gupta pointed out at the public meeting on December 21, West Virginia has avoided a major HIV outbreak such as the one experienced by Indiana because of the state's syringe exchange programs. Such an outbreak would be difficult and costly to contain in West Virginia.

**Public Comment.** Many of the comments recognized the harm caused by stigma against people who use drugs and the therapies that can help save their lives. Other comments, however, reflected anger, frustration, and fear and expressed the view that people who use drugs should be punished, either by restrictions on access to treatment or direct sanction. At the public meeting and in the comments, speakers cited examples of harm reduction programs saving lives and connecting people to treatment. Many family members impacted by substance use disorders expressed hope for a more caring approach and greater options for people to be reached "where they are" in order to attain long-term recovery.

**Discussion and Recommendations.** In West Virginia, as in many parts of the country, stigma is a major barrier to progress against the opioid epidemic. A concerted campaign encouraging people to seek help, instead of enduring shame, can bring hope to thousands of families statewide. West Virginia should consider other state models, such as the State without StigMA campaign in Massachusetts,[15] in developing an anti-stigma program. Focused efforts to emphasize de-stigmatizing language among clinicians, law enforcement, and media professionals may be particularly effective in addressing stigma within the State. Organizations funded by the Bureau for Behavioral Health and Health Facilities for prevention could be important partners in such an effort. In addition, such a campaign can encourage people to seek treatment through 1-844-HELP4WV.

Several Police Departments in West Virginia are pursuing the LEAD diversion model. This is a promising practice, and greater adoption across the state would lead to many more people engaging in treatment earlier during their substance use disorder, promoting recovery and reducing recidivism.

Harm reduction strategies in West Virginia are critically necessary to reduce the spread of infectious disease and save lives. These programs not only reduce transmission of HIV and hepatitis C, but they can reduce crime and community harms by connecting individuals with a broad range of services, including treatment for opioid use disorder. As in other parts of the country, these programs are controversial in West Virginia. The public comments reflect that much of the opposition is based in stigma: either a decision to blame individuals for their substance use disorder or a frustration that the problem has not gone away. One approach that other states including Maryland have used to support the most successful strategies is to appoint an advisory committee with broad representation, including individuals in recovery from opioid use disorder. This committee can then suggest changes to policies that now restrict harm reduction policies, and can help direct additional state resources for maximum impact.

---

[15] https://www.mass.gov/state-without-stigma.

12

CT2_RGupta000017

P-44223_00014

In addition to these strategies, West Virginia should expand drug courts according to best national practices, enhance education about opioid use disorder and evidence-based treatment for all working with individuals and families experiencing opioid use disorder, and consider enhanced penalties and increased enforcement on drug trafficking involving guns in order to reduce violence.

<div style="border:1px solid black; padding:1em;">

**High Priority, Short-Term Recommendations**

3. West Virginia should expand awareness of substance use disorder as a treatable disease by developing a public education campaign to address misinformation and associated stigma. This campaign should also support access to treatment through 1-844-HELP4WV.

    a. Key Measure: Change in stigmatizing attitudes after education campaign, using data from both before and after implementation.

    b. Key Measure: Number of calls for treatment to 1-844-HELP4WV.

4. West Virginia should expand promising law-enforcement diversion programs, such as the LEAD model, to help people experiencing a substance use disorder access treatment and achieve long-term recovery.

    a. Key Measure: Number of individuals diverted from jail to care.

5. West Virginia should strengthen support for lifesaving harm reduction policies by removing legal barriers to programs that are based on scientific evidence and by adding resources.

    a. Key Measure: Removal of legal barriers to programs that are based on evidence.

</div>

---

# Treatment

---

*"Treatment- it is difficult to get: too many waiting lists. People are turned away because they aren't "addicted enough", private facilities are terrible costly. God Bless the people who work in substance use disorder facilities, we need more of them and they need to be paid adequately."*

-- Public Comment, New Martinsville, West Virginia

13

*The West Virginia Perinatal Partnership … urges the state to seek strategies to expand the availability of medication assisted treatment programs for pregnant women. This is the standard of care for opioid addicted pregnant women, yet too often women face tremendous barriers in obtaining these services. Many counties across the state do not offer these services to the pregnant population. New credentialing and licensing rules adopted by the state have created even more barriers. Even when ob-gyns are willing to become prescribers of buprenorphine for their patients, they face significant and expensive bureaucratic rules and regulations.*

     -- Public Comment, Charleston, West Virginia.

*"I am proud of the work I have done with suboxone treatment. I am moving on to a career and am so glad I got the help but some people don't know about the help or can't afford it. I am a single mom of four kids and it is very hard at times but suboxone changed my life and I have watched it change many lives. I plan on using suboxone long-term or until I feel I no longer need it."*
     -- Public Comment, Huntington, West Virginia

*"When someone decides to go [into treatment] we need them in right now not 2 weeks from now."*

     -- Public Comment, White Sulphur Springs, West Virginia.

**Data and Evidence.** Opioid use disorder is a chronic illness of the brain associated with significant risks to health and life. The good news is that this disease is treatable. For example, Medication-assisted treatment combines behavioral therapy and the medications, methadone, buprenorphine, or naltrexone to treat substance use disorders. Evidence indicates that medication-assisted treatment reduces the risk of death, relapse, infectious disease transmission, and chance of going to prison, increases employment, and greatly improves quality of life. [16] Expansion of high quality substance use disorder treatment with medications have contributed to substantial declines in overdose at the population level.[17] In addition, residential treatment programs are recommended for people with multiple types of substance use disorders and living in unstable situations. There are many paths to recovery, and all with opioid use disorder should have access to individualized care.

     Because people using opioids illicitly will use two or three times a day in order to avoid withdrawal, it is important to begin treatment as soon as possible. There are important opportunities to begin treatment in syringe exchange programs, emergency departments, and detention. At the public hearing on December 21, 2017 there was testimony about a successful effort to refer clients of a syringe exchange in West Virginia to treatment programs; in other states,

---

[16] https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction

[17] See, e.g., Schwartz RP, Gryczynski J, O'Grady KE, Sharfstein JM, Warren G, Olsen Y, Mitchell SG, Jaffe JH. Opioid agonist treatments and heroin overdose deaths in Baltimore, Maryland, 1995-2009. Am J Public Health. 2013 May;103(5):917-22.

14

CT2_RGupta000019

P-44223_00016

syringe exchange programs are considering starting treatment at the site itself. There is compelling evidence that initiating treatment in emergency departments improves short-term outcomes.[18] There is also strong evidence that many people in detention suffer from addictive disorders,[19] and are at high risk of overdose when released.[20] Treatment that starts in jail or prison reduces the risk of death[21] and the rate of recidivism.[22]

**Public Comment.** Multiple comments supported the need for greater access to treatment programs. Some comments expressed concern that medications used for substance use disorder treatment, particularly buprenorphine, could be misused or reflected the stigma that treatment with methadone and buprenorphine is incompatible with recovery. A number of public comments expressed the view that marijuana could be an effective treatment for opioid use disorder.[23] Several healthcare providers wrote that state regulations made it difficult to expand access to effective treatment that uses medications.

**Discussion and Recommendations.** One of the most important actions that any state can take to address the opioid crisis is expanding access to effective treatment. Absent treatment, individuals who survive an overdose will remain at high risk for overdosing again. Absent treatment, many will continue to commit crimes, hurt those they love, and threaten the vitality of their communities. Across the world, and in the United States, the most impressive success stories at the county or state level against opioid use disorder have involved major expansions of access to treatment. In the United States, a critical tool for expanding access to treatment is

---

[18] D'Onofrio G, O'Connor PG, Pantalon MV, Chawarski MC, Busch SH, Owens PH,Bernstein SL, Fiellin DA. Emergency department-initiated buprenorphine/naloxone treatment for opioid dependence: a randomized clinical trial. JAMA. 2015 Apr 28;313(16):1636-44.

[19] Chandler RK, Fletcher BW, Volkow ND. Treating drug abuse and addiction in the criminal justice system: improving public health and safety. JAMA. 2009 Jan 14;301(2):183-90.

[20] Binswanger IA, Stern MF, Deyo RA, Heagerty PJ, Cheadle A, Elmore JG, Koepsell TD. Release from prison--a high risk of death for former inmates. N Engl J Med. 2007 Jan 11;356(2):157-65.

[21] Degenhardt L, Larney S, Kimber J, Gisev N, Farrell M, Dobbins T, Weatherburn DJ, Gibson A, Mattick R, Butler T, Burns L. The impact of opioid substitution therapy on mortality post-release from prison: retrospective data linkage study. Addiction. 2014 Aug;109(8):1306-17.

[22] Larney S, Toson B, Burns L, Dolan K. Effect of prison-based opioid substitution treatment and post-release retention in treatment on risk of re-incarceration. Addiction. 2012 Feb;107(2):372-80.

[23] With a medical marijuana program, due to launch in West Virginia soon, cannabis is beyond the scope of this report. For evidence on marijuana, we would refer to the recent National Academies of Science and Medicine consensus report. This report found conclusive or substantial evidence for cannabis for the treatment of chronic pain, but insufficient or no evidence for "achieving abstinence in the use of addictive substances." The report also found moderate evidence of an association between cannabis use and the development of a substance dependence disorder "including alcohol, tobacco, and other illicit drugs." See: https://www.nap.edu/catalog/24625/the-health-effects-of-cannabis-and-cannabinoids-the-current-state.

CT2_RGupta000020

P-44223_00017

insurance coverage.  Private insurers and the Medicaid program should cover the continuum of high quality, evidence based treatments for opioid use disorder.[24]

There are multiple paths to recovery. West Virginia has made important investments in access to residential treatment through the Ryan Brown fund, which is increasing the capacity of the state with several hundred new beds.

Through a Medicaid waiver for substance use disorder, West Virginia is also increasing access to medication-assisted treatment through expansion of the Comprehensive Opioid Addiction Treatment (COAT) model.[25] COAT uses buprenorphine/naloxone in combination with medical and psychosocial groups that are chronologically linked. Physicians manage the medication management groups, and therapists manage the parallel psychotherapy/educational groups. Case managers handle everything in between and are the direct link with patients so that physicians and therapists can focus on their specific expertise and work to the top of their training. Using a Hub-and-Spoke model, West Virginia has expanded the full COAT model to four additional locations across the state, which will serve as Centers of Excellence to support "spokes," or office-based physicians prescribing buprenorphine across the state. Tele-health programs will support this effort, and special attention will be paid to particularly high-risk populations, such as women with a history of trauma.

This treatment expansion is a critically important initiative. All people with opioid use disorder should also have access to high quality treatment that includes counseling and all FDA-approved medications, including methadone, buprenorphine, and depot naltrexone.

Unfortunately, West Virginia has some of the most burdensome regulations on the provision of substance use disorder treatment that includes medications. These restrictions include a moratorium on new programs that use methadone and extra state rules that limit the prescribing of buprenorphine. These policies may reflect, in part, a history of public opposition to the use of medications for treatment, which is reflected in some of the public comments. This opposition may be the result of a vicious cycle. The historical underfunding of treatment with medications has made it difficult for high-quality programs to thrive. It is also the case that the majority of patients receiving these treatments, who are indistinguishable from everyone else in their daily activities, are largely hidden. Patients struggling with treatment, or multiple substance use disorders, on the other hand, are highly visible.

The expansion of medication-assisted treatment is an important step to break this vicious cycle. West Virginia should also adopt a statewide quality strategy for all levels of substance use

---

[24] Medicaid  other related medical and psychiatric conditions.. If implemented, a work requirement in the Medicaid program should be carefully designed to not interfere with access to care for individuals with opioid use disorder.

[25] http://wvumedicine.org/ruby-memorial-hospital/services/wvu-specialty-clinics/behavioral-and-mental-health/chestnut-ridge-center/adult-addiction-services/comprehensive-opioid-addiction-treatment-coat/

16

P-44223_00018

disorder treatment, combined with the removal of unnecessary restrictions on expanding access to care. West Virginia should follow the example set by Rhode Island and create voluntary standards for hospital provision of substance use disorder treatment (including buprenorphine induction in the Emergency Department) and expand access to effective care, including treatment with medications in the criminal justice system. West Virginia should also encourage other medical providers, including federally qualified health centers and free and charitable clinics, to provide treatment for opioid use disorder.

In addition to these steps, West Virginia should encourage Medicaid enrollment for those eligible and support and grow the workforce needed to care for individuals with opioid use disorder, including substance use and other behavioral health professionals.

---

**High Priority, Short-Term Recommendations**

6. Reflecting the need for all patients to have access to multiple options for treatment, West Virginia should require a statewide quality strategy for opioid use disorder treatment and remove unnecessary regulatory barriers to the expansion of effective treatment.

   a. <u>Key measure</u>: Adoption of statewide quality strategy.

   b. <u>Key measure</u>: Removal of unnecessary regulatory barriers.

7. West Virginia should expand access to effective substance use disorder treatment in hospital emergency departments, other healthcare settings, and the criminal justice system to reach people at key moments of opportunity to enter care.

   a. <u>Key measure</u>: Number of patients participating in medication-assisted treatment, including the COAT program.

   b. <u>Key Measure</u>: Number of clinicians actively providing medication-assisted treatment.

   c. <u>Key measure</u>: Number of individuals who have started opioid use disorder treatment in Emergency Departments.

   d. <u>Key measure</u>: Number of individuals who have started opioid use disorder treatment in the criminal justice system and have successfully transitioned to community treatment.

---

CT2_RGupta000022

P-44223_00019

## Overdose Reversal

*"I would like to see… the development of mobile crisis units that partner with EMS to address overdoses with naloxone and include a social worker or recovery coach to link individuals to treatment for a warm handoff is needed."*

-- Public Comment, Ravenswood, West Virginia

*"The more we train and educate the public on naloxone the more the overdose deaths will go down. This includes the homeless and other at risk groups. We are able to save live more lives as a direct result of those being able to administer."*

-- Public Comment, Shepherdstown, West Virginia

*"Community naloxone programs, when fully funded and supplied, have, in Cabell County, shown the potential to match EMS in lives saved from overdose death. The investment required for optimal implementation, however, is far above current levels of support. Research is needed to establish need and project the necessary resources."*

-- Public Comment, Lavalette, West Virginia.

**Data and Evidence.** Naloxone treatment can immediately reverse the life-threatening respiratory depression associated with opioid overdose, and programs that make naloxone available have been associated with fewer overdoses.[26]

Naloxone, however, does not address the underlying substance use disorder. A person who is resuscitated with naloxone is at high risk for a subsequent overdose. A study in Maryland found that of people who suffered a fatal overdose, three in five had been seen in the Emergency Department for a nonfatal overdose in the previous year.[27]

An effective response to a nonfatal overdose, therefore, requires more than just naloxone. It requires attempts to link individuals at highest risk into the care that can truly take them out of harm's way and help them achieve sustained recovery and live a full life.

---

[26] Walley AY, Xuan Z, Hackman HH, Quinn E, Doe-Simkins M, Sorensen-Alawad A, Ruiz S, Ozonoff A. Opioid overdose rates and implementation of overdose education and nasal naloxone distribution in Massachusetts: interrupted time series analysis. BMJ. 2013 Jan 30;346:f174.

[27] Department of Health and Mental Hygiene. News Release. 29 December 2014.

18

CT2_RGupta000023

P-44223_00020

**Public Comment.** Many comments supporting expanding naloxone programs. Other comments expressed frustration with multiple resuscitations of the same person, and a few suggested limits on the number of times an individual should be resuscitated. Some comments called for programs to offer services to individuals after a nonfatal overdose.

**Discussion and Recommendations.** Naloxone distribution is a core component of every state's strategy against overdose, for the simple reason that naloxone reverses overdoses. In West Virginia, statewide protocols have provided this treatment modality in the pre-hospital setting for a number of years.  Within the past couple of years, other first responders, including from the Fire Department and law enforcement, have been provided the opportunity to provide this life saving measure.  Starting in May 2015, the Office of Emergency Medical Services developed and began teaching naloxone administration to trainers throughout the state.  This has expanded since that time to include at least 17 different law enforcement entities, day report centers, fire departments, local health departments and general laypersons. There are trainers in every region of the state and the Office of Emergency Medical Services continues to facilitate and conduct trainings whenever the need is presented.  Over 1500 individuals have been trained statewide.  An important model is the collaboration between the Bureau for Behavioral Health and Health Facilities and West Virginia University on the Prevent Prescription Drugs/Opioid-Related Deaths Initiative. The Office of Emergency Medical Services also works with the WV Poison Center on tracking naloxone administrations from fire, law enforcement and laypersons.  All trained entities are encouraged to report any administrations. However, the numbers of such voluntary reports are very small, fewer than 100 per year. By contrast, required reporting from EMS reveals hundreds of naloxone administrations per month.[28]

  To build on this progress, West Virginia should set a bold statewide goal: all first responders should be equipped with and trained to use naloxone (which will also help with efforts to prevent secondary exposure), and there should be community programs in every county that provide naloxone to people who are close to users of opioids. Physicians should be encouraged to co-prescribe naloxone with opioid prescriptions. The state should explore strategies such as a standing order to better assure insurance coverage for naloxone. West Virginia should explore making naloxone available to other state employees who may encounter people who are using drugs and making naloxone and overdose training available to individuals leaving detention.

  In addition, each overdose reversal also represents an opportunity to prevent the next one. To take advantage of this opportunity, West Virginia should implement the relevant provisions of House Bill 2620 and require hospital emergency departments and Emergency Medical Services to notify the Bureau for Public Health of nonfatal overdoses for the sole purpose of arranging for outreach and services, such as the Quick Response Teams. It is critical that adequate treatment sources be available to handle the referrals. Other healthcare providers

---

[28] Legislative Rule 64CSR48 Section 3 requires that all EMS providers must submit data from every run to the OEMS within 72 hours of completion.  From 2012 to 2016 there was a steady increase in the number of naloxone administrations provided by EMS (i.e., from approximately a couple thousand doses a year to over 5000 doses annually).  Over recent months at the end of 2017, we have started seeing a decline in the monthly administrations of naloxone from 400-500 month to 300-400 per month.

19

CT2_RGupta000024

P-44223_00021

should have the option to notify the Bureau as well. Where possible, this notification should be implemented electronically, to minimize the burden on the healthcare system. There should be adequate resources to support the notification process and the provision of outreach and follow-up services.

---

**High Priority, Short-Term Recommendations**

8. West Virginia should require all first responders to carry naloxone and be trained in its use, support community-based naloxone programs for initial responders, and authorize a standing order for naloxone prescriptions to improve insurance coverage.

    a. <u>Key Measure</u>: Reports of overdose reversals, both through EMS and Poison Control.

9. West Virginia should require hospital emergency departments and Emergency Medical Services to notify the Bureau for Public Health of nonfatal overdoses for the purpose of arranging for outreach and services.

    a. <u>Key Measure</u>: Number of people who engage in care or recovery support after nonfatal overdose.

---

## Supporting Families with Substance Use Disorder

*"Our Drug Free Mother and Baby program is a shining example of something that works. Medicaid, PEIA, and private insurance companies need to cover the costs of all aspects of this care. This program has proven itself, but it must be reimbursable to survive."*

-- Public Comment, Lewisburg, West Virginia

**Data and Evidence.** West Virginia's opioid epidemic has led to the highest rate of Neonatal Abstinence Syndrome in the country, with a rate about 5 times the national average.[29] Untreated opioid use disorder is also responsible for thousands of children placed into foster care.[30]

---

[29] https://www.cdc.gov/mmwr/volumes/65/wr/mm6531a2.htm

[30] http://wvpublic.org/post/opioid-epidemic-putting-thousands-more-foster-care#stream/0

20

There are important models in West Virginia that aim to address these challenges by supporting families. These include:

- The Drug Free Moms and Babies Program aims to support healthy pregnancy outcomes by providing integrated and comprehensive prevention, early intervention, substance use disorder treatment, and recovery support services for pregnant and postpartum women with substance use disorders. There were four pilot project sites funded under the original program, with an additional eight projects to be funded through the State's Opioid State Targeted Response project. Project sites offer screening and referral to treatment, prenatal risk screening, integrated and comprehensive care, recovery coaches, and long-term follow-up. Preliminary data has associated participation in this program with reduced rates of adverse birth outcomes, such as low birthweight.

- Home visitation programs that provide direct assistance to families, such as Right from the Start. These programs have been shown to reduce the incidence of child abuse.

- Comprehensive programs for families with substance use disorder, including Lily's Place, which offers medical follow-up and coordination of services for affected children, their siblings, and their parents. Among other services, this program links parents to potentially life-saving treatment for opioid use disorder.

An important point is that programs encourage, and do not discourage, women from receiving high quality treatment for opioid use disorder that includes medications – even though some infants exposed to these medications may develop Neonatal Abstinence Syndrome. This is because treatment for parents is essential for the long-term health and well-being of their children.

There have also been important discussions in West Virginia on strengthening services for at-risk children.[31]

**Public Comment.** Public comment generally supported additional services for high-risk women, children, and families in West Virginia.

**Discussion and Recommendations.** West Virginia is moving in the right direction to expand access to successful models of care and support for families. The state should work with the federal government, the Medicaid program, and others to maximize support for these efforts to be able to serve all who can benefit. These programs and others can also help provide access to reproductive healthcare services to women and men who are experiencing an opioid use disorder. There is evidence of significant needs for care among individuals both in and out of treatment programs.[32]

---

[31] See for example, the Kids' Health Roundtable Series from the West Virginians for Affordable Health Care.

[32] http://journals.lww.com/journaladdictionmedicine/Abstract/2016/02000/Reproductive_Health_Needs_Among_Substance_Use.4.aspx

21

Beyond these efforts, West Virginia should explore expanding programs such as Handle with Care that support trauma-informed services for families impacted by the opioid epidemic.

---

**High Priority, Short-Term Recommendations**

10. West Virginia should expand effective programs that serve families, including Drug Free Moms and Babies, home visitation programs, and comprehensive services for the families of children born with Neonatal Abstinence Syndrome such as Lily's Place.

    a. <u>Key Measure</u>: Out of home foster care placement.

11. West Virginia should provide access to voluntary long-acting reversible contraception and other contraceptive services for men and women in multiple settings.

    a. <u>Key Measure</u>: Number of infants with Neonatal Abstinence Syndrome born to women with untreated opioid use disorder.

---

# Recovery

*"We ... need peer recovery coaches in the emergency rooms when overdoses come in so they can talk to the person about changing their life and getting on the right track."*

-- Public Comment, White Sulphur Springs, West Virginia.

*"Lastly, peer support should be integrated into intervention and trauma centers to have individuals with lived experience helping traumatized users begin the process of change needed. Evidence shows having a person of compassionate lived experience can often break past resistance with identification."*

-- Public Comment, Dunbar, West Virginia.

**Data and Evidence.** Recovery services, including peer recovery services and other services such as support from recovery allies, involve the process of giving and receiving non-clinical assistance to support long-term recovery from substance use disorders. For example, a peer recovery coach brings the lived experience of recovery, combined with training and supervision, to assist others

CT2_RGupta000027

P-44223_00024

in initiating and maintaining recovery, helping to enhance the quality of personal and family life in long-term recovery.[33]

People who have worked with peer recovery coaches provide strong testimonies of the positive impacts of peer recovery support on their own recovery journeys. While the body of research is still growing, there is mounting evidence that people receiving peer recovery coaching show reductions in substance use, improvements on a range of recovery outcomes, or both. Two rigorous systematic reviews examined the body of published research on the effectiveness of peer-delivered recovery supports published between 1995 and 2014. Both concluded that there is a positive impact on participants.[34,35]

**Public Comment.** Many public comments highlighted the importance of engaging with peers, in order to use the lived experiences of people in recovery to help others find hope and a way out of their circumstances.

**Discussion and Recommendations.** West Virginia is poised to build upon existing efforts utilizing peers and take two important steps forward in the use of Peer Recovery Support Services, which includes both recovery housing and peer coaches.

*New funding for peer coaches.* The Bureau for Behavioral Health and Health Facilities has issued a competitive funding announcement for specialized Peer Recovery Coaches, using the Opioid States Targeted Response Grant award, as part of a statewide plan to expand regionally based substance use recovery services for adults. Through this grant, the Bureau seeks to expand the capacity of the existing network of Peer Recovery Coaches to aid and support individuals withopioid use disorder. The vision for this project is to hire and train new Peer Recovery Coaches in areas of special focus and populations:

- Offenders reentering the community from incarceration in a correctional setting;
- Pregnant and post-partum women and their infants/children;
- Overdose survivors served by the emergency response system and emergency departments.
- All peers will receive training about medication-assisted treatment.

*Medicaid reimbursement.* To promote sustainability as well as continued growth in peer recovery services, the Centers for Medicare & Medicaid Services has approved West Virginia's new five-

---

[33] http://www.recoveryanswers.org/

[34] Bassuk EL, Hanson J, Greene RN, Richard M, Laudet A. Peer-Delivered Recovery Support Services for Addictions in the United States: A Systematic Review. J Subst Abuse Treat. 2016 Apr;63:1-9.

[35] Reif S, Braude L, Lyman DR, Dougherty RH, Daniels AS, Ghose SS, Salim O, Delphin-Rittmon ME. Peer recovery support for individuals with substance use disorders: assessing the evidence. Psychiatr Serv. 2014 Jul;65(7):853-61.

CT2_RGupta000028

P-44223_00025

year section 1115 demonstration, entitled "Creating a Continuum of Care for Medicaid Enrollees with Substance Use Disorders." Among the services to be covered is Peer Recovery Support, delivered by individuals in recovery from substance use disorder (peer recovery coach) to provide recovery support to help prevent relapse and promote long term recovery. High quality services can be provided by appropriately trained staff when working under the supervision of a competent behavioral health professional.

West Virginia also has a robust array of recovery residences, some of which are collaborating to form a state chapter of the National Alliance of Recovery Residences. It is important that individuals are able to find high quality recovery housing, regardless of their pathway to recovery, including whether or not they are receiving medication-assisted treatment.

These expansions in access to recovery supports are critically important and should be encouraged. West Virginia should also explore steps to promote education about recovery and help individuals in recovery find employment, such as facilitating access to state ID cards and providing employment training. The state can also promote additional support services for college students with substance use disorders as well as those who are in recovery.

---

**High Priority, Short-Term Recommendations**

12. West Virginia should continue pursuing a broad expansion of recovery supports, including peer-based support services, families and allies.

   a. <u>Key measure</u>: Number of recovery coaches

   b. <u>Key measure</u>: Number of recovery residences that permit multiple pathways to recovery, including with and without medication-assisted treatment, including number that meet peer review standards established by the chapter of the National Alliance of Recovery Residencies.

---

24

## Conclusion

In West Virginia's battle against the pain, trauma, and death caused by the opioid epidemic, there are no quick fixes. But there is reason for hope. There are a number of specific steps that can turn the tide. These steps are based in evidence and rooted in compassion. Some are already underway. Others require additional action. All require rising above the stigma against substance use disorder to the recognition that recovery -- for individuals, for their families, for their communities, and indeed, for our state -- is within reach.

25

CT2_RGupta000030

P-44223_00027