IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,

     Plaintiff,

v.                                CIVIL ACTION NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

     Defendants.
_____

CABELL COUNTY COMMISSION,

     Plaintiff,

v.                                CIVIL ACTION NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

     Defendants.
_____

<u>MEMORANDUM OPINION AND ORDER</u>

     Pending before the court is defendants' motion to exclude
certain Rule 30(b)(6) testimony of Thomas Prevoznik.  <u>See</u> ECF No.
1310.  That motion is fully briefed and, for the reasons
discussed herein, it is **DENIED**.

                              I.

     These two cases, arising out of the opioid epidemic, are
related to thousands of other lawsuits that have been filed
throughout the country since 2017.  "These cases concern the
alleged improper marketing of and inappropriate distribution of

various prescription opiate medications into cities, states, and
towns across the country."  In re Nat'l Prescription Opiate
Litig., 290 F. Supp.3d 1375, 1377 (J.P.M.L. 2017).  The Opioid
MDL (MDL 2804) was created by the Judicial Panel on Multidistrict
Litigation (JPML) in December of 2017 after the JPML determined
that a large number of cases should be centralized for pretrial
proceedings in the Northern District of Ohio to coordinate the
resolution of these actions.  See id. at 1378.

Since MDL 2804's formation, well over 2,000 cases have been
transferred to the MDL court.  See In re Nat'l Prescription
Opiate Litig., No. 1:17-MD-2804, 2019 WL 4686815, at *1 (N.D.
Ohio Sept. 26, 2019).  In his management of the MDL, Judge Dan
Polster, the presiding judge, has overseen "discovery involving
over 450 depositions and over 160 million pages of documents" and
ruled "on innumerable discovery motions, ranging from the trivial
to motions to compel production of documents from the United
States Drug Enforcement Agency".  Id. at *2.  Specifically, with
respect to the DEA, Judge Polster notes that "the DEA and the
parties thoroughly and vigorously negotiated the scope of MDL
discovery, in light of the needs of the case and the burden on
the DEA as a non-party, governmental agency.  Disputes were
mediated and resolved by Special Master Cohen.  Ultimately, DEA
produced thousands of pages of documents and provided several
witnesses for lengthy deposition."  ECF No. 502-1.

In response to defendants' subpoenae, one of the witnesses
DEA tapped to testify in the MDL was Thomas Prevoznik.  At the
time of his deposition in April 2019, Prevoznik was a 28-year
veteran of the DEA.  See ECF No. 1355-7.  Hired as a Diversion
Investigator in 1991, Prevoznik moved up the ranks at DEA and, as
of his deposition, was the Associate Section Chief for the DEA's
Diversion Control Division in the Pharmaceutical Investigations
Section.  See id.  Not only did Prevoznik hold a number of
different positions over the course of his DEA career, he also
served the agency in several different geographic areas before
moving to DEA headquarters in May 2012 to become a Diversion
Staff Coordinator.  See id.

The particulars of Prevoznik's deposition (as well as the
other DEA witnesses) were negotiated between the parties and the
DEA and overseen by Special Master Cohen.  See, e.g., ECF No.
1355-4.  In response to plaintiffs' and defendants' requests and
subject to certain limitations, the DOJ authorized Prevoznik to
testify as to the following topics:

> Def. Topic 2: Your interpretation and enforcement of,
> and practices related to 21 U.S.C. § 823 and 21 C.F.R.
> § 1301.74.
>
> • DEA's policies, practices, and guidance relating
>   to whether registrants are permitted to ship
>   orders of controlled substances that the
>   registrant determines to be "suspicious" and/or
>   "excessive," including the nature of the purported
>   duty to conduct due diligence on such orders, as
>   described in the 2006 and 2007 letters from DEA to

registrants, and any changes to those policies, practices, and guidance over time;

- DEA's interpretation of, and policies and practices relating to, what constitutes a "suspicious order" under 21 C.F.R. § 1301.74(b), and any changes thereto over time;

- DEA's interpretation of, and policies and practices relating to, registrants' obligations to "know their customers" and/or "know their customers' customers," and any changes thereto over time;

- DEA's guidance and/or directions given to registrants about suspicious order reports, including the scope, format, types of systems to be utilized (including automated systems), and DEA locations (field offices or headquarters) for such submissions, and how such guidance changed over time.

Def. Topic 3:  Guidance or other Communications provided by You to Defendants, whether written or oral, regarding the criteria for what makes an order for controlled substances "suspicious" under 21 C.F.R. § 1301.74.

- DEA's guidance to registrants relating to whether registrants are permitted to ship orders of controlled substances that the registrant determines to be "suspicious" and/or "excessive," including the nature of the purported duty to conduct due diligence, as described in the 2006 and 2007 letters from DEA to registrants, and any changes in that guidance over time;

- DEA's guidance to registrants relating to what constitutes a "suspicious order" under 21 C.F.R. § 1301.74(b), and any changes in that guidance over time;

- DEA's "Distributor Briefing" initiative, including when these briefings were given and the guidance provided to registrants relating to their obligations under the CSA;

4

- DEA's guidance to registrants relating to the adequacy of their suspicious order monitoring systems; and

- DEA's guidance to registrants relating to any obligation to monitor registrants' customers and the downstream supply chain.

Def. Topic 9: Your procedures and practices relating to obtaining, processing, analyzing, and taking formal or informal actions based upon the ARCOS Data, Suspicious Order Reports, or other Communications from DEA Registrants to identify and stop sources of diversion. This topic encompasses the following subjects:

- DEA's general procedures relating to the analysis of ARCOS data, Suspicious Order Reports, or other Communications from DEA Registrants identifying suspicious orders or customers from 1995 to 2014, but not including DEA's analysis of particular ARCOS data or Suspicious Order Reports.

Def. Topic 12: Your decision not to allow DEA-registered distributors access to de-identified ARCOS Data prior to February 2018, and your decisions to provide DEA-registered distributors with limited access to certain ARCOS Data in February.

Pl. Topic 1: DEA's interpretation of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 et seq. ("CSA" or "Controlled Substances Act") and its implementing regulations, including but not limited to, 21 C.F.R. § Part 1300 et seq. (including, but not limited to, 21 C.F.R. §§ 1301.11, 1301.74), 21 C.F.R. Part 1305, and 28 C.F.R. § 0.100 with respect to a registrant's obligation "to main[tain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances," 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74, including the registrants' duty not to shop suspicious orders, and to "maintain effective controls against diversion" as described in the September 27, 2006, February 7, 2007, and December 27, 2007 letters to registrants.

Pl. Topic 2: DEA's enforcement activities with respect to [defendant] registrants who manufacture, prescribe,

distribute, or dispense Opioids, including the use, disclosure, and limitations of ARCOS data.

Pl. Topic 4:  DEA's guidance to registrants and requests for guidance from registrants with respect to any of the topics in this subpoena, including, but not limited to, all guidance and communications related to DEA's Distributor Initiative.

Pl. Topic 5:  DEA's interaction with the Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")) regarding best practices, guidance, or enforcement related to registrants' obligations under the CSA and its implementing regulations, as laid out in Topic 1.

ECF No. 1355-1.

Prevoznik testified in a Rule 30(b)(6) capacity for over three days beginning on April 17, 2019.  In preparation for his deposition, Prevoznik spent more than 100 hours over almost four months talking to DEA employees and reviewing DEA documents.

## II.

Defendants ask the court to exclude Prevoznik's testimony from trial to the extent that he testified about matters occurring before 2012, when he transferred to DEA Headquarters' Office of Diversion Control.  According to defendants, Prevoznik's testimony is inadmissible at trial because he lacks personal knowledge.

Plaintiffs argue that Rule 30(b)(6) testimony need not be based on personal knowledge to be admissible at trial.  In the alternative, plaintiffs contend that Prevoznik has sufficient personal knowledge to testify to pre-2012 matters.

"Rule 30(b)(6) deponents testify on behalf of entities, not
themselves, and often do so based on careful advance preparation,
not personal knowledge." Virginia Dept. of Corr. v. Jordan, 921
F.3d 180, 193 (4th Cir. 2019).  However, Federal Rule of Evidence
602 permits a witness to "testify to a matter only if evidence is
introduced sufficient to support a finding that the witness has
personal knowledge of the matter."  The fact that a witness will
testify in a Rule 30(b)(6) capacity does not obviate Rule 602's
requirement that the witness have personal knowledge of the
subject matter of his testimony.  See Brooks v. Caterpillar
Global Mining America, LLC, CIVIL ACTION NO. 4:14CV-00022-JHM,
2017 WL 3426043, at *5 (W.D. Ky. Aug. 8, 2017) ("Rule 30(b)(6)
does not eliminate Rule 602's personal knowledge requirement.");
Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc., No.
8:12-cv-691-T-24-MAP, 2014 WL 4983912, at *3 (M.D. Fl. Oct. 6,
2014) ("While Rule 30(b)(6) permits [a corporate
representative's] deposition testimony to be based on matters
outside his personal knowledge, Rule 602 limits his trial
testimony to matters that are within his personal knowledge.").
The court acknowledges that there is authority holding otherwise.
See, e.g., Univ. Healthsystem Consortium v. UnitedHealth Grp.,
Inc., 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("[A] Rule
30(b)(6) witness may testify both in a deposition and at trial to

matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602.").

Another line of cases holds that "a Rule 30(b)(6) witness may 'testify not only to matters within his personal knowledge but also to matters known or reasonably available to the organization.'" <u>Sara Lee Corp. v. Kraft Foods Inc.</u>, 276 F.R.D. 500, 503 (N.D. Ill. 2011) (quoting <u>PPM Finance, Inc. v. Norandal USA, Inc.</u>, 392 F.3d 889, 894-95 (7th Cir. 2004) (internal citation and quotation omitted)).  As the <u>Sara Lee</u> court explained:

> When it comes to using Rule 30(b)(6) depositions at trial, strictly imposing the personal knowledge requirement would only recreate the problems that Rule 30(b)(6) was created to solve.  For example, a party might force a corporation to "take a position" on multiple issues through a Rule 30(b)(6) deposition, only to be left with the daunting task of identifying which individual employees and former employees will have to be called at trial to establish the same facts.  This Court, therefore, will not limit Thompson's testimony strictly to matters within Thompson's personal knowledge.

<u>Id.</u>; <u>see also</u> <u>Corcoran v. CVS Pharmacy, Inc.</u>, No. 15-cv-03504-YGR, 2021 WL 633809, at *7 (N.D. Cal. Feb. 18, 2021) ("It is this Court's view that persons who have been designated to testify on behalf of the corporation may be examined on specifically articulated topics whether the representative obtained the information by personal experience or upon investigation in their corporate capacity.").

There is, however, nothing in Rule 602 that dictates how a witness may acquire personal knowledge.  "Although firsthand observation is obviously the most common form of personal knowledge, that is not the only basis for it."  3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 602.03[1][a] (2d ed. 2010); see also United States v. Christie, 624 F.3d 558, 568 (4th Cir. 2010) (suggesting as "unsound" the "premise that the only competent testimony about a complicated transaction is testimony from eyewitnesses at every step").  As the United States Court of Appeals for the Seventh Circuit noted:

> All perception is inferential and most knowledge social; since Kant we have known that there is no unmediated contact between nature and thought. Knowledge acquired through others may still be personal knowledge within the meaning of [Federal Rule 602], rather than hearsay, which is the repetition of a statement made by someone else—a statement offered on the authority of the out-of-court declarant and not vouched for as to truth by the actual witness.  Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

Agfa-Gevaert, A.B. v. A.B. Dick Co., 879 F.2d 1518, 1523 (7th Cir. 1989); see also FloodBreak, LLC v. Art Metal Industries, LLC, No. 3:18-cv-503 (SRU), 2020 WL 6060974, at *8 (D. Conn. Oct. 13, 2020) ("The relevant question governing admissibility is not whether Waters had first-hand knowledge, but whether he had 'personal knowledge.'").  Rule 602 "is not so narrowly defined" so as to exclude "knowledge acquired through others."  U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, No.

9

00 Civ. 4763 RMB JCF, 2006 WL 2136249, at *11 (S.D.N.Y. Aug. 1, 2006); see also In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig., 870 F. Supp. 1293, 1304 (E.D. Pa. 1992) (refusing to strike declaration where declarant "acquired personal knowledge by reviewing relevant documents and discussing the issues with senior management and other personnel").

Nor does "[t]he rule require that personal knowledge be acquired contemporaneous with the events at issue.  Indeed '[p]ersonal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry practice, is a sufficient foundation for lay opinion testimony.'"  In re: RFC and RESCAP Liquidating Trust Action, Case No. 0:13-cv-3451 (SRN/HB), 2020 WL 504661, at *6 (D. Minn. Jan. 31, 2020) (quoting Qwest Corp. v. City of Santa Fe, No. 10-CV-0617 RB/KBM, 2013 WL 12239494, at *1 (D.N.M. Apr. 15, 2013) (internal citation omitted)); see also Los Angeles Times Comm's, LLC v. Dept. of the Army, 442 F. Supp.2d 880, 886 (C.D. Cal. 2006) ("Plaintiff fails to appreciate that a declarant can testify about practices or procedures in place before the witness was employed with the organization about which he is relating information.").

In this case, Prevoznik spent more than 100 hours over a four-month period preparing for his deposition.  See ECF No.

1355-8.  In so doing, talked to more than 30 people and spent
more than 50 hours reviewing documents.  See id.  Prevoznik's
personal knowledge appears to be the result of "compiling and
assimilating information he gleaned from many sources" and there
is nothing before the court to suggest that he "is merely
repeating (without attribution) a statement made wholesale to him
by another."  Mirowski Family Ventures, LLC v. Boston Scientific
Corp., Cause No. 1:11-cv-736-WTL-DKL, 2013 WL 432500, at *2 (S.D.
Ind. Feb. 4, 2013); see also In re Texas Eastern Transmission,
870 F. Supp. at 1304 (refusing to exclude declaration for lack of
personal knowledge where declarant "acknowledge[d] that he relied
on various sources to acquire his knowledge of the events to
which he attests.  He does not, however, offer his statement
solely on the authority of those statements, but rather vouches
for the statements' truth himself. [His] alleged reliance on
documents distinguishes this case from one in which a declarant
relies solely on the 'say-so' of third parties.").  Based upon
the foregoing, the court finds that Prevoznik's deposition
testimony was based on personal knowledge and does not run afoul
of Rule 602.

Ultimately, the limitations of Prevoznik's testimony on pre-
2012 matters go to the weight to be given that testimony, not its
admissibility.  A Rule 30(b)(6) witness's testimony carries no
greater weight than any other witness.  See, e.g., Indus. Hard

Chrome, LTD v. Hetran, Inc., 92 F. Supp. 2d 786, 791 (N.D. Ill.
Apr. 18, 2000) ("The testimony given at a Rule 30(b)(6)
deposition is evidence which, like any other deposition
testimony, can be contradicted.").  For example, where his
testimony conflicts with documents or contemporaneous witnesses
or he is asked to interpret a document which he had no hand in
drafting, the court will have to weigh his testimony carefully
and give it such weight as it deserves.  Furthermore, although
"personal knowledge may be based on review of files," a witness
stands on stronger ground where "the testimony states facts
reflected by the files and does not give inferences, opinions,
and surmises."  Cf. Howard Acquisitions, LLC v. Giannasca New
Orleans, LLC, Civil No. WDQ-09-2561, 2010 WL 3834917, at *3 (D.
Md. Sept. 28, 2010) (discussing the requirement that summary
judgment affidavits be based on personal knowledge) (internal
quotation and citation omitted).

## III.

Defendants' motion to exclude certain Rule 30(b)(6)
testimony of Thomas Prevoznik is **DENIED** and this court declines
to make a blanket ruling excluding all his testimony predating
2012.  However, the court will carefully evaluate his testimony
and reserves the right to exclude any testimony that appears to
be inadmissible in context.

12

The Clerk is directed to send copies of this Memorandum Opinion and Order to counsel of record who have registered to receive an electronic NEF.

**IT IS SO ORDERED** this 15th day of February, 2022.

ENTER:

David A. Faber
Senior United States District Judge