# APPENDIX A.1

**Script :**          **Quintero G 20181206 DA 7-23**

**Deposition :**     **Quintero, Gilberto 2018-12-06**

**Highlighter Key :**

| ■ Defense Affirmatives | **00:37:40** |

Quintero G 20181206 DA 7-23

**Quintero G 20181206 DA 7-23**

| Scene | Designation | Source | Tx Duration | Elapsed | Remains | Media File | Barcode |
|-------|-------------|--------|-------------|---------|---------|------------|---------|
| 1 | **70:3 -70:4** | Quintero, Gilberto 2018-12-06 | 00:00:02 | 00:00:00 | 00:37:40 | QUINTERO, GILBEI | V132A.1 |

70:3      What else did Deloitte do for

70:4      Cardinal?

| 2 | **70:7 -72:11** | Quintero, Gilberto 2018-12-06 | 00:02:40 | 00:00:02 | 00:37:38 | QUINTERO, GILBEI | V132A.2 |

70:7      A.  During the time that I was there,

70:8      their primary role was project management.  They

70:9      also provided, you know, labor that could help

70:10    us, either do calculations or evaluate certain

70:11    things.

70:12    Q.  Do you recall which projects

70:13    Deloitte worked on?

70:14    A.  Not all.  I recall they worked for

70:15    me in some of the improvements that I wanted to

70:16    make on the anti-diversion program.

70:17    Q.   Okay.  So within the

70:18    anti-diversion program, what were the projects

70:19    they worked on for you?

70:20    A.   We were working on developing a

70:21    threshold methodology using additional

70:22    information that we had collected.

70:23    Q.   Can you explain that to me?  I

70:24    don't -- what is the threshold methodology you

71:1      and Deloitte were able to come up with?  What

71:2      was it?

71:3      A.   Well, I don't think Deloitte came

71:4      up with.  I mean, we provided the information --

71:5      some of the information to Deloitte and they

71:6      helped us develop some of the principles of our

71:7      threshold methodology.

71:8      Q.   Which principles?

71:9      A.   Is that we are using script counts

71:10    from the pharmacy and national averages and

71:11    standard deviations to establish thresholds.

71:12    Q.   What's a script count?  I think I

71:13    know what a national average is, but what's a

71:14    script count?

71:15    A.   Is when you go to a pharmacy with

71:16    a script, that's one script.  If a hundred

■ Defense Affirmatives

71:17   people go to a pharmacy to fill the script,
71:18   that's a hundred scripts.
71:19   Q.   And script counts for all
71:20   prescriptions that a pharmacy fills or for a
71:21   particular section of scripts, such as for
71:22   controlled substances?
71:23   A.   The script count is the total
71:24   script count, which is all of the prescription
72:1    that that pharmacy fills.
72:2    Q.   So it could be oxycodone, but it
72:3    also could be albuterol?
72:4    A.   It could be oxycodone.  It could
72:5    be albuterol.  It could be a beta-blocker.  It
72:6    could be a Lipitor.
72:7    Q.   And then with regard to the
72:8    national average, rather than me assuming I
72:9    know, what did Deloitte help you with in terms
72:10   of the national average, or how was that
72:11   employed?

| 3 | 72:14 -74:17 | Quintero, Gilberto 2018-12-06 | 00:02:32 | 00:02:42 | 00:34:58 | QUINTERO, GILBEI | V132A.3 |
|---|---|---|---|---|---|---|---|

72:14   A.   Deloitte didn't provide the
72:15   national average.  I got that information from
72:16   other sources.
72:17   Q.   What sources?
72:18   A.   IMS.
72:19   Q.   Okay.  Any other sources?
72:20   A.   We got additional information on
72:21   national averages from Symphony.
72:22   Q.   Symphony, is that a consulting
72:23   firm?  I don't know what Symphony is.
72:24   A.   Symphony is the data -- as I know
73:1    them, it's a data collection firm.  I do not
73:2    know all the businesses that they have, but they
73:3    provide data to customers.
73:4    Q.   What data do they provide to
73:5    Cardinal?
73:6    A.   They provided data on script
73:7    counts, on average dispensing of controlled
73:8    substances for different drug families.
73:9    Q.   Anything else?
73:10   A.   Not that I recall at this point in

■ Defense Affirmatives

73:11   time.

73:12   Q.   So you talked about the script

73:13   counts, the national average that Deloitte

73:14   helped you bring into a new threshold

73:15   methodology; is that accurate?

73:16   A.   The primary role of Deloitte was,

73:17   you know, project management and they provided

73:18   additional resources as we required them.  But

73:19   they work under our direction.

73:20   Q.   What other projects do they work

73:21   on?

73:22   A.   Projects on different aspects of

73:23   our anti-diversion program, but if you ask me

73:24   the details at this point in time, I don't

74:1    recall all of the products that they worked.  I

74:2    can tell you --

74:3    Q.   Can you tell me the ones you do?

74:4    A.   The one that are most significant

74:5    to me was our project of establishing a new

74:6    threshold methodology.

74:7    Q.   And when was that new threshold

74:8    methodology?

74:9    A.   It was a process that probably

74:10   started in -- sometime in 2012, but I don't

74:11   remember the exact date.

74:12   Q.   And when did that project get

74:13   completed?

74:14   A.   We're continuously looking at how

74:15   to improve our system, so I cannot tell you

74:16   after my departure in 2015 if other changes were

74:17   made.

| 4 | 77:6 -77:20 | Quintero, Gilberto 2018-12-06 | 00:00:41 | 00:05:14 | 00:32:26 | QUINTERO, GILBEI | V132A.4 |

77:6    Q.   Did you ever work with Dendrite?

77:7    A.   We used their services.

77:8    Q.   What services of theirs did you

77:9    use?

77:10   A.   To the best of my knowledge, we

77:11   used them to do field inspections.

77:12   Q.   Can you explain that to me,

77:13   please.

77:14   A.   Inspections or reviews of

■  Defense Affirmatives

Quintero G 20181206 DA 7-23

77:15    pharmacies in the field.  Customers.
77:16    Q.   So Dendrite would send individuals
77:17    out to do a site visit; is that what you mean?
77:18    A.   Yes.
77:19    Q.   What kind of oversight did
77:20    Cardinal have of Dendrite personnel?

---

| 5 | 77:23 - 78:9 | Quintero, Gilberto 2018-12-06 | 00:00:22 | 00:05:55 | 00:31:45 | QUINTERO, GILBEI | V132A.5 |

77:23    A.   Those people were supervised by
77:24    one of their supervisors, but they provided
78:1    different work of site visits.
78:2    Q.   Framework of -- I'm sorry.  I
78:3    didn't understand.
78:4    A.   Of the site visits.
78:5    Q.   Of the site visits, okay.
78:6           So they would provide the
78:7    framework of the site visits?
78:8    A.   (Nods head.)
78:9    Q.   What does that mean?  Does that --

---

| 6 | 78:19 - 79:23 | Quintero, Gilberto 2018-12-06 | 00:01:15 | 00:06:17 | 00:31:23 | QUINTERO, GILBEI | V132A.6 |

78:19    Q.   You were talking about Dendrite,
78:20    and the role -- and I was asking about the role
78:21    that they played in site visits.  I was also
78:22    asking about what oversight Cardinal had of
78:23    Dendrite personnel and what specifically
78:24    Dendrite personnel did with regard to site
79:1    visits.  And so my understanding is that you
79:2    said that Dendrite employees would provide a
79:3    framework for the site visits.  Is that
79:4    accurate?
79:5    A.   No, I did not say that.
79:6    Q.   Okay.
79:7    A.   They provide the services of doing
79:8    the site visit.  We provided the forms that they
79:9    had to complete during site visits and we
79:10    provided the list of the customers that we
79:11    wanted them to visit.
79:12    Q.   When you say you provided the
79:13    forms, you mean physical forms, Cardinal would
79:14    provide paper forms that Dendrite personnel
79:15    would then go to a pharmacy and fill out?

■ Defense Affirmatives

79:16   A.   It could be paper, it could be

79:17   electronic forms.

79:18   Q.   But a questionnaire of sorts that

79:19   they would have to answer?

79:20   A.   They would be the forms that we

79:21   use to document our customer visits.

79:22   Q.   And when is it that Cardinal began

79:23   to delegate site visits to Dendrite personnel?

| 7 | **80:2 - 80:15** | Quintero, Gilberto 2018-12-06 | 00:00:41 | 00:07:32 | 00:30:08 | QUINTERO, GILBEI | V132A.7 |

80:2   A.   The word "delegation" is probably

80:3   not the right -- we used their services to help

80:4   us complete a number of visits.  We didn't

80:5   delegate.  We used their services.

80:6   Q.   Was it Cardinal personnel that was

80:7   performing the site visits, or was it Dendrite

80:8   personnel?

80:9   A.   We had both.  We have our own

80:10   personnel, and we used the services from

80:11   Dendrite at that time, I believe, to help us

80:12   perform some of the visits.

80:13   Q.   And was that because Cardinal

80:14   didn't have sufficient personnel to do all the

80:15   site visits needed on their own?

| 8 | **80:18 - 82:16** | Quintero, Gilberto 2018-12-06 | 00:02:39 | 00:08:13 | 00:29:27 | QUINTERO, GILBEI | V132A.8 |

80:18   A.   It was because we were reacting to

80:19   changes in the regulatory environment, and there

80:20   were some additional visits that we wanted to

80:21   perform in a short period of time, so we used

80:22   outside resources to assist us with that.

80:23   Q.   Okay.  So the first question I

80:24   have about that is:  What period of time are we

81:1   talking about that Dendrite was assisting you,

81:2   Cardinal, with site visits?

81:3   A.   To the best of my knowledge, they

81:4   were involved with some of our site visits from

81:5   sometime in 2012 and sometime in 2013, but I

81:6   don't recall the exact dates.

81:7   Q.   And you said this was due to

81:8   changes in the regulatory environment.  What

81:9   were the changes in the regulatory environment

■ Defense Affirmatives

81:10   that led Cardinal to decide we need to hire or
81:11   bring on Deloitte -- or Dendrite personnel to
81:12   assist us in site visits?
81:13   A.   Where we follow, you know, what's
81:14   going on in the public media, so we understand
81:15   there's, you know, an increase in use of certain
81:16   drugs in certain markets.  We may ask our team
81:17   to go to those markets and review the stores
81:18   that we have as customers or that we have
81:19   concerns.
81:20   Q.   Maybe I missed it, but I don't
81:21   understand where in your answer you talked about
81:22   changes in the regulatory environment.
81:23   A.   Well, there's changes in -- have
81:24   been changes in the expectations in the
82:1    regulatory environment over time.  So -- and
82:2    expectations of pharmacies, expectations of
82:3    distributors.
82:4    Q.   And what were the changes?
82:5    A.   There have been changes over time.
82:6    Q.   Okay.  But specific to what we're
82:7    talking about right at this moment, is there's a
82:8    point in time, you think it's in 2012 to
82:9    sometime in 2013 -- you're not certain of the
82:10   dates -- but in that two-year period, you said
82:11   that Cardinal enlisted assistance from Dendrite
82:12   to do site visits because there were changes in
82:13   the regulatory environment.  So those are the
82:14   specific changes I'm asking about right now.
82:15         What were those changes in 2012
82:16   and '13 that you're talking about?

---

9       **82:19 -83:11**   Quintero, Gilberto 2018-12-06      00:00:36   00:10:52   00:26:48   QUINTERO, GILBE    V132A.9

82:19   A.   Some of the changes is the
82:20   expectations that the agency had with us and
82:21   other registrants.
82:22   Q.   The agency, being the DEA?
82:23   A.   DEA.
82:24   Q.   Drug Enforcement Agency of the
83:1    United States?
83:2    A.   (Nods head.)
83:3    Q.   Is that a yes?

■ Defense Affirmatives

83:4    A.  Yes.
83:5    Q.  Sorry.  That's just for the
83:6    record.  Sometimes we have the nods of the head,
83:7    which the camera will catch it but the
83:8    transcript won't.
83:9         So what were the changes in
83:10   expectations that the agency had with Cardinal
83:11   and other registrants in 2012 and '13?

| 10 | 83:12 - 83:18 | Quintero, Gilberto 2018-12-06 | 00:00:36 | 00:11:28 | 00:26:12 | QUINTERO, GILBEI | V132A.10 |

83:12   A.  One of the changes that I recall,
83:13   we had an understanding with the DEA that we
83:14   will investigate threshold events, and if we
83:15   found that those threshold events resulted in
83:16   customer that had the potential for diversion,
83:17   that they wanted us to communicate those to
83:18   them.

| 11 | 83:19 - 84:1 | Quintero, Gilberto 2018-12-06 | 00:00:23 | 00:12:04 | 00:25:36 | QUINTERO, GILBEI | V132A.11 |

83:19   Q.  So your testimony today is that
83:20   sometime in 2012 or 2013, the DEA, for the first
83:21   time, said that Cardinal and other registrants
83:22   need to investigate threshold events, and if
83:23   they find that a customer has a potential for
83:24   diversion, they need to report that to the DEA?
84:1    A.  When we terminated the customer.

| 12 | 84:4 - 85:9 | Quintero, Gilberto 2018-12-06 | 00:01:40 | 00:12:27 | 00:25:13 | QUINTERO, GILBEI | V132A.12 |

84:4    Q.  Say again?
84:5    A.  Is when the termination of that
84:6    particular customer, they wanted us, based on
84:7    the communications between my staff and the DEA,
84:8    that's the information that they wanted us to
84:9    communicate as suspicious order.  Later in time,
84:10   we learned that the agency had changed their
84:11   expectations and they wanted to know every
84:12   single order that hit a threshold event after a
84:13   small investigation, had to be communicated to
84:14   them.
84:15   Q.  So it's the every single threshold
84:16   event after a small investigation has been
84:17   communicated to the DEA, that's the change that

■ Defense Affirmatives

84:18    occurred in 2012 and '13?

84:19    A.  That's the -- yes.

84:20    Q.  And what was the small

84:21    investigation that would have to occur after a

84:22    threshold event?

84:23    A.  Is like a quick review of the

84:24    customer order to determine whether the customer

85:1    was likely due to a typographical error, and we

85:2    were, you know, expected to make a decision very

85:3    quickly.  And if we could not resolve that order

85:4    in a short period of time, we had to report it

85:5    to the DEA and continue our investigation in

85:6    regards to the customer, because that takes a

85:7    longer period of time.

85:8    Q.  And this review, this short

85:9    investigation, where did that occur?

| 13 | 85:12 -87:2 | Quintero, Gilberto 2018-12-06 | 00:02:11 | 00:14:07 | 00:23:33 | QUINTERO, GILBEI | V132A.13 |

85:12    A.  That review of investigation

85:13    occurs as part of our electronic monitoring

85:14    system with the personnel that is responsible

85:15    for that.

85:16    Q.  And so do you recall, who at the

85:17    DEA communicated this change to Cardinal?

85:18    A.  The initial agreement between

85:19    Cardinal Health and the DEA occurred between --

85:20    to the best of my knowledge, between Michael

85:21    Moni, Barbara Boockholdt, Sue Langston, and Nick

85:22    Rausch, I believe, was at that meeting, too.

85:23    Q.  But you were not?

85:24    A.  I was not.  That was before I

86:1    joined Cardinal Health.

86:2    Q.   So there was a meeting with those

86:3    four individuals you just named.  Nick Rausch

86:4    and Michael Moni are the two Cardinal

86:5    representatives?

86:6    A.  That is my understanding.

86:7    Q.  And when you started, was it

86:8    conveyed to you that this is a new change we

86:9    have?

86:10    A.  My understanding was these are the

86:11    expectations from the agency, that we evaluate

■ Defense Affirmatives

86:12    orders, determine if the customer had the
86:13    potential to divert the order, and our practice
86:14    was:  Terminate the customer and communicate
86:15    that termination to the DEA.
86:16    Q.   And so what I'm confused about now
86:17    is that you're talking about a meeting prior to
86:18    you joining Cardinal between Michael Moni, Nick
86:19    Rausch and the DEA, correct?
86:20    A.   Correct.
86:21    Q.   And that is in response to me
86:22    asking you about the regulatory changes that
86:23    took place in 2012 and '13 that required
86:24    Cardinal Health to employ Dendrite to assist in
87:1     site visits?
87:2     A.   Well, we had --

| 14 | 87:5 -88:17 | Quintero, Gilberto 2018-12-06 | 00:01:53 | 00:16:18 | 00:21:22 | QUINTERO, GILBEL | V132A.14 |

87:5     A.   -- we had a regulatory action from
87:6     the agency in 2012.  So that definitely --
87:7     there was a change in the expectation from the
87:8     agency from what we had done before, which had
87:9     been reviewed in numbers of time, not only by
87:10    the meeting the DEA had at our corporate
87:11    headquarters, but also during dozens of cyclical
87:12    inspections.  We did not express concern until
87:13    we received the administrative action from the
87:14    agency.
87:15    Q.   So Cardinal Health was
87:16    communicated changes -- regulatory changes that
87:17    the DEA expected in -- prior to December 1st,
87:18    2009, when Michael Moni and Nick Rausch meets
87:19    with the DEA, correct?
87:20    A.   We presented the program that we
87:21    had for anti-diversion, our intent on how to
87:22    execute the program.  And my understanding was
87:23    that there was an agreement that the program
87:24    fulfilled the expectations of the agency and
88:1     that met the regulatory requirements.
88:2     Q.   And that was at a meeting prior to
88:3     you joining Cardinal?
88:4     A.   That was the meeting that occurred
88:5     before I joined Cardinal Health.

■ Defense Affirmatives

88:6     Q.   And did you ever see any agreement
88:7     in writing between the DEA and Cardinal with
88:8     regard to that meeting?
88:9     A.   I did not see any agreement in
88:10    writing, but I got a consistent message from
88:11    Michael, from Bob Giacalone, from Mr. Morford
88:12    that that was our agreement with the agency, so
88:13    we needed to make sure that we keep compliant
88:14    with that agreement.
88:15    Q.   And as the supervisor of
88:16    anti-diversion, you didn't confirm that in
88:17    writing?

| 15 | 88:20 - 89:5 | Quintero, Gilberto 2018-12-06 | 00:00:36 | 00:18:11 | 00:19:29 | QUINTERO, GILBEI | V132A.15 |
|---|---|---|---|---|---|---|---|

88:20    A.   I believe the information that was
88:21    provided by my staff, by our senior legal
88:22    regulatory counsel, and by my boss.
88:23    Q.   And what I'm still trying to
88:24    understand is, this meeting occurred before you
89:1     joined Cardinal on December 1st, 2009.  And in
89:2     that meeting was conveyed to Cardinal that the
89:3     DEA had additional expectations with regard to
89:4     reporting threshold events after a small
89:5     investigation, correct?

| 16 | 89:8 - 90:4 | Quintero, Gilberto 2018-12-06 | 00:01:11 | 00:18:47 | 00:18:53 | QUINTERO, GILBEI | V132A.16 |
|---|---|---|---|---|---|---|---|

89:8     A.   My understanding of what occurred
89:9     in the meeting was we provided a presentation to
89:10    two members of the Drug Enforcement
89:11    Administration.  That presentation was an
89:12    overview of our anti-diversion program and our
89:13    suspicious order monitoring program.  And the
89:14    agency didn't have any objections, didn't have
89:15    any concerns with the way that we were executing
89:16    our program.
89:17    Q.   But I thought you said that this
89:18    meeting -- we're talking about one meeting that
89:19    happened before you got there, just to be clear,
89:20    there's only one meeting we're talking about
89:21    between Michael Moni, Nick Rausch, as
89:22    representatives of Cardinal, and the DEA.
89:23              I thought your testimony earlier

■ Defense Affirmatives

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 89:24 | was that at that meeting the DEA conveyed to | | | | |
| | | | 90:1 | Cardinal regulatory changes, in particular, that | | | | |
| | | | 90:2 | upon a threshold event, Cardinal would do a | | | | |
| | | | 90:3 | small investigation and then report to the DEA | | | | |
| | | | 90:4 | if a customer had to be terminated? | | | | |

| 17 | **90:7 - 90:20** | Quintero, Gilberto 2018-12-06 | 00:00:35 | 00:19:58 | 00:17:42 | QUINTERO, GILBEI | V132A.17 |
|---|---|---|---|---|---|---|---|

90:7    A.  That's incorrect.  I didn't say
90:8    that.
90:9    Q.  Okay.
90:10   A.  I didn't say that.  I think as a
90:11   result of the regulatory action that we had in
90:12   2012, those were new expectations that were
90:13   communicated to us.
90:14   Q.   Okay.  So you're testifying that
90:15   in 2009 -- well, I'm sorry.  Before you joined
90:16   Cardinal in 2009, there was a meeting between
90:17   Michael Moni, Nick Rausch and the DEA, and at
90:18   that meeting, there weren't new expectations --
90:19   new regulatory changes that were conveyed to
90:20   Cardinal.  That's your testimony now?

| 18 | **90:23 - 92:16** | Quintero, Gilberto 2018-12-06 | 00:02:14 | 00:20:33 | 00:17:07 | QUINTERO, GILBEI | V132A.18 |
|---|---|---|---|---|---|---|---|

90:23   A.   That is not what I said.  What I
90:24   said was, there was a meeting between
91:1    representative from DEA and Cardinal Health,
91:2    where Cardinal Health presented our suspicious
91:3    order monitoring program to the agency.  As we
91:4    were executing the program at that time, the
91:5    agency appeared to be satisfied with our
91:6    execution of the program, did not express any
91:7    concern.
91:8               Also, that program has been
91:9    presented to the agency during multiple
91:10   inspections of our distribution centers.  And to
91:11   the best of my knowledge, there has not been a
91:12   single concern about that until we got the
91:13   administrative action in 2012.
91:14   Q.   And so between your start date of
91:15   December 1st, 2009 and the action in 2012 --
91:16   early February, 2012, does that sound --
91:17   A.   Sounds about right.

■ Defense Affirmatives

91:18   Q.   -- sounds about right?

91:19         Between December 1, 2009 and early

91:20   February 2012, did you ever have any contact

91:21   with the DEA to determine if the suspicious

91:22   order monitoring program of Cardinal was in line

91:23   with their expectations?

91:24   A.   I personally did not have a

92:1   meeting with DEA.  Members of my staff did.

92:2   Michael Moni, I believe, was in routine

92:3   communication with Barbara Boockholdt and other

92:4   members of the DEA.  I also attended, you know,

92:5   presentations from the DEA but never had

92:6   personal interaction with the agency.

92:7         Michael had most of those

92:8   interactions, and Steve Reardon and some other

92:9   members of my staff.

92:10   Q.   How about above you?  Did Craig

92:11   Morford ever have conversations or contact with

92:12   the DEA, to your knowledge?

92:13   A.   I would speculate if I say yes or

92:14   no.  I don't know that.

92:15   Q.   So you're not aware of any time

92:16   that he did?

| 19 | **92:19 -94:3** | Quintero, Gilberto 2018-12-06 | | 00:01:45 | 00:22:47 | 00:14:53 | QUINTERO, GILBEI | V132A.19 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

92:19   A.   During that period of time, I

92:20   would not be able to recall.

92:21   Q.   All right.  Well, during the

92:22   period of time that you've been with Cardinal,

92:23   from December 1st, 2009, are you aware of any

92:24   time that Craig Morford had contact with the

93:1   DEA?

93:2   A.   I have personally not been in any

93:3   of the meetings that either Craig or somebody

93:4   else may have with personnel from the DEA.

93:5   Q.   Okay.  And maybe you weren't

93:6   present, but I'm asking right now if you're

93:7   aware of any meetings between Craig Morford and

93:8   the DEA.

93:9   A.   I believe there was a meeting --

93:10   one meeting between Cardinal Health and DEA

93:11   where we made another presentation of our

■ Defense Affirmatives

93:12    program.  And my understanding was Craig may
93:13    have been there.  I'm not 100 percent sure.  I
93:14    know Todd Cameron was there.
93:15    Q.   And when was that?
93:16    A.   I cannot tell the date, but it
93:17    could be '15 to '17.  But I don't even recall if
93:18    I was involved with the program at that time or
93:19    not.
93:20    Q.   And do you know who from the DEA
93:21    was involved?
93:22    A.   I'm trying to recollect if I
93:23    remember.  I'm not very good with names.  But I
93:24    do not recall from the top of my head.
94:1    Q.   Is it fair to say, then, if you
94:2    can't recall, that at least it wasn't Barbara
94:3    Boockholdt?

| 20 | 94:6 -95:16 | Quintero, Gilberto 2018-12-06 | 00:02:13 | 00:24:32 | 00:13:08 | QUINTERO, GILBEI | V132A.20 |

94:6    A.   I don't recall.  I mean -- or they
94:7    didn't tell me who was there, or I don't recall
94:8    if Barbara was there or not.
94:9    Q.   Okay.  That's fair.
94:10            So we -- I want to go back because
94:11    I still don't think I have a full understanding
94:12    of what it was in 2012 that was communicated to
94:13    Cardinal that led Cardinal to employ the
94:14    services of Dendrite to assist with site visits.
94:15    A.   Our understanding was that the
94:16    agency expectations and definition on suspicious
94:17    orders had changed.
94:18    Q.   In what way?
94:19    A.   In the past, the program that we
94:20    presented to the agency, which the agency had no
94:21    objection, was that when we had a threshold
94:22    event, we had to investigate the threshold event
94:23    if we concluded that the customer had posed a
94:24    risk for diversion or we couldn't conclude
95:1    that -- at that point in time, after an
95:2    investigation, that we should report that
95:3    customer as suspicious.
95:4            The expectations changed in 2012
95:5    were the time frame that we were allowed to do

■ Defense Affirmatives

Quintero G 20181206 DA 7-23

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| | | 95:6 | an investigation, and the agency decided that | | | | |
| | | 95:7 | each threshold event, after a quick | | | | |
| | | 95:8 | investigation -- when I say "quick | | | | |
| | | 95:9 | investigation," is a very short period of time | | | | |
| | | 95:10 | to be communicated to them as a suspicious | | | | |
| | | 95:11 | order, even though that threshold event not | | | | |
| | | 95:12 | necessarily met all of the requirements of a | | | | |
| | | 95:13 | suspicious order. | | | | |
| | | 95:14 | Q.  So what kind of threshold events | | | | |
| | | 95:15 | would not meet the requirements of a suspicious | | | | |
| | | 95:16 | order? | | | | |

| 21 | **95:19 - 96:4** | Quintero, Gilberto 2018-12-06 | | 00:00:28 | 00:26:45 | 00:10:55 | QUINTERO, GILBEF | V132A.21 |
|---|---|---|---|---|---|---|---|---|
| | | 95:19 | A.  For example, we're reporting them | | | | |
| | | 95:20 | as suspicious, but is a pharmacist going on | | | | |
| | | 95:21 | holiday weekend and he ordered twice as many | | | | |
| | | 95:22 | drugs because he's not going to be at the site | | | | |
| | | 95:23 | to order the drugs the next week?  I mean, that | | | | |
| | | 95:24 | will -- potentially could hit a threshold event. | | | | |
| | | 96:1 | Q.  Could potentially also signal that | | | | |
| | | 96:2 | a number of people have decided they want to buy | | | | |
| | | 96:3 | a bunch of oxycodone for a party on the weekend, | | | | |
| | | 96:4 | couldn't it? | | | | |

| 22 | **96:7 - 96:9** | Quintero, Gilberto 2018-12-06 | | 00:00:04 | 00:27:13 | 00:10:27 | QUINTERO, GILBEF | V132A.22 |
|---|---|---|---|---|---|---|---|---|
| | | 96:7 | A.  Not necessarily. | | | | |
| | | 96:8 | Q.  Not necessarily, but it could, | | | | |
| | | 96:9 | couldn't it? | | | | |

| 23 | **96:12 - 97:13** | Quintero, Gilberto 2018-12-06 | | 00:01:30 | 00:27:17 | 00:10:23 | QUINTERO, GILBEF | V132A.23 |
|---|---|---|---|---|---|---|---|---|
| | | 96:12 | A.  Not necessarily.  Everything is | | | | |
| | | 96:13 | possible, but it's not necessarily.  So we want | | | | |
| | | 96:14 | to do an investigation on that customer to look | | | | |
| | | 96:15 | at the fact on why there was an increase in | | | | |
| | | 96:16 | order, and we want -- that takes time.  But with | | | | |
| | | 96:17 | our current system and the current expectations | | | | |
| | | 96:18 | of the agency, we report those as suspicious. | | | | |
| | | 96:19 | Q.  You said you want to investigate | | | | |
| | | 96:20 | those but that takes time.  I don't understand. | | | | |
| | | 96:21 | What kind of time does it take to find out if a | | | | |
| | | 96:22 | threshold event is suspicious or not? | | | | |
| | | 96:23 | A.  It takes -- to determine if the | | | | |

■ Defense Affirmatives

Quintero G 20181206 DA 7-23

96:24    order is likely to be diverted, it takes time.
97:1    It takes some time, customer visit.  It takes
97:2    time interacting with the customer.  It takes
97:3    time maybe having a salesperson drive by to get
97:4    additional information.
97:5         It takes time to evaluate an order
97:6    and determine whether Cardinal Health feels
97:7    comfortable either filling that order or we
97:8    decide to -- not to longer do business with that
97:9    particular customer because it poses a risk of
97:10    diversion.
97:11    Q.  And in order to meet that
97:12    requirement, Cardinal employed Dendrite to
97:13    assist with site visits?

| 24 | 97:16 -97:18 | Quintero, Gilberto 2018-12-06 | 00:00:12 | 00:28:47 | 00:08:53 | QUINTERO, GILBEI | V132A.24 |

97:16    A.  We used Dendrite to help us to --
97:17    more site visits so we can have more recent
97:18    information on our customer.

| 25 | 97:22 -97:23 | Quintero, Gilberto 2018-12-06 | 00:00:05 | 00:28:59 | 00:08:41 | QUINTERO, GILBEI | V132A.25 |

97:22    Q.  But prior to 2012, you did not use
97:23    Dendrite to assist with site visits, correct?

| 26 | 97:24 -98:8 | Quintero, Gilberto 2018-12-06 | 00:00:26 | 00:29:04 | 00:08:36 | QUINTERO, GILBEI | V132A.26 |

97:24    A.  During the time that I was there
98:1    in 2009 to 2012, I don't recall us using
98:2    Dendrite.  That doesn't necessarily mean that we
98:3    had not used them, but I don't recall.
98:4    Q.  But your testimony is that, to
98:5    your knowledge, Dendrite was employed by
98:6    Cardinal in order to assist with this new
98:7    requirement from the DEA that threshold events
98:8    get a fast investigation?

| 27 | 98:11 -99:9 | Quintero, Gilberto 2018-12-06 | 00:01:16 | 00:29:30 | 00:08:10 | QUINTERO, GILBEI | V132A.27 |

98:11    A.  Not -- not for that.  It was to
98:12    assist us to do -- we wanted to have more site
98:13    visits done.  We wanted to refresh all of our
98:14    files, so we used Dendrite to help us do
98:15    additional visits.
98:16    Q.  And you say you wanted, but in

■ Defense Affirmatives

98:17    2012, didn't the DEA tell you that you had to do
98:18    those site visits within 120 days?
98:19    A.   I don't recall the terms of the
98:20    agreement.  It could be in the agreement, but I
98:21    would have to review the agreement to say if
98:22    that was the case.
98:23    Q.   Okay.  We can do that.
98:24             But your testimony so far is that
99:1     you, Cardinal, that Cardinal employed Dendrite
99:2     to assist with these site visits because you
99:3     wanted to do more of them; is that correct?
99:4     A.   I believe that we wanted to do
99:5     more site visits.
99:6     Q.   And you think that this is
99:7     something that Cardinal decided on its own, its
99:8     own accord, to do more site visits in 2012; is
99:9     that your testimony?

| 28 | **99:12 - 99:20** | Quintero, Gilberto 2018-12-06 | 00:00:34 | 00:30:46 | 00:06:54 | QUINTERO, GILBEI | V132A.28 |

99:12    A.   I can tell you as a member of the
99:13    management team, we wanted to do more site
99:14    visits.  And even today, we continue to do a lot
99:15    of site visits.
99:16    Q.   And why is it -- strike that.
99:17             In 2010 and 2011, why is it that
99:18    Cardinal didn't have the same desire to visit
99:19    all the sites to which they sold controlled
99:20    substances that they did in 2012?

| 29 | **99:23 - 100:16** | Quintero, Gilberto 2018-12-06 | 00:00:54 | 00:31:20 | 00:06:20 | QUINTERO, GILBEI | V132A.29 |

99:23    A.   We did plenty of site visits.  We
99:24    investigated every single suspicious customer
100:1    and every single suspicious order was reported
100:2    to the agency, based on the understanding that
100:3    we had at the time.
100:4    Q.   What was that understanding?
100:5    A.   I already explained to you the
100:6    understanding that we had of investigating the
100:7    order, investigating the customer, and if we
100:8    deemed that a customer had the potential for --
100:9    to pose a risk for diversion to -- the agency
100:10   wanted to know that suspicious order and that

■ Defense Affirmatives

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  | 100:11 | suspicious customer that was terminated. |  |  |  |  |
|  |  | 100:12 | Q.  But suddenly in 2012 Cardinal had |  |  |  |  |
|  |  | 100:13 | a greater desire to do site visits than it had |  |  |  |  |
|  |  | 100:14 | in 2010 and '09 -- or 2010 and '11; is that |  |  |  |  |
|  |  | 100:15 | right? |  |  |  |  |
|  |  | 100:16 | A.  Well, we had -- |  |  |  |  |

| 30 | **100:19 -101:6** | Quintero, Gilberto 2018-12-06 | 00:00:52 | 00:32:14 | 00:05:26 | QUINTERO, GILBEI | V132A.30 |
|---|---|---|---|---|---|---|---|
|  |  | 100:19 | A.  We had a regulatory action, so to |  |  |  |  |
|  |  | 100:20 | me, the agency had changed the expectations on |  |  |  |  |
|  |  | 100:21 | how we executed the program.  So we wanted to |  |  |  |  |
|  |  | 100:22 | make sure that we cover all the bases.  We do |  |  |  |  |
|  |  | 100:23 | not want another regulatory action against |  |  |  |  |
|  |  | 100:24 | Cardinal Health, and we employ not only internal |  |  |  |  |
|  |  | 101:1 | resources, but external resources to make sure |  |  |  |  |
|  |  | 101:2 | that we not only met the expectations of the |  |  |  |  |
|  |  | 101:3 | agency, but that we exceeded those. |  |  |  |  |
|  |  | 101:4 | Q.  But Cardinal didn't have the same |  |  |  |  |
|  |  | 101:5 | desire to avoid that regulatory action or exceed |  |  |  |  |
|  |  | 101:6 | expectations of the DEA in 2010 or '11? |  |  |  |  |

| 31 | **101:9 -101:24** | Quintero, Gilberto 2018-12-06 | 00:00:49 | 00:33:06 | 00:04:34 | QUINTERO, GILBEI | V132A.31 |
|---|---|---|---|---|---|---|---|
|  |  | 101:9 | A.  That's not what I said. |  |  |  |  |
|  |  | 101:10 | Q.  But Cardinal decided to wait until |  |  |  |  |
|  |  | 101:11 | 2012 to ask Dendrite to assist with site visits |  |  |  |  |
|  |  | 101:12 | across the country? |  |  |  |  |
|  |  | 101:13 | A.  Cardinal always had the same |  |  |  |  |
|  |  | 101:14 | desire to comply with all regulatory |  |  |  |  |
|  |  | 101:15 | requirements.  That desire has never changed as |  |  |  |  |
|  |  | 101:16 | far as I know.  At least since I joined the |  |  |  |  |
|  |  | 101:17 | company.  I can attest to that.  Our management |  |  |  |  |
|  |  | 101:18 | team has to have -- wants to have a good |  |  |  |  |
|  |  | 101:19 | regulatory record, which we have demonstrated |  |  |  |  |
|  |  | 101:20 | over many, many years. |  |  |  |  |
|  |  | 101:21 |       These regulatory actions that we |  |  |  |  |
|  |  | 101:22 | got in 2012 was a surprise to us because, to the |  |  |  |  |
|  |  | 101:23 | best of my knowledge, we were meeting the |  |  |  |  |
|  |  | 101:24 | expectations of the agency. |  |  |  |  |

| 32 | **102:6 -102:11** | Quintero, Gilberto 2018-12-06 | 00:00:16 | 00:33:55 | 00:03:45 | QUINTERO, GILBEI | V132A.32 |
|---|---|---|---|---|---|---|---|
|  |  | 102:6 | Q.  But, again, just to be clear, it |  |  |  |  |
|  |  | 102:7 | wasn't until 2012 when the regulatory action |  |  |  |  |

■ Defense Affirmatives

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  |  | 102:8 | commenced against Cardinal that Cardinal |  |  |  |  |  |
|  |  | 102:9 | decided, we want to and need to employ Dendrite |  |  |  |  |  |
|  |  | 102:10 | to assist with site visits across the country? |  |  |  |  |  |
|  |  | 102:11 | That's your testimony, correct? |  |  |  |  |  |

| 33 | 102:14 - 103:5 | Quintero, Gilberto 2018-12-06 | 00:01:02 | 00:34:11 | 00:03:29 | QUINTERO, GILBEI | V132A.33 |
|---|---|---|---|---|---|---|---|
|  |  | 102:14 | A.   My testimony is that since I got |  |  |  |  |  |
|  |  | 102:15 | to Cardinal Health on December 1st, 2009, the |  |  |  |  |  |
|  |  | 102:16 | company intended to comply with all regulatory |  |  |  |  |  |
|  |  | 102:17 | requirements, including DEA regulations, and |  |  |  |  |  |
|  |  | 102:18 | that we executed a program that was presented to |  |  |  |  |  |
|  |  | 102:19 | the agency, that the agency accepted as a good |  |  |  |  |  |
|  |  | 102:20 | program, we executed according to those |  |  |  |  |  |
|  |  | 102:21 | expectations. |  |  |  |  |  |
|  |  | 102:22 | We did hundreds of visits.  We cut |  |  |  |  |  |
|  |  | 102:23 | hundreds of customers during that period of time |  |  |  |  |  |
|  |  | 102:24 | before 2012.  To the best of my knowledge, we |  |  |  |  |  |
|  |  | 103:1 | cut over 300 customers during that period of |  |  |  |  |  |
|  |  | 103:2 | time. |  |  |  |  |  |
|  |  | 103:3 | Q.   And yet it wasn't until 2012 that |  |  |  |  |  |
|  |  | 103:4 | you -- that Cardinal realized it needed |  |  |  |  |  |
|  |  | 103:5 | assistance to conduct appropriate site visits? |  |  |  |  |  |

| 34 | 103:9 - 104:2 | Quintero, Gilberto 2018-12-06 | 00:01:03 | 00:35:13 | 00:02:27 | QUINTERO, GILBEI | V132A.34 |
|---|---|---|---|---|---|---|---|
|  |  | 103:9 | A.   We were always conducting |  |  |  |  |  |
|  |  | 103:10 | appropriate visits.  We decided to increase the |  |  |  |  |  |
|  |  | 103:11 | number of site visits that we did because the |  |  |  |  |  |
|  |  | 103:12 | expectations of the agency appeared to have |  |  |  |  |  |
|  |  | 103:13 | changed and we were adapting to the changes in |  |  |  |  |  |
|  |  | 103:14 | expectations from the agency. |  |  |  |  |  |
|  |  | 103:15 | But in terms of whether or not we |  |  |  |  |  |
|  |  | 103:16 | were doing inspections according to the |  |  |  |  |  |
|  |  | 103:17 | expectations of the agency at that time, we were |  |  |  |  |  |
|  |  | 103:18 | doing hundreds of inspections.  We dedicated |  |  |  |  |  |
|  |  | 103:19 | personnel to do those inspections.  We used our |  |  |  |  |  |
|  |  | 103:20 | compliance officers to do inspections, too.  And |  |  |  |  |  |
|  |  | 103:21 | we required our salespeople to notify us of any |  |  |  |  |  |
|  |  | 103:22 | concerns that they had with any customer. |  |  |  |  |  |
|  |  | 103:23 | And those inspections were |  |  |  |  |  |
|  |  | 103:24 | conducted and they resulted in over 300 |  |  |  |  |  |
|  |  | 104:1 | customers being cut, which most of them today |  |  |  |  |  |
|  |  | 104:2 | still have a DEA license to dispense product. |  |  |  |  |  |

■ Defense Affirmatives

Quintero G 20181206 DA 7-23

| 35 | **124:7 -124:10** | Quintero, Gilberto 2018-12-06 | 00:00:08 | 00:36:16 | 00:01:24 | QUINTERO, GILBEI | V132A.35 |
|---|---|---|---|---|---|---|---|
| | 124:7 | Q.  You started reporting suspicious | | | | | |
| | 124:8 | orders in 2012 when the DEA amended their | | | | | |
| | 124:9 | expectations of Cardinal? | | | | | |
| | 124:10 | A.  We reported -- | | | | | |

| 36 | **124:14 -125:4** | Quintero, Gilberto 2018-12-06 | 00:00:53 | 00:36:24 | 00:01:16 | QUINTERO, GILBEI | V132A.36 |
|---|---|---|---|---|---|---|---|
| | 124:14 | A.  We reported -- if you look at the | | | | | |
| | 124:15 | record and the number of suspicious orders to | | | | | |
| | 124:16 | DEA, we reported thousands of orders in 2012 and | | | | | |
| | 124:17 | thousands of orders in 2013, '14, '15 as | | | | | |
| | 124:18 | suspicious orders. | | | | | |
| | 124:19 | Q.  So the years you just chose to | | | | | |
| | 124:20 | list are '12, '13, '14, and '15, correct? | | | | | |
| | 124:21 | A.  Yes.  Because you're giving me a | | | | | |
| | 124:22 | document that is dated 2013. | | | | | |
| | 124:23 | Q.  Did you report thousands of | | | | | |
| | 124:24 | suspicious orders in 2011? | | | | | |
| | 125:1 | A.  We reported suspicious orders, as | | | | | |
| | 125:2 | defined by our program and as agreed by DEA, in | | | | | |
| | 125:3 | 2009, '10, and '11. | | | | | |
| | 125:4 | Q.  So the answer is no? | | | | | |

| 37 | **125:7 -125:13** | Quintero, Gilberto 2018-12-06 | 00:00:24 | 00:37:16 | 00:00:24 | QUINTERO, GILBEI | V132A.37 |
|---|---|---|---|---|---|---|---|
| | 125:7 | A.  The answer is no to what? | | | | | |
| | 125:8 | Q.  That Cardinal reported thousands | | | | | |
| | 125:9 | of suspicious orders in 2011. | | | | | |
| | 125:10 | A.  We -- the answer is we reported | | | | | |
| | 125:11 | suspicious orders, as defined by our program, as | | | | | |
| | 125:12 | defined with agreement with DEA in 2009, '10, | | | | | |
| | 125:13 | and '11. | | | | | |

Play Time for this Script:   **00:37:40**

Total time for all Scripts in this report:   **00:37:40**

■ Defense Affirmatives