**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

––––––––––––––––––

**No. 22-1819**

––––––––––––––––––

CITY OF HUNTINGTON, WEST VIRGINIA,

                 Plaintiff - Appellant,

     v.

AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION,

                 Defendants - Appellees.

------------------------------

LEGAL SCHOLARS,

                 Amicus Curiae,

THE NATIONAL ASSOCIATION OF COUNTIES; THE COUNTY EXECUTIVES OF AMERICA; THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; THE WEST VIRGINIA SHERIFFS' ASSOCIATION; AMERICAN PUBLIC HEALTH ASSOCIATION; NATIONAL ASSOCIATION OF COUNTY AND CITY HEALTH OFFICIALS,

                 Amici Supporting Appellant.

––––––––––––––––––

**No. 22-1822**

––––––––––––––––––

CABELL COUNTY COMMISSION,

                 Plaintiff - Appellant,

     v.

AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION,

        Defendants - Appellees,

    and

CVS HEALTH CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; THE KROGER COMPANY; RITE AID CORPORATION,

        Defendants.

------------------------------

LEGAL SCHOLARS,

        Amicus Curiae,

THE NATIONAL ASSOCIATION OF COUNTIES; THE COUNTY EXECUTIVES OF AMERICA; THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; THE WEST VIRGINIA SHERIFFS' ASSOCIATION; AMERICAN PUBLIC HEALTH ASSOCIATION; NATIONAL ASSOCIATION OF COUNTY AND CITY HEALTH OFFICIALS,

        Amici Supporting Appellant.

————————

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  David A. Faber, Senior District Judge.  (3:17−cv−01362)

————————

Argued:  January 25, 2024              Decided:  October 28, 2025

————————

Before KING and BENJAMIN, Circuit Judges, and KEENAN, Senior Circuit Judge.

————————

Vacated and remanded with instructions by published opinion, Senior Judge Keenan wrote the opinion, in which Judge King and Judge Benjamin concur.

————————

**ARGUED:** David Charles Frederick, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK P.L.L.C., Washington, D.C., for Appellant. Paul William Schmidt, COVINGTON & BURLING, LLP, Washington, D.C.; Enu Mainigi, WILLIAMS & CONNOLLY LLP, Washington, D.C; Robert A. Nicholas, REED SMITH, LLP, Philadelphia, Pennsylvania, for Appellees. **ON BRIEF:** Louis M. Bograd, Michael J. Quirk, MOTLEY RICE LLC, Washington, D.C., for Appellant City of Huntington, West Virginia. Anthony J. Majestro, Christina L. Smith, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Appellant Cabell County Commission. Ariela M. Migdal, Lillian V. Smith, Matthew N. Drecun, Kathleen W. Hickey, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Appellants. F. Lane Heard III, George A. Borden, Ashley W. Hardin, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellee Cardinal Health, Inc. Timothy C. Hester, Christian J. Pistilli, Stephen F. Petkis, Nicole M. Antoine, COVINGTON & BURLING LLP, Washington, D.C., for Appellee McKesson Corporation. Kim M. Watterson, Pittsburgh, Pennsylvania, Joseph J. Mahady, REED SMITH LLP, Philadelphia, Pennsylvania, for Appellee AmerisourceBergen Drug Corporation. Leslie Kendrick, Charlottesville, Virginia; Michael J. Skoler, SOKOLOVE LAW, LLC, Chestnut Hill, Massachusetts; Ruthanne M. Deutsch, Hyland Hunt, DEUTSCH HUNT PLLC, Washington, D.C., for Amici Legal Scholars. Robert B. Nealon, NEALON & ASSOCIATES, P.C., Alexandria, Virginia; J. Carl Cecere, CECERE PC, Dallas, Texas, for Amici The National Association of Counties, The County Executives of America, The National League of Cities, The U.S. Conference of Mayors, The International Municipal Lawyers Association, and the West Virginia Sheriffs' Association. Henry G. Garrard, III, BLASINGAME, BURCH, GARRARD & ASHLEY, P.C., Athens, Georgia; Deepak Gupta, Gregory A. Beck, GUPTA WESSLER PLLC, Washington, D.C., for Amici American Public Health Association and National Association of County and City Health Officials.

---

BARBARA MILANO KEENAN, Senior Circuit Judge:

The opioid epidemic in West Virginia continues to have a devastating impact on the health and welfare of communities throughout the state. In fact, it is undisputed in the present appeal that West Virginia is "ground zero" for the opioid epidemic in the United States. Within West Virginia, individuals living in Cabell County and the City of Huntington have suffered severe effects in their communities. As of 2017, more than 10 percent of the nearly 150,000 people living in those jurisdictions were or had been addicted to opioids, creating widespread harm to those areas.[1]

The Cabell County Commission and the City of Huntington (the local governments) filed the present action in 2017 against three distributors of opioids: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation (the distributors, or the defendants). The local governments originally filed their claims in state court; the defendants later removed the cases to federal court under the court's diversity jurisdiction. After removal to federal court, the United States Judicial Panel on Multidistrict Litigation[2] designated these cases as "bellwether" cases and directed the parties to "streamline" their claims. In response, the local governments narrowed their claims to a public nuisance action against the three distributor defendants. The Judicial Panel on Multidistrict

---

[1] The City of Huntington is a political subdivision located in Cabell County, West Virginia, a separate political subdivision. A small portion of the City of Huntington also is located in Wayne County, West Virginia.

[2] The Judicial Panel on Multidistrict Litigation was established by 28 U.S.C. § 1407.

Litigation remanded the cases to the Southern District of West Virginia, which consolidated the cases for trial.

The local governments allege that the distributors created, maintained, and perpetuated the opioid epidemic in their jurisdictions. The local governments focus their allegations on the distributors' conduct of repeatedly shipping opioids to pharmacies in quantities that the distributors allegedly knew or should have known exceeded any legitimate uses for the drugs. So, according to the local governments, the defendants' actions were a proximate cause of a widespread public nuisance that requires abatement under West Virginia common law.

The district court held a bench trial during which 70 witnesses testified. After the trial, the court entered final judgment for the defendants in a 184-page opinion, which included extensive factual findings. *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408 (S.D. W. Va. 2022) (*Huntington*). In that opinion, the court held that the local governments' public nuisance claims failed as a matter of law because West Virginia common law does not permit such a claim based on the distribution of prescription drugs. *Id.* at 475. The district court also made alternative holdings, including that even if a public nuisance claim based on the distribution of opioids were permitted under West Virginia law, the plaintiffs nonetheless failed to prove the elements of such a claim. *Id.* at 476–84.

Upon review, we disagree with the district court's analysis. Initially, we hold that under West Virginia common law, the conditions resulting from the over-distribution of opioids can constitute a public nuisance. We also hold that in assessing the local

5

governments' claim, the district court misconstrued the distributors' duties under the Controlled Substances Act, 21 U.S.C. §§ 801–904.[3]  This error materially affected the court's analysis of the distributors' conduct.  The court's analytical error also materially affected its rulings on proximate causation and remoteness.  Finally, we conclude that the district court erred in holding that abatement under West Virginia law is limited to ordering the cessation of the conduct that caused the nuisance, and in holding that the local governments' abatement request is barred per se as a request for money damages.  We vacate the district court's judgment and remand for further proceedings.

## I.

The evidence at trial showed that opioids, including prescription opioids, are highly addictive drugs that are prescribed by doctors to provide patients with pain relief.  Individuals who use opioids can become physically dependent on the drugs and, if used to a sufficient degree, opioids can cause death.

### A.

#### 1.

---

[3] Notably, West Virginia has a state statute equivalent to the Controlled Substances Act.  *See* W. Va. Code § 60A-4-401; *see also* W. Va. Code R. § 15-2-2 (2017), *superseded by* W. Va. Code R. § 15-2-3.

Because of the risk of addiction and death, prescription opioids[4] are heavily regulated under the Controlled Substances Act (the Act), 21 U.S.C. §§ 801–904, which regulates drugs and other substances based on their medical use, potential for abuse, safety, and likelihood of inducing dependence. Under the Act, controlled substances generally are placed on a "schedule" based on the drug's potential for abuse or dependence. *See* 21 U.S.C. § 812; *John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 563 (D.C. Cir. 2007). As relevant here, the Drug Enforcement Administration (the DEA)[5] categorizes oxycodone, hydrocodone, and other opioids as Schedule II narcotics, *see* 21 C.F.R. § 1308.12(b)(1), which classification applies to substances having a "currently accepted medical use" but a "high potential for abuse" that "may lead to severe psychological or physical dependence," 21 U.S.C. § 812(b)(2).

The Act establishes rules governing the manner in which regulated drugs, like prescription opioids, may be dispensed to patients. For opioid distribution, the Act creates a "closed regulatory system." *Gonzales v. Raich*, 545 U.S. 1, 13 (2005). This system identifies three categories of entities: manufacturers, distributors, and dispensers, which include pharmacies and doctors. 21 U.S.C. §§ 822(a), 802(10), (11), (15). In the context of opioid production and distribution, manufacturers produce opioids and sell them to

---

[4] The term "opioid" encompasses both prescription and illicit substances. Prescription opioids include oxycodone and hydrocodone. Licensed pharmacists can dispense those opioids to any patient with a legitimate prescription. In contrast, for example, heroin is an illicit substance that cannot legally be dispensed to patients in any circumstance.

[5] The United States Attorney General has delegated many aspects of its authority under the Act to the DEA Administrator. *See* 21 U.S.C. § 871(a); 28 C.F.R. § 0.100(b).

7

distributors.  Distributors ship those opioids to pharmacies, which dispense the opioids to individuals who have received a valid prescription from a doctor.  Each entity in this closed system, including doctors, is required to register with the DEA, and each manufacturer or distributor is restricted to selling opioids only to other registered entities.  *See* 21 U.S.C. §§ 822, 823, 828, 842(a)(1); 21 C.F.R. § 1301.74(e).

This system seeks to combat "diversion," which is the transfer of legally prescribed controlled substances for illicit purposes.  21 U.S.C. § 823(b)(1).  To accomplish this goal, the DEA conducts facility inspections of the registered entities and monitors the flow of drugs by using a database program that is regularly updated.  The DEA also uses enforcement actions to ensure that distributors comply with the various regulations.  Although the DEA provides this oversight, the DEA's resources are limited, and so it is difficult for that agency to scrutinize effectively all the registered entities.  As a result, entities registered with the DEA also must police themselves.

Each category of registered entity in the closed system has its own specific obligations under the Act, but all entities have an obligation to maintain effective controls against diversion.  *See* 21 C.F.R. § 1301.71(a).  The Act requires that all the registered entities substantially comply with the Act's stated requirements.  21 C.F.R. § 1301.71(b); *see also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021).

## 2.

In this case, we focus on the obligations that the Act places on distributors in the context of shipping opioid orders to pharmacies.  Defendants AmerisourceBergen Drug

Corporation (Amerisource), Cardinal Health, Inc. (Cardinal), and McKesson Corporation (McKesson) are the three largest opioid distributors in the United States. Sometimes referred to as the "Big Three," these distributors collectively comprise 90% of the market share for opioid distribution in this country.

Opioid distributors, including the defendants, have a broad obligation under the Act to maintain effective controls against diversion, which obligation includes the exercise of due care to confirm that all pharmacy orders are legitimate before filling those orders. 21 C.F.R. § 1301.71(a). In particular, distributors are required by the Act to "design and operate a system" to identify "suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). The regulations categorize as "suspicious" "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[6] *Id.* Distributors must report to the DEA any "suspicious" orders that they receive.[7] *Id.* The DEA clarified in 2007 that distributors also are prohibited from shipping those "suspicious" orders to their pharmacy customers.

During the timeframe relevant to the present case, the distributors each maintained similar monitoring systems to detect "suspicious orders." Each of the distributors

---

[6] *Morris & Dickson Co., LLC*, 88 Fed. Reg. 34523-01, 34535 (DEA May 30, 2023) (outlining other "red flags"); *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017) (holding that a distributor must either decline to ship or conduct due diligence before shipping a suspicious order (citing *Southwood Pharm., Inc.*, 72 Fed. Reg. 36487, 36501 (DEA July 3, 2007)).

[7] Congress codified the "suspicious" order reporting requirement in the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT) Act, Pub. L. No. 115-271, §§ 3291–92, 132 Stat. 3894, 3956 (Oct. 24, 2018), *codified at* 21 U.S.C. § 832.

presented its monitoring program to the DEA, and the DEA did not object to the design of the distributors' programs. The distributors also created large compliance teams to run these monitoring programs. The district court largely relied on trial testimony from the distributors' employees to determine how those systems operated. *Huntington*, 609 F. Supp. 3d at 425–38.

The record shows that before accepting a pharmacy as a customer, a distributor was required under the Act to evaluate the potential pharmacy customer and its business practices. The distributor conducted an evaluation of the potential pharmacy customer to ensure that this particular pharmacy did not have a history of noncompliance under the Act.

The record also shows that each distributor conducted site visits to existing pharmacy customers to ensure that they were complying with the Act's requirements. Additionally, the distributors used their monitoring programs to scrutinize their pharmacy customers for "red flags" that might indicate a risk of diversion.

The district court described in detail these and other precautionary measures taken by the distributors to investigate their pharmacy customers on an ongoing basis. *Id*. at 427–34. The distributors used their monitoring systems to identify orders that exceeded the "threshold" limits for opioids that each distributor had placed on its pharmacy customers. These threshold limits for an individual pharmacy customer represented the maximum quantity of opioids that the distributor would supply to a given pharmacy in a month.

Notably, the DEA did not prescribe or endorse any particular formula for calculating the threshold limits that the distributors placed on the orders of its pharmacy customers.[8]

The record shows that Amerisource calculated a particular pharmacy's monthly limit by determining the average monthly amount of a drug that a pharmacy ordered over the prior four months and then multiplying that monthly average by three. Cardinal's monthly threshold limit for each pharmacy was set by grouping pharmacies by size (small, medium, or large) and then by calculating the average monthly orders placed by pharmacies of that size. Cardinal would multiply that average by four to determine the monthly threshold limit for a pharmacy of a given size. Finally, McKesson's monthly threshold limit was set by applying a certain multiplier to the average historical purchases of a given pharmacy. And the distributors continued to raise their threshold limits for pharmacy orders over a period of several years.

Employees of the distributors testified that the distributors "flagged" any order that reached or exceeded a pharmacy's threshold limit. When a distributor flagged such an order, the distributor would hold the order for further examination. Those flagged orders later were reviewed individually by employees of the distributors to determine whether the orders qualified under 21 C.F.R. § 1301.74(b) as being "suspicious."

---

[8] One of the local governments' expert witnesses, James Rafalski, a former DEA Diversion Investigator, presented six alternative threshold formulas that the distributors could have used. *Id.* at 439–43. However, after reviewing those formulas, the district court determined that those formulas "were not convincing ways to achieve accurate results of the number of orders that should have been flagged or blocked" by the distributors. *Id.* at 439. The district court thus found Rafalski's diversion-control opinions "unpersuasive." *Id.* at 448.

As an example of this review, the record includes a Cardinal employee's description of Cardinal's typical response to an order that exceeded the threshold limit of a pharmacy customer.  In such a circumstance, Cardinal's anti-diversion team would "familiarize themselves with background due diligence on the customer, including previous held orders and resolutions thereof, the location of the customer, the customer's class of trade, and comments in the Anti-Diversion Centralization database" that the DEA maintains.  *Id.* at 432.  Cardinal's anti-diversion team used that information to decide whether the held order qualified as being "suspicious."

If a distributor determined that a particular order met the stated metrics for a "suspicious" order, the order would not be sent to the requesting pharmacy, and the distributor would report that order and pharmacy to the DEA.  Relying primarily on the testimony of the distributors' employees about how those companies' "suspicious" order monitoring programs worked, the district court found that the distributors "blocked all suspicious orders" that they identified under their monitoring programs.  *Id.* at 476.  The court also found that based on the precautions that the distributors employed, the distributors did not supply controlled substances to illicit pharmacies[9] or to pharmacies lacking DEA registration.  *Id.* at 468.

---

[9] Of particular concern to the DEA were internet pharmacies.  Internet pharmacies allow patients to obtain prescriptions, including prescriptions for opioids, by "completing a questionnaire on a [pharmacy's] website and getting that [questionnaire] approved by a doctor for a prescription."  *Id.* at 423.  Pharmacies then would fill those prescriptions.  *Id.* "Internet pharmacies were a concern to the DEA because there was no legitimate doctor-patient relationship."  *Id.*  As a result, internet pharmacies were filling prescriptions for patients about whom they knew little.  *Id.*

While it is unclear from the trial transcript exactly how many orders the defendants reported to the DEA as being "suspicious," the documentary record shows that these numbers were small in relation to the total number of orders that exceeded the threshold limits the distributors placed on their customer pharmacies. For example, between 2007 and 2011, Amerisource logged 775 orders as exceeding the threshold limit it placed on one pharmacy in Cabell County but only reported 16 of those orders as "suspicious" to the DEA. The evidence also shows that Cardinal reported only a handful of orders to the DEA each year. Finally, McKesson reported to the DEA almost no "suspicious" orders between 2008 and 2009 but increased its reporting after the company was reprimanded by the DEA.

By frequently increasing their pharmacy customers' threshold limits, the distributors necessarily avoided having to report many "suspicious" orders to the DEA. The documentary record shows that when a pharmacy came close to exceeding the then-existing threshold limit, the distributors often raised the permitted limit for that pharmacy customer. Thus, the practice of routinely raising the threshold limits on opioids could allow the distributors to fill potentially "suspicious" orders without additional scrutiny.

For example, the documentary record shows that Amerisource "made adjustments" to a particular pharmacy's threshold limit because opioids were "the primary business" for that pharmacy customer. Less than a year later, the DEA blocked that same pharmacy from purchasing opioids. In another instance, a deposition of an Amerisource employee includes a discussion of an email in which an employee warned particular pharmacy customers that they were close to exceeding their threshold limits and gave those pharmacies the

opportunity to request an increase in the threshold limit imposed by Amerisource to prevent "a bunch of orders [being] reported to the DEA." J.A. 1205–08.

The documentary record also shows that distributors Cardinal and McKesson regularly increased their threshold limits for various pharmacy customers. Cardinal, like Amerisource, often increased pharmacies' threshold limits when the pharmacies were close to exceeding their then-existing limits. Nevertheless, Cardinal employees testified that its anti-diversion team conducted extensive evaluations of any customer requests to increase their threshold limits.

Certain McKesson employees testified that they followed established procedures to investigate a customer before granting a request for an increased threshold limit. But other McKesson employees stated that increases sometimes occurred without a customer's request and that McKesson's practice of numerical limit increases was "almost automatic" and "too easily accept[ed]." J.A. 3568. By 2013, however, McKesson had updated its due diligence processes, and the new procedures resulted in McKesson making fewer threshold modifications.

While the distributors' conduct of increasing a pharmacy's threshold limits on opioid orders did not explicitly violate any DEA regulation, the practice resulted in the distribution of more and more opioids and in the distributors' ability to avoid the required reporting to the DEA. Between 2006 and 2014, opioid distributors shipped dosage units[10] in quantities that represented a total of 122.1 dosage units per person in the general

---

[10] A dosage unit represents the number of pills shipped, without regard to the strength of the pills.

14

population of Cabell County and Huntington, a sharp rise from the prior decade. It is undisputed that the defendants were responsible for the bulk of these shipments.

### 3.

Although some opioid use that contributed to the opioid epidemic was illicit, the epidemic was fueled significantly by an increase in the supply of prescription opioids. A major source of this increase in the opioid supply came from "the high volume of opioid prescriptions that doctors were writing." *Huntington*, 609 F. Supp. 3d at 464. Starting in the 1990s, the standard of care surrounding the use of prescription opioids changed. The district court found that there was no evidence that the distributors played any role in changing the standard of care for treating patients' pain. *Id.* at 462. During this time frame, doctors began paying more attention to their patients' level of pain and, as a result, began prescribing more opioids to manage their patients' pain. The record shows that doctors' actions prescribing opioids in good faith were a major factor in the increase in the supply of opioids.

But the record also shows that, at the same time, "[i]t takes only a few untrained or unscrupulous physicians to create . . . large pockets of addicts." J.A. 2419. Notably, the trial record shows that the "top 1 percent of prescribers" in Cabell County "prescribed upwards of over 40 percent of [opioid] dosage units . . . in a given year." J.A. 2483. Two doctors in particular were "outlier" opioid prescribers in Cabell County, namely, Dr. Deleno Webb and Dr. Philip Fisher. These doctors were the two largest opioid prescribers in Cabell County. Between 1997 and 2017, Dr. Webb prescribed over 14 million opioid dosage units. Between 1997 and 2012, Dr. Fisher prescribed more than 10 million opioid

dosage units.  Both these doctors eventually lost their medical licenses for their conduct of writing excessive amounts of opioid prescriptions.

The record shows that the distributors supplied pharmacies that routinely filled orders submitted by Dr. Webb and Dr. Fisher.  And the record also includes undisputed evidence that the distributors had access to information about the high levels at which Dr. Webb and Dr. Fisher were prescribing opioids.  For instance, Lacey Keller, an expert in the field of data analytics, testified that the distributors "had access to dispensing data . . . that would [have] allow[ed] them to identify outlier prescribers."  J.A. 2487.  And one pharmacy emailed Amerisource a list of doctors, including Dr. Webb and Dr. Fisher, who were frequent prescribers of "[t]roublesome [d]rugs."  J.A. 4831–32.  Notwithstanding this information, certain pharmacies continued to fill prescriptions submitted by Dr. Webb and Dr. Fisher.

4.

The inundation of opioids in Cabell County and in Huntington had devastating effects on those communities.  Neighborhoods throughout these locations have experienced increased crime rates and decreasing property values.  Hundreds of pregnant women have been admitted for treatment of opioid use disorder and, at times, up to 10 percent of babies born at Cabell Huntington Hospital have suffered from neonatal abstinence syndrome.[11]  The number of children placed in foster care has doubled.

---

[11] Neonatal abstinence syndrome (NAS) occurs in newborns "exposed in utero to drugs taken by the mother."  Dorland's Illustrated Medical Dictionary 1840 (32d ed. 2012).  Newborns with NAS show signs of substance withdrawal such as tremors, sweating, yawning, poor feeding, and sleep disturbance.  Id.

Infectious disease rates have sharply increased.  And cases of Hepatitis B and C in Cabell County have far exceeded national averages.

Between 2001 and 2018, 1,151 people died from drug overdoses in Cabell County. Of those individuals, 1,002 died from opioid-related overdoses.  Between 2001 and 2017, the fatal drug overdose rate in Cabell County increased from 16.6 individuals to 213.9 individuals per 100,000 people.  And, at the time of the 2021 bench trial in the district court, prescription opioids remained "an ongoing and significant cause of drug overdose deaths in Cabell [County] and Huntington."  *Huntington*, 609 F. Supp. 3d at 421.

B.

In 2017, the local governments filed their claims against the distributors.  The local governments alleged that the distributors created a public nuisance under West Virginia common law by shipping large quantities of prescription opioids into Cabell County and Huntington and by failing to prevent diversion.  To state a claim for public nuisance in West Virginia, a plaintiff must show that the defendants unreasonably interfered with a public right, that the defendants' actions were a proximate cause of the plaintiffs' injury, and that there is a remedy that will abate the nuisance.  *See infra* at 31–32.

After holding a bench trial in 2021, the district court entered judgment in favor of the distributors.  *Huntington*, 609 F. Supp. 3d at 412.  As an initial matter, the district court held that West Virginia's common law of public nuisance did not encompass the subject matter of the plaintiffs' claims.  *Id.* at 475.  Recognizing that the Supreme Court of Appeals of West Virginia (the State Supreme Court) had not ruled on this issue, the district court predicted that the State Supreme Court would decline to extend West Virginia's common

17

law of public nuisance to the sale, distribution, and manufacture of opioids. *Id.* at 472,

475.  In reaching this conclusion, the district court relied on the Restatement (Third) of

Torts: Liability for Economic Harm § 8 (A.L.I. 2020) and observed that the State Supreme

Court had applied the common law of public nuisance only "in the context of conduct that

interferes with public property or resources." *Id.* at 472.  The district court also held that

extension of the common law of public nuisance to cover the plaintiffs' claims would be

"inconsistent with the history and traditional notions of nuisance." *Id.*

The district court did not find persuasive two West Virginia trial court decisions in

which those courts held that the common law of public nuisance may apply to the sale and

distribution of opioids. *Id.* at 473 (citing *Brooke Cnty. Comm'n v. Purdue Pharma L.P.*,

No. 17-C-248, 2018 WL 11242293 (W. Va. Cir. Ct. Dec. 28, 2018), and *State ex rel.*

*Morrisey v. AmerisourceBergen Drug Corp.*, No. 12-C-141, 2014 WL 12814021 (W. Va.

Cir. Ct. Dec. 12, 2014).  The district court explained:

> To apply the law of public nuisance to the sale, marketing and distribution of
> products would invite litigation against any product with a known risk of
> harm, regardless of the benefits conferred on the public from proper use of
> the product.  The economic harm and social costs associated with these new
> causes of action are difficult to measure but would obviously be extensive.

*Id.* at 474.

Alternatively, addressing the merits of the local governments' public nuisance

claims, the district court held that the local governments had not established that the

distributors' conduct unreasonably interfered with a public right, a required element for

stating a common law claim for public nuisance under West Virginia law. *Id.* at 477.  At

trial, the local governments attempted to show that the distributors violated the Act and,

18

thus, acted unreasonably by failing to identify and investigate "suspicious" orders. *Id.* at 476; *see* Restatement (Second) of Torts § 821B(2)(b) (A.L.I. 1979) (conduct is unreasonable if "proscribed by a statute, ordinance or administrative regulation").

The trial court rejected that argument, holding that under the Act the distributors only were required to "guard against" selling to "pharmacies that are essentially acting as adjuncts of the illicit market," a standard not found in the Act's language or the pertinent regulations. *Huntington*, 609 F. Supp. 3d at 477. The court found that there was no basis to conclude that the distributors were selling opioids to those types of pharmacies. *Id.* at 425.

The trial court did not address much of the documentary evidence of threshold limit increases made by the distributors but concluded in its findings of fact that the distributors "substantially complied with their duties under the CSA to design and operate a [suspicious order monitoring] system and report suspicious orders." *Id.* (cleaned up). Accordingly, the court determined that the local governments had failed to show that the distributors unreasonably interfered with a public right. *Id.* at 475.

The district court also held that the local governments had not satisfied the element of proximate causation. The court observed that "[n]o culpable acts by defendants caused an oversupply of opioids" in Cabell County and Huntington. *Id.* at 476. In reaching this conclusion, the court found that the defendants could not be held liable simply because they had supplied opioids to legitimate pharmacies. So, the district court held that because the local governments did not demonstrate that the distributors supplied opioids to pharmacies conducting illicit activities, the local governments failed to show that the

19

distributors' conduct was a proximate cause of the harm alleged. *See id.* at 479 (noting that "[t]he lack of evidence of pharmacy-level diversion on the part of defendants' pharmacy customers" was "fatal to plaintiffs' claims").

The district court further concluded that the harm alleged by the local governments was too remote from the defendants' actions to render the defendants' conduct a proximate cause of the alleged public nuisance. *Id.* at 481. The court stated that "overprescribing by doctors, dispensing by pharmacists of [] excessive prescriptions, and diversion of the drugs to illegal usage" all were intervening causes that broke the chain of causation between the distributors' conduct in shipping prescription opioids to their pharmacy customers and the harm alleged by the local governments. *Id.* at 481–82.

Finally, the district court rejected the local governments' proposed remedy, namely, a 15-year "Abatement Plan" developed by Dr. G. Caleb Alexander, a professor of epidemiology and medicine at Johns Hopkins University, who qualified as an expert witness in the field of opioid abatement intervention. *Id.* at 417, 470–71, 484. Dr. Alexander testified that the opioid epidemic and the resulting harm from the epidemic was reasonably certain to continue absent implementation of a $2.5 billion abatement plan, which would address prevention, treatment, recovery, and special populations.

The district court held that this requested relief did not fall within the scope of common law abatement. *Id.* at 484. The court concluded that, under West Virginia common law, any abatement remedy would have to be directed at restricting the defendants' conduct or their distribution of opioids, while the plaintiffs' proposed abatement plan improperly focused on funding programs and services to address "the

attendant harms caused by opioid abuse and addiction." *Id.* at 470, 482–84. The court reasoned that the costs of the plan had "no direct relation to any of [the distributors'] alleged misconduct" and so did not qualify as an abatement remedy. *Id.* at 483.

After the district court entered final judgment for the distributors, the local governments timely appealed. On appeal, we initially observed that "there is no controlling appellate decision, constitutional provision, or statute of West Virginia" answering the question whether conditions caused by the distribution of a controlled substance can constitute a public nuisance under West Virginia common law. *City of Huntington v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 644 (4th Cir. 2024). Accordingly, we certified the following question to the State Supreme Court:

> Under West Virginia's common law, can conditions caused by the distribution of a controlled substance constitute a public nuisance and, if so, what are the elements of such a public nuisance claim?

*Id.*

The State Supreme Court declined to answer our certified question. *City of Huntington v. AmerisourceBergen Drug Corp.*, 915 S.E.2d 828, 831 (W. Va. 2025) (*City of Huntington*). The state's highest court explained that "whether a nuisance exists is a factual issue." *Id.* at 836. Because the local governments contested some of the district court's factual findings, the State Supreme Court concluded that any answer that it provided would result in an advisory opinion. *Id.* at 831. The case was returned to this Court for resolution, and we now turn to consider the merits of the case.

II.

21

We employ a mixed standard of review to a district court's judgment entered after a bench trial. *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005). We review the court's legal conclusions de novo and the court's factual findings for clear error. *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019). In reviewing the court's factual findings, we may reverse only when: (1) the court reached its conclusions after applying the incorrect legal standard; (2) the factual findings are not supported by substantial evidence; (3) substantial evidence supports a contrary factual finding; or (4) the factual findings are "'contrary to the clear weight of the evidence.'" *Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995)). Notably, this is a deferential standard, and we will not disturb the district court's factual findings if they are "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

The local governments contend that the district court erred in holding that public nuisance claims under West Virginia common law are limited to conduct that interferes with public property or resources. The local governments also challenge several of the court's legal and factual determinations regarding the court's alternative conclusions that the local governments failed to satisfy the required elements of a claim for public nuisance. We address these arguments in turn.

A.

We first consider whether the district court erred in concluding that conditions caused by the distribution of a controlled substance cannot constitute a public nuisance under West Virginia law. This issue presents a novel question of West Virginia law, which,

22

as we have noted, the State Supreme Court declined to answer.  *See City of Huntington*, 915 S.E.2d at 838.  Because there is an absence of controlling state law, we are charged with predicting what the State Supreme Court would conclude based on that state's existing law.  *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citing *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011)).

Although the State Supreme Court declined to answer the certified question in this case, the court nonetheless explained that "whether a nuisance exists is a factual issue." *City of Huntington*, 915 S.E.2d at 836; *see also Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 618 (W. Va. 1985) (noting that "the existence of a nuisance raises a question of fact" (quoting *Sticklen v. Kittle*, 287 S.E.2d 148 (W. Va. 1981))).  In this context, we observe that public nuisance under state law is broadly defined.  Under West Virginia common law, a public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons."  *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 921 (W. Va. 1997) (citation omitted); *Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 (W. Va. 1992).

In its decision in *Duff*, the State Supreme Court explicitly tied West Virginia's definition of public nuisance to the Restatement (Second) of Torts, stating that "[w]e believe [our] definition is consistent with the *Restatement (Second) of Torts*, [] which defines a public nuisance as 'an unreasonable interference with a right common to the general public.'" 421 S.E.2d at 257 n.6 (quoting Restatement (Second) of Torts § 821B(1) (A.L.I. 1979)).  The State Supreme Court also has explained that "the distinction between a public nuisance and a private nuisance is that [a public nuisance] affects the general

public, and [a private nuisance] injures one person or a limited number of persons only." *Sharon Steel*, 334 S.E.2d at 620 (quoting *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (1945)).

Notwithstanding these West Virginia precedents articulating a very broad definition of public nuisance, the defendants urge us to apply the West Virginia common law of public nuisance more narrowly, as the district court did in the present case. The defendants submit that the State Supreme Court has applied the common law of public nuisance only in the context of conduct that interferes with public property such as highways, public grounds, harbors, landings, or shared resources such as clean air and water. Accordingly, the defendants ask us to reject as a matter of law a claim of public nuisance for conduct involving the distribution of opioids, contending that such conduct reflects only a "product-based" harm.

In particular, the defendants request that we apply the Restatement (Third) of Torts, which states that "the common law of public nuisance is an inapt vehicle for addressing" harms related to products. Restatement (Third) of Torts: Liability for Economic Harm § 8 cmt. g (A.L.I. 2020). The defendants contend that mass harm caused by dangerous products like opioids is better addressed through the law of products liability. In the defendants' view, application of the common law of public nuisance to harms caused by the distribution of opioids would mean that every seller of a product that arguably affects public health could be liable for creating a public nuisance. The defendants also maintain that three decisions from other state courts support their position.

24

We decline the defendants' request to restrict the scope of public nuisance under West Virginia law by excluding as a matter of law harm suffered by the general public originating from the distribution of opioids. The State Supreme Court has not identified any particular type of product-based harm that should be excluded from qualifying as a public nuisance. And nothing in that court's jurisprudence indicates that public nuisance under West Virginia law should be restricted by carving out any product-based harm. Tellingly, the State Supreme Court could have used our certified question as a vehicle for restricting the availability of public nuisance as requested by the defendants and for adopting the position of the Restatement (Third) of Torts on this issue, but the court did not do so.

Instead of restricting to any degree the availability of public nuisance claims under West Virginia law, the State Supreme Court repeatedly has used the expansive definition of public nuisance from the Restatement (Second) of Torts § 821B(1) (A.L.I. 1979), namely, that a public nuisance is "an unreasonable interference with a right common to the general public." *See Duff*, 421 S.E.2d at 257 n.6; *Sharon Steel*, 334 S.E.2d at 620; *Hendricks v. Stalnaker*, 380 S.E.2d 198, 202 (W. Va. 1989). And the State Supreme Court has not restricted this definition of public nuisance by requiring that a defendant's unreasonable conduct also be unlawful. *Sharon Steel*, 334 S.E.2d at 621.

In view of (1) West Virginia's broad definition of a public nuisance, (2) the lack of any decision by West Virginia's highest court limiting that definition with respect to product-based harms, and (3) the high court's admonition that "whether a nuisance exists is a factual issue," *City of Huntington*, 915 S.E.2d at 836, we reject the defendants'

25

argument that, as a matter of law, a product-based harm cannot constitute a public nuisance. We hold that, under West Virginia law, an unreasonable interference with a right common to the general public resulting from the distribution of opioids may qualify as a public nuisance when the evidence establishes that distribution of this product unreasonably "operates to hurt or inconvenience an indefinite number of persons." *Kermit Lumber*, 488 S.E.2d at 921 (citation omitted).

We observe that our conclusion is supported by decisions issued by West Virginia trial courts holding that common law claims of public nuisance are cognizable against distributors of opioids.[12]  For example, in *State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, a West Virginia circuit court held that the state government had "sufficiently assert[ed]" a claim for public nuisance against opioid distributors by alleging that the "safety and health and morals of the people of West Virginia" had been compromised due to the defendants' alleged "wrongful influx of addictive, controlled substances into West Virginia, thereby causing substantial injury to West Virginia citizens and taxpayers."  No. 12-C-141, 2014 WL 12814021, at *10 (W. Va. Cir. Ct. Dec. 12, 2014).  Similarly, in *Brooke County Commission v. Purdue Pharma L.P.*, a West Virginia circuit court held that the common law of public nuisance is "not limited to property disputes," and that the

---

[12] We also observe that in the State Supreme Court's decision declining to answer our certified question, two of the five participating jurists, the Chief Justice and one judge sitting by designation, would have answered our certified question and would have concluded that conditions caused by distribution of a controlled substance *can* constitute a public nuisance under West Virginia common law.  *City of Huntington*, 915 S.E.2d at 844 (Wooten, C.J., dissenting).

distributors of opioids had "interfered with a public right, including the public health." No.

17-C-248, 2018 WL 11242293, at *1 (W. Va. Cir. Ct. Dec. 28, 2018).

Additionally, various judges serving on the West Virginia Mass Litigation Panel

(the Mass Litigation Panel)[13] have ruled that the distribution of opioids can form the basis

of a public nuisance claim under West Virginia common law.[14]     Likewise, when

_____

[13] The Mass Litigation Panel consists of seven active or senior status state circuit court judges appointed by the Chief Justice of the State Supreme Court with the approval of the court's other justices.  Mass Litigation Panel, *Overview*, *available at* https://www.courtswv.gov/lower-courts/mass-litigation-panel     [https://perma.cc/PBT5-3KQS].  The Panel provides a process for judicial management and resolution of multiple cases with a common question of law or fact.  Under this process, one or more judges, sitting as a state circuit court, hear a group of cases that shares such common features.  W. Va. Tr. Ct. R. 26.  As of 2021, West Virginia cities, counties, hospitals, and the state had brought more than 80 lawsuits against manufacturers and distributors of opioids.  *See State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 859 S.E.2d 374, 378 (W. Va. 2021).  By 2023, those suits had been resolved, primarily through settlements reached by the parties.  Mass     Litigation     Panel,     2022     Annual     Report,     *available     at* https://www.courtswv.gov/sites/default/pubfilesmnt/2023-08/2022%20MLP%20Annual%20Report.pdf     [https://perma.cc/N978-27LK];     Mass Litigation     Panel,     2023     Annual     Report,     *available     at* https://www.courtswv.gov/sites/default/pubfilesmnt/2024-04/2023AnnualReportMassLitigationPanel.pdf. [https://perma.cc/E6YT-SFH3]

[14] *See, e.g.*, Findings of Fact and Conclusions of Law and Order Denying Defendants' Motion for Summary Judgment Re: "Factual Issue #2", Civil Action No. 21-C-9000 Distributor, at 1–6 (W. Va. MLP July 1, 2022) (holding that "West Virginia public nuisance law encompasses Plaintiffs' opioid claims" against the distributor defendants), available     at     https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/7-1-22OrderDenyingFactualIssue2.pdf [https://perma.cc/PJ3Y-SR56]; Findings of Fact and Conclusions of Law on Order Denying Pharmacy Defendants' Motions to Dismiss Complaints and Amended Motions, Civil Action No. 21-C-9000-PHARM, at 30 (W. Va. MLP     Aug.     3,     2022),     available     at https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/8-3-22FOF-COLandOrderDenyingPharmacyMTDs.pdf     [https://perma.cc/Y74N-W426];     Amended Order Regarding Rulings Issued During March 25, 2022, Pretrial Conference, Civil Action No. 21-C-9000 MFR, at 4 (W. Va. MLP May 23, 2022) (declining to follow the Oklahoma (Continued)

considering a motion to dismiss filed by the same distributors who are defendants in this case, a Mass Litigation Panel judge denied the distributors' motion and adopted and incorporated by reference the findings of fact and conclusions of law from the West Virginia circuit court's decision in *Brooke County*.[15]   These rulings by various West Virginia circuit courts offer further support for our prediction that West Virginia's high court would hold that the common law of public nuisance in West Virginia does not exclude as a matter of law any claim based on the widespread community harm caused by the distribution of opioids.  *See Comm'r v. Est. of Bosch*, 387 U.S. 456, 465 (1967) (explaining that lower state court decisions are not controlling but are entitled to some weight).

In reaching this conclusion, we disagree with the defendants' contrary argument that all "product-based" harms are better addressed through the law of products liability.  We observe that product liability claims and public nuisance claims are distinct causes of action.  While product liability claims focus on harms specifically borne by discrete individuals seeking monetary damages for the injuries they have sustained, *see McNair v. Johnson & Johnson*, 818 S.E.2d 852, 859–60 (W. Va. 2018), public nuisance claims serve

---

Supreme          Court's          ruling          in          *Hunter*), https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/5-23-22AmendedPretrialRulingsOrder21-C-9000MFR.pdf [https://perma.cc/5NK3-LXPV].

[15] *See Order Denying the Distributor Defendants' Motion to Dismiss Plaintiffs' Complaint*, Civil Action No. 19-C-1900, at 3 (W. Va. MLP Oct. 31, 2019), *available at* https://www.courtswv.gov/sites/default/pubfilesmnt/2023-07/OrderDenyingDistributor DefendantsMTD.pdf [https://perma.cc/2CHF-8CEK].

a different function in focusing on harm suffered by the public more generally and seeking abatement of that harm through the court's equitable authority, *see Sharon Steel*, 334 S.E.2d at 621; *Tull v. United States*, 481 U.S. 412, 423–24 (1987). So, by both purpose and defined scope, public nuisance claims allow governmental entities to obtain relief for a broader swath of the population, including relief for those who have not used a particular product but nonetheless have suffered an unreasonable interference with the public health or welfare of their community.

Our view of West Virginia's common law also does not change after considering the decisions from other state courts cited by the defendants, namely, the Oklahoma Supreme Court's decision in *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021) (the Oklahoma decision); the Supreme Court of Ohio's decision in *In re Nat'l Prescription Opiate Litig.*, 2024 WL 5049302 (Ohio Dec. 10, 2024) (the Ohio decision); and the Supreme Judicial Court of Maine's decision in *E. Maine Med. Ctr. v. Walgreen Co.*, 331 A.3d 380 (Me. 2025) (the Maine decision). As an initial matter, the decisions from Ohio and Maine are readily distinguishable from the present case.

In the Ohio decision, the state high court held that an Ohio statute "abrogate[d] a common-law claim of absolute public nuisance resulting from the sale of a product." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 5049302, at *1. In contrast, West Virginia has not enacted any relevant state statutes restricting the common law of public nuisance in this manner.

The state high court in the Maine decision addressed a public nuisance claim brought by "*private*" entities, which were non-profit hospitals, against opioid marketers

and distributors.  *E. Maine Med. Ctr.*, 331 A.3d at 391–93 (emphasis added).  The court held that the hospitals failed to state a claim because they failed to allege injuries "sufficiently particular" to the hospitals and distinct from the injuries to the public.  *Id.* at 393.  Because the present case was filed by local governments, which are public entities, the Maine decision is inapposite.[16]

The Oklahoma decision, however, addressed the merits of the issue before us. There, in a case brought by the state against various opioid manufacturers, the state high court held that Oklahoma "public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids."  *Hunter*, 499 P.3d at 721.  That court explained that "[f]or the past 100 years, [Oklahoma courts], applying Oklahoma's nuisance statutes, ha[ve] limited Oklahoma public nuisance liability to defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable."  *Id.* at 724.  The Oklahoma court therefore declined to "extend Oklahoma public nuisance law to the manufacturing, marketing, and selling of prescription opioids."  *Id.* at 729–30.

The Oklahoma court's decision, however, does not impact our conclusion in the present case.  The Oklahoma high court was required to interpret Oklahoma's public

---

[16]  We also observe that, in footnote 6 of the Maine decision, the Maine high court suggested in dictum that "public nuisance claims based on dangerous consumer products are better presented as product liability claims," citing the Restatement (Third) of Torts: Liability for Economic Harm § 8 cmt. g (A.L.I. 2020).  *E. Maine Med. Ctr.*, 331 A.3d at 393 n.6.  As previously explained, the State Supreme Court has not adopted the Restatement (Third) in this context.  Thus, we do not consider the Maine dictum persuasive on this issue.

nuisance statutes, and we are required to predict how West Virginia's high court would decide an issue of West Virginia common law. Decisions from other courts of last resort are entitled to respect but do not have any controlling effect in deciding questions of West Virginia law. *State v. Blatt*, 774 S.E.2d 570, 579 (W. Va. 2015) (citing *Burless v. W. Va. Univ. Hosps., Inc.*, 601 S.E.2d 85, 94 n.9 (W. Va. 2004)). Additionally, we observe that courts in other jurisdictions have not reached a consensus regarding whether a plaintiff can state a public nuisance claim based on the distribution of opioids. *Compare Hunter*, 499 P.3d at 731 (rejecting "novel theory-public nuisance liability for the marketing and selling of a legal product, based upon the acts not of one manufacturer, but an industry") *with Alaska v. Express Scripts, Inc.*, No. 3:23-CV-00233-JMK, 2024 WL 2321210, at *2 (D. Alaska May 22, 2024) ("[P]ublic nuisance claims need not be property-based and a claim may be based on the use of a lawful product under Alaska law.") *and City and Cnty. of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 998 (2022) (permitting claim that "Walgreens is liable for substantially contributing to the public nuisance—the ongoing opioid epidemic—in San Francisco") *and King Cnty. v. Express Scripts, Inc.*, No. 24-CV-49-BJR, 2025 WL 1082130 (W.D. Wash. Apr. 10, 2025) (denying a motion to dismiss a county's public nuisance claim related to distribution of opioids).

We hold that West Virginia's highest court would not exclude as a matter of law any common law claim for public nuisance caused by the distribution of a controlled substance. Therefore, we necessarily conclude that the district court erred when it held that a public nuisance claim based on the distribution of opioids was per se legally insufficient under West Virginia law.

B.

We now consider the local governments' challenge to the district court's alternative holding, namely, that their public nuisance claims fail on their merits.  As set forth above, to assert a public nuisance claim under West Virginia law, the local governments must show that (1) the defendants unreasonably interfered with a public right, Restatement (Second) of Torts § 821B & cmt. g (A.L.I. 1979); *see also Duff*, 421 S.E.2d at 257 & n.6; (2) the defendants were a proximate cause of the plaintiffs' injury, *Sergent v. City of Charleston*, 549 S.E.2d 311, 320 (W. Va. 2001); Restatement (Second) of Torts § 821B cmt. e (A.L.I. 1979); and (3) there is a remedy that will abate the nuisance, *see Moats*, 859 S.E.2d at 383–84.  The district court determined that the local governments failed to satisfy any of these three elements.  We address each element in turn.

1.

To create a public nuisance under West Virginia law, an act or condition must cause "unreasonable interference" with a public right, such as the right to public health. Restatement (Second) of Torts § 821B(1) (A.L.I. 1979); *see also Duff*, 421 S.E.2d at 257 & n.6; *Kermit Lumber*, 488 S.E.2d at 925 (explaining that public nuisance action ordinarily seeks abatement of a harm affecting public health and safety).  One means of demonstrating an unreasonable interference with a public right is to show that a defendant's act or causal contributions to that act were "unlawful."  *See West v. Nat'l Mines Corp.*, 285 S.E.2d 670, 677 (W. Va. 1981); *Kermit Lumber*, 488 S.E.2d at 921; Restatement (Second) Torts §

32

821B(2)(b) (A.L.I. 1979) (explaining that conduct is unreasonable if "proscribed by a statute, ordinance or administrative regulation").

An alternative means of analyzing whether a defendant unreasonably interfered with a public right is having the trial court perform a balancing test, in which the court determines whether the utility of the defendants' conduct is greater than the gravity of, and the ability to avoid, the potential harm that may result from the defendant's conduct. *See Duff*, 421 S.E.2d at 257 & n.5; *see also* Restatement (Second) of Torts § 821B cmt. e (A.L.I. 1979). However, use of this alternative test presupposes that the defendants' conduct at issue was lawful. *See N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 482 (E.D.N.Y. 2003) (applying New York law); *Moore's v. Steve's Outboard Serv.*, 339 P.3d 169, 171 (Wash. 2014) (citation omitted); *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 173 (Miss. 1999).

The district court used this alternative "balancing test" in determining that the defendants did not unreasonably interfere with a public right. *Huntington*, 609 F. Supp. 3d at 475. The court explained its conclusion, stating that "the distribution of medicine to support the legitimate medical needs of patients as determined by doctors exercising their medical judgment in good faith cannot be deemed an unreasonable interference with a right common to the general public." *Id.*

Because the balancing test used by the district court only applies when the defendant's conduct complies with governing law, we first consider the issue whether the

district court correctly interpreted the distributors' duties under the Act.[17]   The court's understanding of those duties formed the basis of the court's determination that the defendants' conduct substantially complied with the Act's requirements and did not interfere with a public right.

The local governments assert that the district court erred as a matter of law in concluding that the Act only requires the distributors to maintain effective controls against supplying pharmacies that essentially serve "as adjuncts of the illicit market."  According to the local governments, the Act and corresponding regulations require the distributors to review each order for opioids placed by each pharmacy and to assess whether each order is "suspicious," as defined in the Act.  They argue that the defendants engaged in unlawful conduct under the Act by failing to stop "suspicious" orders placed by individual pharmacies.  So, the local governments contend that having misconstrued the distributors' duties under the Act, the court was unable to accurately assess whether the distributors' actions substantially complied with the Act's requirements and, thus, were lawful.

The defendants take issue with the local governments' view of the defendants' duties under the Act and assert that the district court correctly held, as a matter of law, that the distributors' obligations under the Act are limited to taking measures to prevent supplying pharmacies that essentially serve "as adjuncts of the illicit market."  Thus, the

---

[17]   We disagree with the local governments' assertion on appeal that the balancing test applies only in the context of private nuisance.  West Virginia has adopted the Restatement (Second) of Torts, which discusses applications of a balancing test in the context of public nuisance.  *See* Restatement (Second) of Torts §§ 821B cmt. e, 926–31 (A.L.I. 1979).

34

distributors ask us to reject any interpretation of the Act that would require them to take action other than to ensure that they sell opioids only to "legitimate" pharmacies. We disagree with the distributors' argument.

As set forth above, the DEA will not "register" a distributor within the closed regulatory system for controlled substance distribution if such registration is against the public interest. 21 U.S.C. § 823(b). Public interest considerations include whether the distributor has maintained "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." *Id.* § 823(b)(1). Under the implementing regulations, distributors must provide "effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). To evaluate a registrant's compliance with Section 1301.71(a), the DEA must determine whether the distributor has "[s]ubstantial[ly] compl[ied]" with certain security procedures under the Act and the Act's implementing regulations. *Id.* § 1301.71(b).

Before doing business with a pharmacy, distributors are required to assess whether that pharmacy is operating in a manner reflecting compliance with its statutory and regulatory duties. *See* 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.71(a). But the distributors also are required to develop a system to disclose to the DEA their receipt of "suspicious *orders*" from any pharmacy. 21 U.S.C. § 832(a); 21 C.F.R. § 1301.74(b) (emphasis added); *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 216 (D.C. Cir. 2017); *see also Southwood Pharm., Inc.*, 72 Fed. Reg. 36487, 36501 (DEA July 3, 2007).

The regulations explain that an order is "suspicious" when it is "of unusual size," deviates "substantially from a normal pattern," or occurs with "unusual frequency." 21 C.F.R. § 1301.74(b). So, the Act imposes on distributors a duty to develop procedures to scrutinize for suspicious activity the individual orders placed by customer pharmacies. *See Masters*, 861 F.3d at 216. And when orders are deemed "suspicious," as defined by the Act and its accompanying regulations, distributors must report those orders to the DEA. *See* 21 C.F.R. § 1301.74(b). As the D.C. Circuit further has explained, "[o]nce a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order." *Masters*, 861 F.3d at 212–13.

After reviewing the distributors' statutory and regulatory duties to prevent diversion, we hold that the district court committed legal error in construing the scope of the distributors' obligations under the Act. The Act directs that distributors develop a system to examine for indicia of diversion the *individual orders* of controlled substances placed by customer pharmacies. *Id.* This statutory duty is ongoing and applies to each order of controlled substances that a distributor receives from a customer pharmacy. The duty is not limited, as the district court held, to examining whether a pharmacy essentially is serving as an "adjunct[] of the illicit market." *Huntington*, 609 F. Supp. 3d at 477.

The Act thus assigns to the distributors a straightforward, but vital, role in helping the DEA combat drug diversion. As the court in *Masters* explained, the distributors have a duty under the Act to design and operate a system to detect suspicious orders of controlled substances and to report such orders to the DEA, "so that DEA 'investigators in the field'

36

can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out 'potential illegal activity.'"  861 F.3d at 212 (quoting *Southwood*, 72 Fed. Reg. at 36501).  The distributors, therefore, serve a crucial function under the Act to proactively identify irregular orders long before a pharmacy accurately may be characterized as an "adjunct of the illicit market."

If the distributors' duties under the Act were as limited as the district court held, the Act's purpose to prevent diversion of controlled substances would be substantially undermined.  By requiring that distributors review pharmacy orders for controlled substances individually for indicia of diversion, the Act requires a more granular review of such orders than the standard employed by the district court.  As noted above, the regulatory definition of a "suspicious" order requires a distributor to evaluate each order for controlled substances received from a customer pharmacy with regard to the size of the order, any deviation from the pharmacy's normal ordering pattern, and whether orders have occurred with unusual frequency.  21 C.F.R. § 1301.74(b).  Examining these criteria permits the distributors to detect irregularities at an earlier time, rather than waiting for the effects of oversupply and diversion to become apparent at the individual pharmacy level or in the community at large.  At the point that a pharmacy is found to be operating essentially as an "adjunct of the illicit market," much of the damage of oversupply and diversion already has been done.  So, the Act emphasizes the importance of recognizing a problem of oversupply and potential diversion before their cumulative effects place an effective solution beyond reach.

When the district court found that the distributors substantially complied with their duties under the Act and did not unreasonably interfere with a public right, those findings necessarily were based, at least in part, on the court's incorrectly narrow perception of what those duties were. *See Heyer*, 984 F.3d at 355. And as a result of the court applying the incorrect legal standard, we cannot determine whether the court erred in applying a balancing test premised on the conclusion that the distributors' complied with the law in discharging their duties under the Act. Thus, we vacate the district court's finding that the local governments failed to prove that the distributors unreasonably interfered with a public right, and we remand that issue to the district court for determination in the first instance under the correct legal standard. *See id*.

## 2.

The district court's failure to consider all the duties imposed on the distributors under the Act and corresponding regulations also affected the court's analysis of proximate causation. Under West Virginia law, a defendant can be held liable for public nuisance only if its actions, or conditions caused by its actions, were a proximate cause of the plaintiff's injury. *Duff*, 421 S.E.2d at 257, 261. To qualify as a proximate cause of an injury, the defendant's act or acts must contribute in uninterrupted sequence to the injury and be conduct without which "the injury would not have occurred." *Sergent*, 549 S.E.2d at 320 (citation omitted); *McCoy v. Cohen*, 140 S.E.2d 427, 437–38 (W. Va. 1965). There may be more than one proximate cause of an injury arising from more than one act by more than one person. *Yates v. Mancari*, 168 S.E.2d 746, 753 (W. Va. 1969). In such cases, those separate and distinct acts must "directly and immediately contribute" to the injury so

38

as to be deemed an "efficient cause of the injury." *Id.* (quoting *Wilson v. Edwards*, 77 S.E.2d 164, 167 (W. Va. 1953)).

On appeal, the defendants urge us to affirm the district court's conclusion that the local governments failed to show that the distributors' conduct was a proximate cause of the harm that occurred. Also part of the court's analysis was its conclusion that "overprescribing by doctors, dispensing by pharmacists of [ ] excessive prescriptions, and diversion of the drugs to illegal usage" were intervening causes, breaking the chain of causation between the distributors' conduct in shipping prescription opioids to their customer pharmacies and the harms alleged by the local governments. *Huntington*, 609 F. Supp. 3d at 481–82. Relying on the district court's analysis, the defendants maintain that, as a matter of law, their conduct was too remote to be a proximate cause of the claimed injuries. We disagree with the defendants' position.

The district court's holding that the distributors' conduct was not a proximate cause of the harm rested, in part, on the court's improperly narrow view of the distributors' duties under the Act. As explained above, the Act and implementing regulations require distributors to develop a system to disclose, and to inform the DEA of, individual "suspicious orders." 21 C.F.R. § 1301.74(b). In focusing on a duty to determine whether a pharmacy conducted its operations essentially "as adjuncts of the illicit market," the district court failed to account for the full scope of documentary evidence indicating that the distributors frequently raised the opioid ordering limits for particular pharmacy customers. Based on this conduct, the distributors potentially allowed some "suspicious"

39

orders to be sent to those pharmacies without prior investigation and without reporting those orders to the DEA.

For example, as noted above, the documentary record shows that Amerisource "made adjustments" to a particular pharmacy's numerical limit because opioids were "the primary business" for that pharmacy customer. Less than a year later, the DEA blocked that same pharmacy from purchasing opioids.

The documentary record also shows that Cardinal, like Amerisource, often increased pharmacies' threshold limits when the pharmacies were close to exceeding their then-existing limits. And McKesson employees described that company's practice of threshold limit increases as "almost automatic," "too easily accept[ed]," and sometimes done without even a customer's request. J.A. 3568. In fact, in one instance, McKesson appeared to raise a pharmacy's threshold limit by roughly 30 percent because that pharmacy was aggressively marketing its opioid business to doctors, including Dr. Philip Fisher, one of the doctors who lost his medical license, and to an owner of a pain clinic.

There also are other questions that arise from the documentary record. The record shows that, in some cases, the distributors submitted to the DEA as "suspicious" only a small number of orders in relation to the total number that initially exceeded the distributors' threshold limits. For instance, as noted above, over a four-year period, Amerisource received 775 orders from a single pharmacy in Cabell County that exceeded Amerisource's threshold limits for that customer. However, Amerisource reported only 16 of those orders to the DEA as being "suspicious." And an Amerisource employee's deposition indicated that Amerisource warned certain pharmacy customers that they were

close to exceeding their threshold limit and needed to request a numerical increase to avoid "a bunch of orders [being] reported to the DEA." J.A. 1205–08.

Without accounting for such documentary evidence of repeated threshold limit increases and irregular reporting practices, the district court could not properly assess whether the distributors' actions caused numerous orders placed by pharmacies to evade being flagged as "suspicious." As one McKesson employee acknowledged, "[u]sing common sense and basic logic, you could assume the more pills that are out there, the more potential for diversion there could be." J.A. 1198.

Under a proper understanding of the Act's requirements, consideration of this evidence could have altered the district court's conclusion that "[n]o culpable acts by defendants" caused the harm resulting from opioid diversion. Therefore, on remand, as part of any proximate cause analysis, the district court should address the documentary record of the distributors' pattern of threshold limit increases and their impact on the duty to report "suspicious" orders to the DEA in determining whether the local governments proved that the distributors were a proximate cause of the injury alleged.

The district court's error in interpreting the distributors' duties under the Act also is reflected in the court's failure to consider the distributors' acts in relation to "outlier" prescribing doctors who were responsible for prescribing about 40 percent of the opioids in Cabell County. The fact that the distributors did not interact directly with the "outlier" doctors did not automatically shield the distributors from any liability regarding the acts of those downstream prescribers. The recent decision in *A.D.A. v. Johnson & Johnson* illustrates this principle of West Virginia law that even an act removed from the prescribing

41

and ingestion of opioids can still be a proximate cause of an injury. 912 S.E.2d 37, 63–64 (W. Va. Ct. App. 2024). There, the West Virginia Intermediate Court of Appeals explained that an opioid manufacturer was not, as a matter of law, excluded from the chain of proximate causation in a products liability case simply because of the downstream acts of the prescribing doctors and the mothers who actually took the drugs. *Id.*

As noted above, Lacey Keller, a data analytics expert, testified that the "top 1 percent of prescribers" in Cabell County "prescribed upwards of over 40 percent of [opioid] dosage units . . . in a given year." J.A. 2483. Keller also testified, and the distributors did not dispute, that the distributors "had access to dispensing data . . . that would [have] allow[ed] them to identify outlier prescribers." J.A. 2487. Moreover, one local pharmacy sent an email to Amerisource identifying three "outlier" prescribers, including Dr. Webb and Dr. Fisher.

Additionally, Dr. Joseph Rannazzisi, a former Deputy Assistant Administrator for the DEA's Office of Diversion Control, testified that "[i]t takes only a few untrained or unscrupulous physicians to create . . . large pockets of addicts." J.A. 2419. In view of this evidence, including the evidence of the distributors' access to the dispensing data and Amerisource's receipt of information identifying certain doctors as prescribers of an unusual amount of opioids, the district court should not have excluded the distributors' conduct from being a proximate cause of the injury without considering the distributors' use, if any, of their "suspicious" order monitoring systems to review orders from pharmacies that supplied these "outlier" prescribers.

We turn now to consider the district court's determination regarding "intervening causes." Despite concluding that "[n]o culpable acts by defendants caused an oversupply of opioids in Cabell/Huntington," the district court further determined that "overprescribing by doctors, dispensing by pharmacists of the excessive prescriptions, and diversion of the drugs to illegal usage" were "all effective intervening causes beyond the control of the defendants." *Huntington*, 609 F. Supp. 3d at 476, 482. Given that the district court explicitly found that the distributors were not negligent or, in the court's wording, not "culpable," the court's "effective intervening cause" analysis can be viewed either as surplusage or as an unstated alternative holding. Because this case will be returned to the district court for further proceedings, we treat the court's "effective intervening cause" determination as an alternative holding, namely, that even if the distributors were negligent, the acts of the pharmacies, doctors, and certain individuals engaged in diversion all were intervening causes of the opioid oversupply beyond the control of the distributors, rendering the distributors' acts too remote to be a proximate cause of the injury.

Under West Virginia law, care must be taken not to label a downstream cause of an injury as an intervening cause breaking the chain of causation if that cause was foreseeable by the upstream actor. As the State Supreme Court explained in *Boyce v. Monongahela Power Co.*, 894 S.E.2d 913 (W. Va. 2023), a "tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were *reasonably foreseeable* by the original tortfeasor at the time of [its] negligent conduct." *Id.* at 923 (quoting *Anderson v. Moulder*, 394 S.E.2d 61, 64 (W. Va. 1990)) (emphasis in *Boyce*); *see Wal-Mart Stores E., L.P. v. Ankrom*, 854 S.E.2d 257,

270 (W. Va. 2020).  However, an intervening act may result in a tortfeasor's negligence being too remote to be a proximate cause of an injury if the intervening act "constitutes a new effective cause and *operates independently of any other act*, making it and it only, the proximate cause of the injury."  *Marcus v. Staubs*, 736 S.E.2d 360, 372 (W. Va. 2012) (emphasis added) (citation omitted); *see also Robertson v. LeMaster*, 301 S.E.2d 563, 569–70 (W. Va. 1983) (citing *Perry v. Melton*, 299 S.E.2d 8, 9 (W. Va. 1982)).  A defendant has the burden of proving that an intervening cause was the sole proximate cause of the injury.  *See Sydenstricker v. Mohan*, 618 S.E.2d 561, 568 (W. Va. 2005).

A true intervening cause, therefore, breaks the causation chain begun by the original tortfeasor's negligent act.  *See Webb v. Sessler*, 63 S.E.2d 65, 68–69 (W. Va. 1950).  Because an intervening cause in a tort claim must operate independently of any other negligent or intentional act, a trial court must examine the evidence of potential proximate causes with relation to one another before determining whether a particular act operated independently of any other act.  *See, e.g.*, *Marcus*, 736 S.E.2d at 372.  Likewise, in considering whether a defendant's acts were too remote to be a proximate cause of an injury, a trial court must examine the ongoing, repeated nature, if any, of the defendant's acts and the other acts in the chain of causation.  *See id.*; *see also Ankrom*, 854 S.E.2d at 270.  Accordingly, the district court should have evaluated these factors, and the foreseeability of the actions of the pharmacies, doctors, and individuals engaged in diversion, before alternatively concluding that those three factors were "effective intervening" causes that rendered the distributors' conduct too remote to be a proximate cause of the harm caused to the general public.

44

We therefore vacate the court's conclusion that three "effective intervening causes" rendered the distributors' acts too remote to be a proximate cause of the alleged harm. On remand, any discussion of remoteness by the district court will need to consider, under the correct legal standard of the distributors' duties, the interaction of the distributors' conduct with the conduct of the other actors in the closed regulatory system, as well as the foreseeability of the intervening acts, to determine whether the distributors' actions operated in conjunction with the acts of the customer pharmacies and the "outlier" doctors as a proximate cause of the injury alleged.

3.

Finally, we address the issue of abatement. In the present case, the local governments seek as a remedy for their public nuisance claims abatement of the widespread addiction, diversion, and related effects of the opioid epidemic that have impacted their communities for more than a decade. *See supra* at 16–17. The local governments request about $2.5 billion to implement measures related to (1) prevention of opioid addiction, (2) treatment of addiction, (3) recovery from addiction, and (4) special aid needed for certain vulnerable populations in the local governments' communities. In particular, the local governments seek funds to develop inpatient and outpatient treatment facilities for individuals addicted to opioids and individuals at risk of becoming addicted to opioids. They also request funds to establish "drug courts," vocational training, and mental health counseling to "enhance public safety" and to help those affected by addiction reintegrate into their communities. According to the proposed abatement plan, the local governments

predict that these measures will be necessary for at least 15 years to abate opioid-related addiction, crime, death, and disease in the local governments' communities.

The defendants, however, urge us to adopt the district court's analysis, in which the court found that the local governments' request for abatement was legally flawed for two reasons. First, the district court held that abatement is appropriate only to eliminate a defendant's wrongful conduct and is not appropriate to address harmful conditions resulting from such conduct. *See Huntington*, 609 F. Supp. 3d at 482–83. And because the local governments sought "recovery for the extensive harms of opioid abuse and addiction," and not to stop the distributors from shipping additional, excessive quantities of opioids, the district court found that the local governments' request exceeded the proper scope of abatement. *Id.* Second, the district court characterized the plaintiffs' proposed abatement plan as a request for monetary damages, which the court concluded is not a proper abatement remedy. *Id.* at 484. We disagree with the district court's conclusions.

At the outset, we observe that the State Supreme Court has not addressed directly whether abatement, which is an equitable remedy, can include a demand for monetary payment to develop facilities and programs for use in ameliorating the conditions comprising a public nuisance. *See Moats*, 859 S.E.2d at 384 (acknowledging that some courts "have recognized that an injunction may entail the payment of money by a defendant"). However, based on our review of West Virginia law, we predict that the State Supreme Court would allow the remedy of abatement to encompass acts to eliminate a public nuisance and would permit a monetary award to fund such abatement efforts. *See Rhodes*, 636 F.3d at 97–98.

46

First, the State Supreme Court has explained that a public nuisance is "an act or *condition* that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Kermit Lumber*, 488 S.E.2d at 921 (emphasis added) (quoting *Sharon Steel*, 334 S.E.2d at 620). The State Supreme Court also has explained that a public nuisance "continu[es]" until the "*harm*" is abated. *Id.* at 924–25 (emphasis added) (holding that statute of limitations will not accrue "until the arsenic levels . . . no longer endanger the public health, safety and the environment" (citation omitted)); *see also* Restatement (Second) of Torts § 834 cmt. e (A.L.I. 1979) (describing liability for continuing harms). And the court has suggested that abatement is appropriate to remedy the conditions that have resulted in the public nuisance. *See Kermit Lumber*, 488 S.E.2d at 925 n.29 (explaining that the harm would continue beyond abatement of "the acts of the persons" causing the harm).

The State Supreme Court also has stated that a court may require a party whose actions create a nuisance "to remedy the conditions *giving rise to* the nuisance." *West*, 285 S.E.2d at 678 (emphasis added); *see also Kermit Lumber*, 488 S.E.2d at 925 n.29 (explaining that in the context of a public nuisance action to remediate a business site containing hazardous waste, "[t]he object of a public nuisance action is to abate or stop the harm to the public health, safety and the environment[,] which will continue until the hazardous waste is removed rather than until the acts of the persons in placing the hazardous waste in the soil abate" (internal quotation marks omitted)). Upon consideration of the foregoing principles of West Virginia law, we hold that, under West Virginia law, the remedy of abatement may be applied both to compel the cessation of wrongful conduct

47

*and* to provide for the remediation of harmful conditions caused by that conduct. *See Kermit Lumber*, 488 S.E.2d at 921, 925 n.29.

We further conclude that West Virginia law permits abatement of a public nuisance to include a requirement that a defendant pay money to fund efforts to eliminate the resulting harm to the public. West Virginia has long characterized abatement as an equitable remedy. *See Hartley v. Henretta*, 13 S.E. 375, 375–76 (W. Va. 1891). And notably, the goal of abatement in a public nuisance case is to repair a public right that has been damaged by a defendant. *Cf. Town of Weston v. Ralston*, 36 S.E. 446 (W. Va. 1900). Courts have broad powers to effect equitable relief, *see Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), and we have not found anything in West Virginia law to suggest that the State Supreme Court would limit abatement to include purely declaratory or injunctive relief. In fact, the State Supreme Court has suggested that a nuisance can be abated "by the expenditure of labor or money, by the defendant."[18] *Kermit Lumber*, 488 S.E.2d at 923 n.26 (citation omitted). And we observe, as a practical consideration, how can widespread harm to the general public be abated without some cost incurred or money spent?

In view of these considerations, we hold that the district court erred (1) in concluding that abatement is limited under West Virginia common law to ordering the cessation of the conduct that caused the nuisance, and (2) in holding that the local

---

[18] We also observe that at least two of our sister circuits have held that injunctions that "compel expenditures of money" may be "permissible forms of equitable relief." *United States v. Price*, 688 F.2d 204, 213 (3d Cir. 1982); *see also United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009) ("That equitable remedies are always orders to act or not to act, rather than to pay, is a myth; equity often orders payment.").

48

governments' abatement request is barred per se as a request for money damages. We observe that on remand, if the district court reaches the issue of abatement, the court should analyze the plaintiffs' proposed abatement plan on its merits to determine whether all aspects of the plan are reasonably calculated to abate the public nuisance. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 266, 268 (3d Cir. 2005). The district court is empowered within its authority to strike aspects of the plan and to make equitable reductions to the estimated abatement costs.[19] *See id.* at 268.

### III.

For these reasons, we vacate the district court's judgment and remand the case for further proceedings consistent with the principles expressed in this opinion.

*VACATED AND REMANDED*
*WITH INSTRUCTIONS*

---

[19] We have reviewed the defendants' additional arguments raised in this appeal and conclude that they lack merit.